# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES, LLC, a Delaware entity, MAO-MSO RECOVERY II, LLC, a Delaware entity, and MSPA CLAIMS 1, LLC**,** a Florida entity,<br><br>Plaintiffs,<br>v.<br><br>SANOFI AVENTIS U.S. LLC, NOVO NORDISK   INC., and ELI LILLY AND COMPANY,<br><br>Defendants. | CASE NO.:<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 3

PARTIES ........................................................................................................................... 9

STANDING ..................................................................................................................... 12

JURISDICTION AND VENUE ...................................................................................... 13

FACTUAL ALLEGATIONS ......................................................................................... 14

    Insulin Therapy for Diabetics ................................................................................ 14

    The Dramatic Rise in the Price of Analog Insulin ............................................... 15

Medicare ......................................................................................................................... 17

    Medicare Part D ...................................................................................................... 17

    The False Claims Act .............................................................................................. 20

    The Anti-Kickback Statute ("AKS") ...................................................................... 20

The Insulin Pricing Scheme ......................................................................................... 22

    Defendants' Concealment of the Insulin Pricing Scheme .................................... 22

    Pharmaceutical Supply Chain Overview .............................................................. 23

The Insulin Pricing Scheme: Rebates Gone Awry ..................................................... 25

The List/Net Price Divergence .................................................................................... 26

The Rise of the PBMs in the Pharmaceutical Supply Chain .................................... 29

Defendants Admit the Insulin Pricing Scheme .......................................................... 31

High List Prices Directly Impact Plaintiffs' Ability to Provide Benefits................ 33

Medicare Part D Payment Submission Process .......................................................... 35

TOLLING OF THE STATUTE OF LIMITATIONS ................................................. 37

    DISCOVERY RULE TOLLING ............................................................................ 37

    FRAUDULENT CONCEALMENT TOLLING .................................................... 37

    ESTOPPEL .............................................................................................................. 37

CLAIMS FOR RELIEF ................................................................................................ 38

    COUNT II: VIOLATIONS OF 18 U.S.C. §1962(c) AND (d) OF THE RACKETEER
    INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ.46

    (Novo Nordisk Inc.) ................................................................................................ 46

    COUNT III: VIOLATIONS OF 18 U.S.C. §1962(c) AND (d) OF THE RACKETEER
    INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ.54

    (Eli Lilly and Company) ......................................................................................... 54

    COUNT V: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS .............. 63

**(All Defendants)** ........................................................................................... **63**

    **ARIZONA CONSUMER FRAUD ACT** ........................................................ **63**

    **DELAWARE CONSUMER FRAUD ACT** ...................................................... **65**

    **FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES ACT** ............. **67**

    **ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT** .......................................................................................................................... **69**

    **MINNESOTA PREVENTION OF CONSUMER FRAUD ACT** .................... **71**

    **MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT** ........... **73**

    **MISSOURI MERCHANDISING PRACTICES ACT** ................................... **75**

    **THE NEW JERSEY CONSUMER FRAUD ACT** ......................................... **77**

    **THE NEW MEXICO UNFAIR TRADE PRACTICES ACT** ......................... **79**

  **COUNT VI: COMMON LAW FRAUD** ............................................................. **81**

  **COUNT VII: UNJUST ENRICHMENT** ........................................................... **83**

**DEMAND FOR JUDGMENT** ................................................................................ **84**

**JURY DEMAND** ..................................................................................................... **85**

## COMPLAINT

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC, a Delaware entity, MSPA CLAIMS 1, LLC, a Florida entity, and  MAO-MSO RECOVERY II, LLC, a Delaware entity ("Plaintiffs"), bring this action against Defendants Sanofi-Aventis U.S. LLC ("Sanofi"), Novo Nordisk Inc. ("Novo Nordisk"), and Eli Lilly and Company ("Eli Lilly")  (collectively, "Defendants") to redress Plaintiffs' injuries due to Defendants' insulin pricing scheme, which has driven up the cost of insulin to the substantial benefit of Defendants. Plaintiffs' allegations, proof and statistical data presented in this complaint are based on their own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, reports, and other sources.

## INTRODUCTION

1.      Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with the condition. In total, nearly 30 million people, 9.3% of the country, live with diabetes. Of this number, approximately six million people rely on daily insulin treatments to survive. Interruptions to or interference with insulin therapy (e.g., insufficient insulin) can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia (hyperosmolar hyperglycemic state or "HHS") and then diabetic ketoacidosis ("DKA"). Left untreated, DKA can lead to loss of consciousness and death within days. DKA is responsible for more than 500,000 hospital stays per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.

2.      As alleged in detail below, numerous third-party payers, including Medicare Advantage Organizations ("MAOs"), health maintenance organizations ("HMOs"), management service organizations ("MSOs"), independent practice associations ("IPAs"), and other Medicare downstream entities across the United States have assigned their rights to Plaintiffs to recover payments for fraudulently-inflated prescriptions.

3.      As alleged in greater detail below, Defendants Sanofi, Novo Nordisk, and Eli Lilly ("Defendants") manufacture analog insulin, the current standard of care for diabetes treatment in the United States and its territories.

4.      In addition to the cost of analog insulin, most diabetics must also spend hundreds of dollars on other diabetes supplies (e.g., test strips, glucose meters, syringes, pen needles, infusion sets, and/or pods to administer their insulin).

5.      Over the course of the last decade, each Defendant has steadily raised the list prices of its respective analog insulin to a remarkable degree.

6.      Drugs that used to cost $25 per prescription now cost between $250 and $450, and in the last five years alone, Defendants have raised their list prices for analog insulin by over 150%.

7.      Defendants' analog insulin list price increases have been both rapid and in lock-step with one another.

8.      The skyrocketing list prices for insulin cannot be explained away with typical drug company rationalizations for high costs, such as manufacturing or supply costs.

9.      Indeed, the manufacturers admit that their list price hikes are unrelated to any jump in production or research and development costs.

10.     Instead, the increased list prices are the result of a scheme between the Defendants and the largest Pharmacy Benefit Managers ("PBM(s)"), including those identified below as

unnamed co-conspirators. In this scheme (the "Insulin Pricing Scheme"), Defendants and the PBMs agree on three different prices for their insulin treatments: (1) a publicly-available "list" price, (2) a discount price at which the third-party payors using the PBMs will purchase the drugs, and – most importantly – (3) a secret "net" price that reflects a rebate, *viz.* kickback, that the Defendants will later pay to the PBMs, the amount of which neither the Defendants nor the PBMs will disclose to the third-party payors. pay for the drugs.

11.   For analog insulin, the gap between these prices has significantly increased.

12.   To understand the Insulin Pricing Scheme, and the reason it is so profitable for Defendants, it is first necessary to understand the role of PBMs in the pharmaceutical supply chain in the United States.

13.   The PBMs serve as both middlemen and gatekeepers between drug manufacturers on the one hand, and health insurers and patients on the other.

14.   PBMs set up tiered formularies for their third party payers clients.

15.   Whether a drug appears on a third-party payer's formulary – and in which tier – determines if, and to what proportion, the third-party payor will bear the cost of the drug for its beneficiaries. Drugs in lower tiers are available to beneficiaries at a lower out-of-pocket cost than drugs in the higher tiers.

16.   Where two medicines are largely interchangeable from a clinical standpoint, a PBM will exclude one of them or place it on a higher, less preferred tier. The purpose for all of this is supposed to be to encourage beneficiaries to use those drugs which the third-party payor can obtain at a lower cost.

17.   Conversely, however, the PBMs' power to place drugs at specific formulary tiers, combined with the scale of consumption that PBMs manage for all the beneficiaries across their

many third-party payer clients, gives the PBMs great bargaining power over drug manufacturers. This power can cause a manufacturer to lower its prices in exchange for the drug's listing on a more favorable tier *vis-à-vis* its competitors in a therapeutic class. In some instances, the PBM may grant a manufacturer an exclusive listing for a drug, such that a beneficiary wishing to use a competing drug would have to pay full price, with no negotiated discount, out-of-pocket.

18.     While PBMs could and should use their market power to drive down drug prices for third-party payers and their beneficiaries the PBMs and Defendants have implemented the Insulin Pricing Scheme to cause third-party payers, and their beneficiaries, to unwittingly fund both inflated drug prices and kickbacks to the PBMs.

19.     In the more transparent phase of the Insulin Pricing Scheme, the Defendants artificially set a "list" price. The PBMs then obtain a discount price from the Defendants, and often get paid a fee from third-party payers for purportedly using their market power to obtain the discount. This discounted price is known to all, and is the basis for which a beneficiary's out-of-pocket expenses are determined.

20.     What is not fully known to the third-party payers (or their beneficiaries) is how much of a kickback the Defendants separately pay to the PBMs, a further effective reduction in price that is not fully realized by the third-party payers (or their beneficiaries).

21.     These kickbacks are given different labels—rebates, credits, concession fees, etc. Regardless of the label, the kickbacks are a *quid pro quo* to the PBM for formulary inclusion and/or preferred tier placement.

22.     In the context of this complaint, the kickbacks include all payments or financial benefits of any kind conferred by Defendants to PBMs, either directly or indirectly via intermediaries controlled by Defendants.

23.     The result of the Scheme is a wide difference between the list price and the final, secret net price realized by Defendants after the kickbacks are paid.

24.     While the PBMs <u>may</u> pass a portion of kickbacks on to some of their third-party payer clients, the PBMs will not disclose the amount of the kickbacks it receives from the Defendants.

25.     As a result of the Scheme and its lack of transparency, the Defendants are able to obtain or maintain formulary status without any significant reduction in profits, while forcing third-party payers (and their beneficiaries) to pay not just for the drugs, but also for the undisclosed kickbacks that are paid to the PBMs.

26.     To make matters worse, since the Defendants are not competing to transparently reduce the price of the drugs to third-party payers, but instead are competing to offer the PBMs greater hidden kickbacks, the prices of the each of the Defendants' drugs – both the "list" price and the "discount price" – have risen steadily, a phenomenon which has no legitimate economic cause.

27.     In an investigative piece published in 2016, exploring the role of middlemen PBMs in skyrocketing insulin prices, the Wall Street Journal used the following graph to illustrate the price gap for Lantus, Defendant Sanofi's top-selling insulin:



Denise Roland, *Insulin Prices Climb, Fueled by Middlemen*, Wall Sᴛ. J., Oct. 10, 2016.

28.      If the relationship between the Defendant manufacturers, PBMs, and consumers (meaning third-party payors and their beneficiaries) worked as it should, Defendants would feel the economic "pain" and reduce their margins as far as possible, to the benefit of consumers. Instead, the Scheme allows Defendants to maintain or increase their margins, surreptitiously provide additional revenue to the PBMs, and transfer all economic "pain" to consumers.

29.      In January 2016, Eli Lilly spokeswoman Julie Williams described the Insulin Pricing Scheme alleged herein:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price. For example, the net price for Humalog—our most commonly used insulin— increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

Mike Hoskins, *The High Cost of Insulin (Plus a Plea to Lilly, Novo, and Sanofi)*, Healthline, (February 22, 2016), https://www.healthline.com/diabetesmine/high-cost-insulin-and-plea-to-lilly#1.  What is left unsaid is that the reason the consumer "experience" (price inflation) greatly outpaces the "net price" for Humalog is because of the kickback scheme that consumers are being forced to finance.

30.      In 2016, an op-ed piece in the New York Times called for transparency in the insulin market:

> In the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.

Kasia Lipska, "Break Up the Insulin Racket," *N.Y. Times* (Feb. 20, 2016),

https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html (last visited February 7, 2018).

31.     As alleged in greater detail below, the Defendants' participation in the Insulin Pricing Scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and the consumer protection statutes of several states.

32.     Defendants' Insulin Pricing Scheme caused third party payers, including the Plaintiffs' assignors, to overpay for these life-saving medications on behalf of thousands of individual beneficiaries throughout the United States, including in New Jersey.

33.     Therefore, this action seeks damages, damage multipliers, and injunctive relief to put an end to the anti-consumer, fraudulent, and non-transparent Insulin Pricing Scheme.

## **PARTIES**

34.     MSP Recovery Claims, Series LLC, is a Delaware entity with its principal place of business located at 5000 S.W. 75th Avenue, Suite 400, Miami, FL 33155. Numerous MAOs across the United States have assigned their rights to MSP Recovery Claims, Series LLC, to recover payments for fraudulently-inflated prescriptions. As a result of these assignments, MSP Recovery Claims, Series LLC, is empowered and has standing herein to pursue the claims of its Assignors that purchased Insulin at inflated prices as a result of Defendants' pattern of racketeering activity and anti-competitive conduct.

9

35.     Plaintiff MSPA Claims 1, LLC is a Florida entity, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, FL 33134.  MSPA Claims 1 is a citizen of the State of Florida and is not a citizen of the state of any of Defendants.  Numerous third-party payers have assigned their rights to MSPA Claims 1, LLC to recover payments for fraudulently-inflated prescriptions. As a result of these assignments, MSPA Claims 1, LLC is empowered and has standing herein to pursue the claims of its Assignors that purchased Insulin at inflated prices as a result of Defendants' pattern of racketeering activity and anti-competitive conduct.

36.     Plaintiff, MAO-MSO Recovery II, LLC is a Delaware entity with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626. Numerous third-party payers have assigned their rights to MAO-MSO Recovery II, LLC to recover payments for fraudulently-inflated prescriptions. As a result of these assignments, MAO-MSO Recovery II, LLC is empowered and has standing herein to pursue the claims of its Assignors that purchased Insulin at inflated prices as a result of Defendants' pattern of racketeering activity and anti-competitive conduct.

37.     Plaintiffs' Assignors paid Medicare benefits on behalf of the Medicare-eligible beneficiaries enrolled under the Medicare Advantage ("MA") program. MAOs and/or their Assignees paid or otherwise incurred losses for insulin through Defendants' racketeering and unlawful practice(s).

38.     Plaintiffs have been assigned recovery rights for over seventy (70) Medicare entities, including Medicare Advantage Organizations ("MAOs"), health maintenance organizations ("HMOs"), management service organizations ("MSOs"), and independent practice associations ("IPAs"), attached hereto is an Appendix detailing the individual assignments between these entities and Plaintiffs. During this litigation, numerous other Medicare entities are

expected to assign their recovery rights to Plaintiffs and will fall under the recovery parameters of this complaint and will be added in the future. Plaintiff's reasonably expect the list of entities to join the recovery efforts to be over one hundred prior to closure of this litigation.

39.     Defendant, Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its headquarters in Bridgewater, New Jersey. Snofi manufactures Apidra, a rapid- acting insulin, and Lantus, a long-acting insulin. For 2015, the Sanofi group reported that Lantus "was the Group's leading product … representing 17.2% of the Group's aggregate net sales for the year." Defendant Sanofi-Aventis U.S. LLC can be served through Corporation Service Company located at Princeton South Corporate CTR STE 160, 100 Charles Ewing Blvd, Ewing, NJ 08628, their authorized agent for service of process in the State of New Jersey.

40.     Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation. Its headquarters are in Plainsboro, New Jersey. Novo Nordisk manufactures insulin products including NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. Defendant Novo Nordisk Inc. can be served at The Corporation Trust Company, 820 Bear Tavern Road, West Trenton, NJ 08628, their authorized agent for service of process in the State of New Jersey.

41.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation, and its principal place of business is in Indianapolis, Indiana. Eli Lilly produces the rapid-acting insulin product Humalog. Defendant Eli Lilly and Company can be served through National Registered Agents, Inc. of NJ, 820 Bear Tavern Rd, West Trenton, NJ 08628, their authorized agent for service of process in the State of New Jersey.

42.     Although not named as parties, the following are co-conspirators, pursuant to 18 U.S.C.§§ 1962(c) and (d), who actively participating in Defendants' scheme to inflate the price of

insulin and conceal Defendants' role in participating in this scheme, which had the intended result of defrauding Plaintiffs' Assignors into paying unlawfully inflated prices for insulin.

       a.     CVS Health Corporation and its subsidiaries, including Caremark Rx, L.L.C. and Caremark Rx, Inc.

       b.     Express Scripts, Inc. and its corporate parent, Express Scripts Holding Company.

## STANDING

43.    Plaintiffs have been assigned all legal rights of recovery and reimbursement for health care services and Medicare benefits provided by certain MAOs, HMOs, MSOs, and IPAs (collectively, the "Assignors"), that administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

44.    The assignments to Plaintiffs, which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

45.    At all material times hereto, one of Plaintiffs' assignors provided Medicare benefits to MA plan beneficiaries, including payment for the beneficiaries' insulin prescription.[1]

46.    Plaintiffs' Assignors provided payment for their beneficiaries' prescribed insulin in New Jersey and across the United State and its territories.

---

[1] Attached hereto as Exhibit A, is a non-exhaustive list of instances wherein Defendants submitted bills for payment for Insulin products for Plaintiffs' Assignors.

## JURISDICTION AND VENUE

47.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) as this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

48.    This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

49.    The Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. 15 U.S.C. § 22 provides for nationwide service of process.

50.    This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

51.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, has a principal place of business in, and/or has agents in New Jersey and because some of the actions giving rise to the complaint took place within this district.

52.    Venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside or may be found in this District and some or all fiduciary breaches or other violations for which relief is sought occurred in or originated in this District.

53.      Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

54.      Venue is also proper in this District pursuant to 15 U.S.C. § 22 because most Defendants inhabit, are found, have an agent, or transact business in this District.

## FACTUAL ALLEGATIONS

### Insulin Therapy for Diabetics

55.      Diabetes is a condition in which the body does not properly process food for use as energy.

56.      In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the bloodstream to be effectively used, by the body, as energy.

57.      People with diabetes are unable to make enough insulin or cannot use insulin as effectively as necessary, causing glucose, or sugar, to build up in the blood-stream.

58.      High levels of blood glucose can pose several serious health risks including heart disease, blindness, kidney failure, and lower-extremity amputations. Though treatable, diabetes can be fatal or severely debilitating if left untreated.

59.      As of 2014, 29.1 million people in the United States, or 9.3 percent of the population, had diabetes and that number continues to grow.

60.      The main types of diabetes in the U.S. are type 1, type 2, and gestational diabetes. All type 1 diabetics rely on regular insulin injections to survive. Some, but not all type 2 diabetics require insulin therapy. Gestational diabetes is the onset of high blood sugar during pregnancy for

women who were not previously diagnosed with diabetes. Some women with gestational diabetes require insulin therapy during pregnancy.

61.     Plaintiffs' Assignors have provided over one million prescriptions of insulin in the past ten years.

62.     Revenue from the top selling analog insulin manufacturers tops $15.9 billion ($6.98 billion for Sanofi's Lantus and $376 million for its Apidra; $3.03 billion for Novo Nordisk's NovoLog and $2.68 billion for its Levemir; and $2.84 billion for Eli Lilly's Humalog).

**The Dramatic Rise in the Price of Analog Insulin**

63.     Since 2003, the cost of one vial of insulin or one box of five insulin pens has increased by more than 500%; an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this time period.

64.     These price increases have occurred even in the face of supposed competition between manufacturers with similar drugs.

65.     Since the mid-1990s, there have been more than two dozen increases of the list price on a vial of Humalog insulin, as represented in the graph below from an article in the Washington Post, outlining the brief history of insulin and price increases:



**The list price of Humalog insulin keeps going up**

Since 1996, there have been more than two dozen price increases on a vial of Humalog insulin. Adjusted for inflation, the current price is 700% higher than it was 20 years ago.

Note: List price is in unadjusted dollars and does not reflect rebates or discounts

Source: Truven Health Analytics                    THE WASHINGTON POST

15

Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, (Oct. 31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/?utm_term=.ce231b04502f.

66.     The nearly identical trajectory in price increases across both categories of analog insulins (rapid and long-acting) is remarkable as well, as this graph illustrates:



Rebecca Robbins, *The insulin market is heading for a shakeup. But patients may not benefit*, (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

67.     Thus, nearly a century after its discovery, there is still no inexpensive supply of insulin for people living with diabetes in the United States.

68.     Instead, third-party payers, like Plaintiffs' Assignors, who provide medical treatments and supplies to beneficiaries who need insulin to survive are stuck in Defendants' Insulin Pricing Scheme.

## MEDICARE

69.     Plaintiffs are the assignees of Medicare Part C and/or Medicare Part D prescription drug coverage providers (MAOs and related entities) who provide benefits to thousands of individual beneficiaries.

70.     The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).

71.     The Medicare Act consists of five parts — Part A, B, C, D and E.

72.     Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." *In re Avandia Mktg. Sales Practices and Products Liability Litigation*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).

73.     Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them. 42 U.S.C. §§ 1395w-21-29.

74.     Further, Part D provides for prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

75.     An enrollee's health coverage with an MAO is strictly construed and regulated by CMS. *Id*.

### Medicare Part D

76.     Medicare Part D coverage is voluntary prescription drug benefits program for Medicare beneficiaries established in 2003.

77.     A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

78.     Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private market model, wherein Medicare contracts with private entities, known as Part D "sponsors" to administer prescription drug plans.

79.     The Part D plan sponsor must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

80.     A Plan D sponsor submits a bid to become a benefits contractor, thereunder, the bid contains a per member per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

81.     If the Plan D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium.

82.     CMS (the U.S. Government) then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

83.     As illustrated below, in 2017, for Medicare Part D beneficiaries, there is an initial $400 deductible phase during which many Medicare Part D plan participants must foot the entire bill for the inflated cost of insulin.

84.     After meeting the $400 deductible, Medicare Part D sponsors are responsible for 75% of all payments in the second phase.

85.     Beneficiaries stay in this phase until they and the plan have spent a total of $3,700 on covered drugs.

86.     MAOs pay 75% of an inflated price injures for these participants.

87.     Upon hitting the second coverage breakpoint, the beneficiary is in what is known as the Medicare Part D "Donut Hole," which refers to a coverage gap phase where the beneficiary

must pay for branded drugs at 40% of the list price, the manufacturer discounts branded drugs by 50%, and the plan pays the remaining 10%.

88.    Again, the percentage-of-cost requirement means that inflated insulin prices hurt Part D sponsors in this third coverage phase.

89.    A beneficiary leaves the coverage gap and is covered again after spending total $4,950 out-of-pocket—which is also when total drug costs covered by the participant, the plan, and discounts reach $7,425. At which point, the Part D Sponsor pays 15% of the list price, while original Medicare pays 80%.





NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

The Medicare Part D Prescription Drug Benefit, The Kaiser Family Foundation (Sept. 26, 2016),http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.Joseph Walker, *Middlemen Faulted on Drug Prices*, Wall St. J., Oct. 3, 2016

**The False Claims Act**

90.     The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, was enacted in 1863 by Congress, which, at the time, was concerned that suppliers of goods to the Union Army during the Civil War were defrauding the Army.

91.     The FCA provided that any person who knowingly submitted false claims to the government was liable for double the government's damages plus a penalty of $2,000.00 for each false claim.

92.     Specifically, liability under the FCA is triggered if any person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, or conspires to commit such action. See 31 U.S.C. § 3729(a)(1)(B-C).

93.     A person knowing or knowingly committed the violation if they: (i) had actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. *See* 31 U.S.C. § 3729(b)(1).

94.     A claim made to the government includes "any request or demand, whether under a contract or otherwise, for money . . . that . . . is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf, or to advance a Government program, and if the United States Government—(i) provides or has provided any portion of the money requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." *See* 31 U.S.C. § 3729(b)(2)(A).

**The Anti-Kickback Statute ("AKS")**

95.     Soon after the establishment of the Medicare and Medicaid programs, unethical provider practices began to develop. Problematic arrangements took various forms, for example,

percentage lease agreements and payment of test interpretation fees to physicians who referred testing without performing the interpretation themselves.

96.     To combat these unethical practices, Congress passed the original version of the AKS in 1972, and later, Congress strengthened the statute to ensure kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-693, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

97.     The statute made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime.

98.     The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase or recommend purchasing any good, service, or item for which payment may be made in whole or in part under a Federal health care program. See 42 U.S.C. § 3729(b)(2).

99.     Compliance with the AKS is a condition of payment in federal health care programs.

100.    Claims that include items or services resulting from a violation of the FCA and AKS are not payable under federal health care programs, and the government has deemed such misconduct material to its decision to pay health care claims, in part through its requirement that providers certify compliance with this law as a condition of payment under, and participation in, government health care programs.

101.    If the government, or Part D sponsors, had been aware of Defendants' violations of the Medicare laws and regulations that are the basis of Plaintiffs' claims, it would not have paid Defendants' claims submitted because of the wrongdoing and fraud.

102.    The foundation of the AKS is based on the realization that kickbacks in health care can lead to overutilization of medical services or products, increased program costs, corruption of medical decision making, patient steering, and unfair competition.

103.    The Affordable Care Act ("ACA") contained provisions that broadened FCA civil liability to include violations of the AKS. See 42 U.S.C. § 1320(a)-7b(g).

104.    Thus, a violation of the AKS—even if the service or item was medically necessary, provided, and appropriately billed—constitutes a per se violation of the FCA.

105.    Further, the ACA provides that "a person need not have actual knowledge … or specific intent to commit a violation." See 18 U.S.C. § 1347(b). It is enough that a defendant knew or should have known that the conduct was generally unlawful.

## THE INSULIN PRICING SCHEME

106.    The prices that Plaintiffs' assignors paid and continue to pay for Defendants' analog insulin are inflated because of Defendants' Insulin Pricing Scheme, which requires payers to pay for both the drug and the undisclosed kickback to the PBMs.

### Defendants' Concealment of the Insulin Pricing Scheme

107.    Defendants have not disclosed their Insulin Pricing Scheme to Plaintiffs, upon information and belief, Defendants have kept these material details of PBM kickbacks confidential for two nefarious purposes – as a precondition for formulary placement; and to obscure the Insulin Pricing Scheme's ability to obtain formulary placement without reducing their net revenue.

108.    Likewise, PBMs have not disclosed the material details of the kickbacks that are paid by the  Defendants, including the gross amount of the kickbacks and what, if any, portion of the kickback revenue is passed through to the Plaintiffs' assignors and other third-party payers.

## Pharmaceutical Supply Chain Overview

109.    The pharmaceutical supply chain in the United States consists of four major actors: drug manufacturers, wholesale distributors, pharmacies, and PBMs.

110.    Pharmaceutical products generally originate in manufacturing sites and then are transferred to wholesale distributors, transferred and stocked at retail, mail-order, and other types of pharmacies, then are subject to price negotiations and processed through quality and utilization management screens by PBMs, are dispensed by pharmacies, and, ultimately, are delivered to and taken by beneficiaries.

111.    The technical function of a PBM is to administer a third-party payer's drug program, including MAOs, including developing the drug formulary (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies, and negotiating with pharmaceutical manufacturers.

112.    Third party payers provide copies of their PBMs' formularies requesting providers and pharmacists ("network prescribers"), and patients in their network to aid prescribers' adherence to the formulary.

113.    Being included in the various payor formularies and obtaining favorable placement of a drug within a formulary (i.e. "Tier-1 placement) drives demand for that drug within the PBM's entire network of physicians, pharmacists, and participating plans, thus manufacturer's view placement as a guarantee for drug utilization.

114.    Formulary inclusion is critical to Defendants' business, as it allows them to increase sales of drugs, including insulin.

115.    As described more fully below, PBMs contract with a network of retail and community pharmacies.

116.    In addition, and of significance here, PBMs have contractual relationships with pharmaceutical manufacturers, retail pharmacies, and pharmaceutical wholesalers, negotiating rebates, fees and other concessions.

117.    These relationships allow PBMs to exert tremendous influence and control over what drugs are made available to health plans and ultimately the public.

118.    The following chart, published by the Wall Street Journal, broadly illustrates the pharmaceutical supply chain, and the PBMs central role in it:



Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, WALL ST. J. (Oct. 3, 2016, 12:43 PM), https://www.wsj.com/articles/drugmakers-point-finger-atmiddlemen-for-rising-drug-prices-1475443336.

**The Insulin Pricing Scheme: Rebates Gone Awry**

119.    PBMs generate revenue in three primary ways. First, their third-party payer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, third-party payers pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists and manufacturers. Third, PBMs receive "rebates" and other fees from manufacturers (including Defendants).

120.    Indeed, PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make ostensibly interchangeable products—i.e., drugs within the same therapeutic class.

121.    In such a scenario, the drug companies should compete on price, as in normal competitive markets, for the PBMs' business.

122.    This rebate arrangement, if operated ethically and honestly, would create an incentive for PBMs to negotiate lower net drug prices.

123.    However, the arrangement is not operated ethically and honestly., Rather, Defendants and PBMs are gaming the system.

124.    Defendants and PBMs have realized that they both benefit if, instead of forcing Defendants to sell their drugs to the PBMs for cheaper, they induce Defendants to raise their publicly reported list price but largely maintain net prices between Defendants and PBMs.

125.    This creates what is, in effect, a massive slush fund derived from the difference between the net and list prices that can be used by Defendants to pay the larger and larger rebates demanded by the PBMs for formulary placement.

126.    The scheme allows PBMS to leverage formulary control for kickbacks and Defendants to maintain their profit margins on drugs sold in the United States and ensure their access to the millions of Americans whose drugs are made available via the PBMs' formularies.

127.    Thus, far from using their prodigious bargaining power to lower drug prices, the PBMs abuse their position to benefit themselves.

128.    It is a profitable enterprise, though deeply unethical and damaging to those who shoulder the burden of the higher prices like third party payers such as MAOs.

129.    This dynamic lies at the heart of the surging cost of prescriptions, including, as here, insulin, and the resulting public health crisis.

**The List/Net Price Divergence**

130.    While Defendants often obscure the true net realized prices for insulin and other drugs, the escalating list price is a matter of public record and have skyrocketed largely in lock-step.

131.    Defendants sell similar, frequently interchanged branded drugs for decades; however, the list prices continue to rise in tandem with each competing drug.

132.    Defendants are not competing on price because instead they are competing on higher rebates and other fees paid to the PBMs.

133.    This anti-competitive, market-distorting conspiracy explains the spectacular rise in insulin list prices, yet the net realized prices for Defendants remain constant.

134.    The figures below—included in a press release by Novo Nordisk—illustrate this phenomenon. Note: The figures below show percentage price changes, not dollar amounts.





Novo   Nordisk   Press   Release   (Nov.   30,   2016),   http://press.novonordisk-us.com/leadershipperspectives?item=1.

135.    As indicated in the below diagrams prepared by SSER Health, a health- industry research firm, the same widening spread has occurred for the other major analog insulins:



Robert Langreth, et al., Decoding Big Pharma's Secret Drug Pricing Practices, Bloomberg (June 29, 2016), https://www.bloomberg.com/graphics/2016-drug-prices/.

136.    Defendants' spread-increasing behavior is also visible from data on these companies' aggregate rebates to PBMs and insurers.

137.    The below figure illustrates Novo Nordisk's aggregate rebates from 2007 to 2014.



Jeffrey Balin, et al., Global Pharma: Rising US Rebates Limit Margin Expansion, Credit Suisse, 23 (May 1, 2015).

138.    Finally, Eli Lilly has greatly increased its rebates off the inflated list prices.

139.    Contrary to Novo Nordisk, for which insulin represents a substantial amount of gross revenues, Eli Lilly is an extremely diversified manufacturer.

140.    As a result, the impact of the very steep insulin rebating that has gained Lilly the lion's share of the U.S. insulin market in recent years is attenuated in the graph below by less aggressive rebating on other drug classes.

141.    Eli Lilly's Reported Rebates as a Percentage of U.S. Gross Sales from 2007- 2014:



Jeffrey Balin, et al., Global Pharma: Rising US Rebates Limit Margin Expansion, Credit Suisse, 23 (May 1, 2015).

**The Rise of the PBMs in the Pharmaceutical Supply Chain**

142.    In the 1990s, drug manufacturers began acquiring PBMs, which caused an egregious conflict of interest, prompting the Federal Trade Commission to undo those deals.

143.    In the early and late 2000s, PBMs started buying pharmacies, which has caused a similar conflict of interest as resulted from the merger of drug manufacturers and PBMs in the 1990s.

144.     When a PBM combines with a pharmacy, they lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive drugs; indeed, they may collude in them.

145.     The power of the largest PBMs has continued to grow and has allowed them to distort the pharmaceutical supply chain to their own financial advantage.

146.     Drug manufacturers understand the power of PBMs. Due to the PBMs size and many thousands of health plan clients they represent, PBMs can steer business between manufacturers based on which will pay the larger kickback to the PBM, maximizing PBM profits.

147.     While the role of PBMs in the supply chain is known, the size of the rebates and other fees they extract from drug companies for formulary placement, and the portion of these payments they pocket (the "PBM kickbacks") is a carefully guarded secret.

148.     PBMs depend on the lack of transparency to conduct their business and have vigorously resisted any requirement that they disclose the details of their agreements with drug manufacturers, and the kickbacks they receive from them.

149.     PBMs manage pharmacy benefits for over 266 million Americans, with a few large companies dominating the PBM market.

150.     For example, from 2014 to 2015, Express Scripts' net income increased by $468.8 million, or 23.4 percent.

151.     During the same time, gross profit for CVS' pharmacy services segment, which includes the PBM CVS Caremark, increased 9.6 percent.

152.     These PBMs earnings increased further in 2016, with a 37.5% and 9.6% increase, respectively.

153.    As set-forth herein, the PBMs solicited and Defendants paid hundreds of millions of dollars in inducement and kickbacks to the PBMs over the relevant period to obtain favorable formulary position, recommendation, and purchase of Defendants' insulin drugs.

**Defendants Admit the Insulin Pricing Scheme**

154.    Defendants have come up with a variety of excuses for the escalating insulin list prices.

155.    For example, Novo Nordisk offered as one justification the "clinical benefit" of their drugs—a nonsensical explanation given that both the drugs and the benefits have been the same for years.

156.    Yet, in the face of widespread criticism of insulin prices spinning out of control—Defendants have admitted the true reasons for the price escalation.

157.    On November 30, 2016, Novo Nordisk issued a press release stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker. We believe that is misleading and here's why: **As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines,** which we call payers. **This is necessary in order for our medicines to stay on their preferred drug list or formulary**. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.

> Novo Nordisk US, *Our Perspectives on Pricing and Affordability*, Our Perspectives, (Last visited February 9, 2018) http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html

158.    In its 2016 annual report[2], Novo Nordisk admitted to the practice of exchanging rebates for preferential formulary placement noting as follows:

> Increasingly, PBMs and health plans play a key role in negotiating price concessions with drug manufacturers on behalf of private payers for both the commercial and government channels, and determining the list of drugs covered in the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall drug costs has resulted in greater focus on negotiating higher rebates from drug manufacturers. Private payers are increasingly keen to adopt narrow formularies that exclude certain drugs, while securing increased rebates from the preferred brand.

159.    As a consequence, the report stated that Novo Nordisk has announced contract negotiations for 2017 with higher-than-anticipated rebates to obtain broader coverage for its products.

160.    Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions: "[t]he reason drug makers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."

161.    In June 2016, CEO of Eli Lilly, John C. Lechleiter, further explained that those "higher rebates can be an incentive for a payer to stick with—with essentially a higher-priced product."

162.    Sanofi has admitted to the same practices. In February 2015, Peter Guenter, Sanofi's Executive Vice President, explained that: "[a]s expected, increased rebates in the U.S. to

---

[2] Novo Nordisk Inc., Annual Report, Letter from the Chairman (February 1, 2017). *See also* Novo Nordisk Inc., Annual Report, Letter from Lars Rebien Sørensen, (February 1, 2017) (stating "[i]n 2017, we will see lower net prices in the U.S. as we had to increase the rebates we offer the pharmaceutical benefit managers (PBMs) in order to ensure broad market access for our products). Attached as Exhibit "B".

secure favorable formula repositions for Lantus with key payers have kicked in since January 1, 2015."

163.    Defendants, thus, acknowledge that the Insulin Pricing Scheme drives up list prices.

164.    While the message they appear to be trying to send is that the "PBMs made them do it," the fact of the matter is they could compete for access to formularies by lowering the list prices for their insulin products and refusing to rebate.

165.    This, however, would cut into their bottom line, as it would require Defendants to compete with one another on price.

166.    While not "real" for the PBMs, the list price is real for third party payers as they pay this amount regardless of any rebate portions that _may_ be provided later.

167.    Even with price negotiation, an artificially high "base price" is still harmful and unlawful.

168.    Thus, the Insulin Pricing Scheme benefits Defendants and PBMs at the expense of the public, including third party payers, MAOs and the Medicare Trust Fund.

169.    Furthermore, Medicare Part D beneficiaries are also left paying inflated amounts in all phases as soaring prices cause them to speed toward the Donut Hole.

170.    Defendants' scheme results in third party payers being saddled with soaring costs based on inflated prices with MAOs being relatively powerless in maximizing benefits for their beneficiaries prior the "donut hole" and the subsequent catastrophe level of Part D benefits.

**High List Prices Directly Impact Plaintiffs' Ability to Provide Benefits**

171.    A drug that used to cost seven cents a week in 1924, now costs hundreds of dollars a month. Plan D beneficiaries are generally on a fixed income and may not be able to afford the "donut hole" price of insulin, leaving these beneficiaries to sacrifice their health by compromising

their treatment regimen, resulting in a higher likelihood of hospitalization for which the MAOs would be responsible.

172.    Doctors are speaking up about the number of diabetes patients coming in with poorly controlled blood sugar who explain that they were not taking their insulin because of its expense.

173.    Patients who are worried about the cost of insulin may ration their insulin, frequently not taking it when they need to, cutting their doses in half, or refilling their pump hours after the insulin runs out, even though it means their blood sugar will go up.

174.    Patients may also deprive themselves of food to keep their blood sugar low and avoid the need for insulin.

175.    The less controlled an individual's blood sugar, the higher their risk for complications including cardiovascular disease, nerve damage that can lead to amputation of limbs, kidney disease and failure, eye damage such as blindness or glaucoma, skin conditions, hearing impairment, and Alzheimer's disease.

176.    The American Diabetes Association estimates that the average person diagnosed with diabetes has about $13,700 in medical expenditures each year, of which about $7,900 is attributable to diabetes.

177.    Costs for people with type 1 diabetes are typically much higher, as the ADA averages include many type 2 patients who manage on low-cost oral medications alone.

178.    The financial burden of diabetes means that many beneficiaries, in the "donut hole", do not receive the care they need for a disease that has been treatable for almost a century.

179.    Insulin rationing is common, as is patients allowing themselves to go into DKA to get insulin in emergency rooms.

180.     While the PBMs continue to conceal the amount they make on kickbacks, Defendants have attempted to blunt criticism through various actions.

181.     For example, in its November 30, 2016, press release, Novo Nordisk made a modest commitment to limit any potential future list price increases for medicines to no more than single-digit percentages annually. Similar statements made on behalf of other manufacturers have occurred as well.

182.     These measures do not end or even address the insidious practice of competing for formulary placement based on kickbacks.

183.     Defendants continue to game the system and the insulin market in the United States as it's an ideal source of profit for unethical middlemen and drug manufacturers, like Defendants, causing third-party payers covering beneficiaries with diabetes to continue paying the price.

184.     About six million Americans use insulin, and although it has been commercially produced for almost a hundred years, in the United States only three major pharmaceutical companies hold patents that allow them to manufacture the drug.

185.     These three manufacturers "compete" with each other not on price, but by offering rebates for insulin to PBMs who profit from every list price increase through the kickbacks they receive.

186.     The result is a staggering abuse of power and trust.

**Medicare Part D Payment Submission Process**

187.     Part D Plan sponsors subcontract with many entities to provide drugs to the Medicare Part D beneficiaries enrolled in their plans, including PBMs who provide drugs through mail order and pharmacies.

188.    When a pharmacy dispenses drugs to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Plan and receives reimbursement from the plan sponsor for the costs not paid by the beneficiary.

189.    The Part D plan sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a Prescription Drug Event ("PDE") record, which includes the amount paid to the pharmacy.

190.    The PDE is an electronically created document that includes at least thirty-seven fields about a specific drug transaction.

191.    As a condition for receiving its monthly payment from CMS, a Part D plan sponsor must certify the accuracy, completeness and truthfulness of all data related to the payment, which may include enrollment information, claims data, bid submission data, and any other data specified by CMS.

192.    If the claims data has been generated by a subcontractor of a Part D plan sponsor, such as a PBM, that entity must "similarly certify" that the claims data it has generated is accurate, complete and truthful, and must acknowledge that it will be used to obtain federal reimbursement.

193.    Part D Plan sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse.

194.    CMS regulations require that all subcontracts between Part D plan sponsors and downstream entities, including pharmacies and PBMs, contain language obligating the downstream entity to comply with all applicable federal laws, regulations, and CMS instructions, including the FCA and AKS.

## <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>
### DISCOVERY RULE TOLLING

195.    Plaintiffs' Assignors had no way of knowing about Defendants' scheme and deception with respect to insulin pricing.

196.    The manufacturers and PBMs refuse to disclose the real, net prices of insulin, labeling them trade secrets, hence a reasonable plaintiff and consumer could not discover the truth.

197.    Within the applicable statutes of limitation, Plaintiffs' Assignors could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

198.    Plaintiffs' Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect, that the defendants were engaged in the scheme and were publishing phony benchmark prices, nor would a reasonable diligent investigation have disclosed the true facts.

199.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

### FRAUDULENT CONCEALMENT TOLLING

200.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

### ESTOPPEL

201.    Defendants were under a continuous duty to disclose to plaintiffs the true character, quality, and nature of the benchmark prices and any rebates upon which their payments for insulin were based.

202.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF 18 U.S.C. §1962(c) AND (d) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ.
(Sanofi-Aventis U.S. LLC)

203.    Plaintiffs incorporate by reference paragraphs 1 through 202 and the Appendix as if fully set forth herein.

204.    Defendant Sanofi, the identified PBMs, and additional unnamed co-conspirators are an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise.

205.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

206.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

207.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

208.    Defendant Sanofi and the identified PBMs established a fraudulent scheme designed to artificially inflate the list price of Defendant's insulin products (Lantus, Apidra, and Toujeo); provide Sanofi with formulary status for its products without its suffering any reduction in revenue; and conceal the substantial kickbacks being covertly paid to PBMs with the overpayments extracted from the Plaintiffs' Assignors.

A.   <u>Description of the Sanofi RICO Enterprise</u>.

209.   RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

210.   An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

211.   Defendant Sanofi and the unnamed co-conspirators, concealed from the scrutiny of the public or even the third-party payers that are Defendant's customers and the PBMs' clients, periodically negotiated the specifics of their Insulin Pricing Scheme, by which Defendant's products would be placed on the PBMs formulary in exchange for significant kickbacks.

212.   To facilitate the payment of the kickbacks to PBMs and ensure their products' position on certain formularies without impacting revenue, Defendants participated in a scheme with PBMs to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

213.   This scheme to secretly divert revenue to the PBMs through artificially increasing the list price of medications works to the detriment of Plaintiffs' Assignors, who are left paying artificially-inflated, rapidly increasing prices for their beneficiaries' life-saving medications.

214.   At all relevant times, Defendant Sanofi, the identified PBMs, and additional unnamed co-conspirators operated an ongoing association-in-fact enterprise.

215.   The central purpose of this association-in-fact was to maximize revenue for Defendant and the identified PBMs through a pattern of racketeering activity under 18 U.S.C. § 1961(4).

216.    The separate legal statuses of Defendant Sanofi, the identified PBMs and the unnamed co-conspirators facilitated the fraudulent scheme and provided a hoped-for shield from liability for Defendant and their co-conspirators.

217.    At all relevant times, the enterprise alleged herein constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the Defendant's profit-making scheme.

218.    The enterprise alleged herein consisted of the following entities and individuals: (a) Defendant Sanofi, its subsidiaries, executives, employees, and agents; (b) the identified PBMs, their subsidiaries, executives, employees, and agents; and (c) other PBMs, their subsidiaries, executives, employees, and agents.

219.    While Defendant Sanofi acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise (a) had an existence separate and distinct from the Defendant, (b) was separate and distinct from the pattern of racketeering in which the Defendant engaged, and (c) was an ongoing and continuing organization consisting of legal entities including the Defendant and other individuals and entities, including unknown third parties.

220.    Defendant and its co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Defendant and the other entities and individuals associated-in-fact with the enterprise's activities by selling Defendant's insulin products at an inflated and artificial price (the "Sanofi RICO Scheme").

221.    PBMs leveraged their dominant position in the prescription drug market to demand that insulin drug manufacturers, like Defendant, pay substantial kickbacks to have their products included or be given priority on the PBMs' formularies.

222.    Defendant facilitated the scheme by agreeing to provide substantial and increasing kickbacks to PBMs in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

223.    In furtherance of the Sanofi RICO Scheme, Defendant affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the kickbacks paid to PBMs.

224.    In furtherance of the Sanofi RICO Scheme, Defendants committed wire fraud by submitting and causing the submission bills, using interstate wires, for payment that were not in compliance with the AKS and therefore amounted to FCA violations or Medicare fraud.

225.    The RICO enterprise engaged in, and its activities affected, interstate and foreign commerce because the Sanofi RICO Scheme involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

226.    Within the enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.

227.    The RICO enterprise used this common communication network for purposes of advertising, marketing, negotiating, contracting and furthering the RICO scheme.

228.    Each participant in the RICO enterprise had systematic linkages to each other through corporate relationships, contractual relationships, financial ties, and a continuing coordination of activities.

229.    Through the RICO enterprise, Defendant and the co-conspirators functioned as a continuing unit with the purpose of furthering the RICO scheme.

230.    Defendant participated in the operation and management of the RICO enterprise by directing its affairs, as described herein.

231.    While Defendant participated in, and is a member of, the enterprise, it has a separate existence from the enterprise, including a distinct legal status, different offices, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

232.    Defendant exerted substantial control over the RICO enterprise, and participated in the affairs of the enterprise by (a) negotiating and/or offering kickbacks for the insulin products described herein, (b) misrepresenting and/or concealing the existence, amount, or purpose of the kickbacks negotiated for the insulin products described herein, (c) misrepresenting and/or concealing the effect that the negotiated prices had on the price of the insulin products for third-party payers, (d) negotiating and/or setting the list price for the insulin products described herein, (e) misrepresenting and/or concealing the true cost of the insulin products described herein, (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin products described herein, (g) negotiating and/or offering preferred formulary placement for the insulin product described herein, (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products, (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein, (j) collecting kickbacks, revenues, and/or profits from the sale of the insulin products described herein, and (k) ensuring that the other Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

233.    Without the willing participation of the Defendant and the co-conspirators, the RICO scheme and common course of conduct would not have been successful.

234.    Defendant directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information is possessed by Defendant and others.

B.    Predicate Acts: Mail and Wire Fraud.

235.    As stated above, Defendant submitted, or caused to be submitted, numerous bills for insulin in violation of the AKS, thus, constituting violations of the FCA.

236.    These bills were submitted and payments from the government were then transmitted through the numerous mail and/or wire facilities utilized by Defendant in furtherance of the scheme and the enterprise.

237.    To carry out, or attempt to carry out, the scheme to defraud, Defendant, as a person associated-in-fact with the RICO enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the RICO enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

238.    Specifically, the Defendant has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

239.    The multiple acts of racketeering activity which the Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

240. The racketeering activity was made possible by Defendant's regular use of the facilities, services, distribution channels, and employees of the RICO enterprise.

241. Defendant participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

242. Defendant used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

243. In devising and executing the illegal scheme, Defendant devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs' Assignors or to obtain money from Plaintiffs' Assignors by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

244. To execute the illegal scheme, Defendant committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

245. Defendant's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a) Mail Fraud: Defendant violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the insulin products described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b) Wire Fraud: Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose

of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

246.    Defendant's use of the mails and wires include, but are not limited to, the following transactions: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that the Defendant changed the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the kickback amount of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating kickbacks associated for the insulin products described herein; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates ("kickbacks") for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

247.    Defendant also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

248.    The mail and wire transmissions described herein were made in furtherance of Defendant's scheme and through a common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs.

249.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendant's books and records.

250.     Defendant has not undertaken the practices described herein in isolation but as part of a common scheme.

251.     Defendant's violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Plaintiffs' Assignors. Plaintiffs' Assignors have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

252.     Therefore, Plaintiffs seek three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II: VIOLATIONS OF 18 U.S.C. §1962(c) AND (d) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ.**
(Novo Nordisk Inc.)

253.     Plaintiffs incorporate by reference paragraphs 1 through 202 and the Appendix as if fully set forth herein.

254.     Defendant Novo Nordisk, the identified PBMs, and additional unnamed co-conspirators are an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise.

255.     At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

256.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

257.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

258.     Defendant Novo Nordisk and the identified PBMs established a fraudulent scheme designed to artificially inflate the list price of Defendant's insulin products (Levemir and Novolog); provide Novo Nordisk with formulary status for its products without its suffering any reduction in revenue; and conceal the substantial kickbacks being covertly paid to PBMs with the overpayments extracted from the Plaintiffs' Assignors.

B.     Description of the Novo Nordisk RICO Enterprise.

259.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

260.     An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

261.     Defendant Novo Nordisk and the unnamed co-conspirators, concealed from the scrutiny of the public or even the third-party payers that are Defendant's customers and the PBMs' clients, periodically negotiated the specifics of their Insulin Pricing Scheme, by which Defendant's products would be placed on the PBMs formulary in exchange for significant kickbacks.

262.     To facilitate the payment of the kickbacks to PBMs and ensure their products' position on certain formularies without impacting revenue, Defendants participated in a scheme with PBMs to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

263.    This scheme to secretly divert revenue to the PBMs through artificially increasing the list price of medications works to the detriment of Plaintiffs' Assignors, who are left paying artificially-inflated, rapidly increasing prices for their beneficiaries' life-saving medications.

264.    At all relevant times, Defendant Novo Nordisk, the identified PBMs, and additional unnamed co-conspirators operated an ongoing association-in-fact enterprise.

265.    The central purpose of this association-in-fact was to maximize revenue for Defendant and the identified PBMs through a pattern of racketeering activity under 18 U.S.C. § 1961(4).

266.    The separate legal statuses of Defendant Novo Nordisk, the identified PBMs and the unnamed co-conspirators facilitated the fraudulent scheme and provided a hoped-for shield from liability for Defendant and their co-conspirators.

267.    At all relevant times, the enterprise alleged herein constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the Defendant's profit-making scheme.

268.    The enterprise alleged herein consisted of the following entities and individuals: (a) Defendant Novo Nordisk, its subsidiaries, executives, employees, and agents; (b) the identified PBMs, their subsidiaries, executives, employees, and agents; and (c) other PBMs, their subsidiaries, executives, employees, and agents.

269.    While Defendant Novo Nordisk acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise (a) had an existence separate and distinct from the Defendant, (b) was separate and distinct from the pattern of racketeering in which the Defendant engaged, and (c) was an ongoing

and continuing organization consisting of legal entities including the Defendant and other individuals and entities, including unknown third parties.

270.     Defendant and its co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Defendant and the other entities and individuals associated-in-fact with the enterprise's activities by selling Defendant's insulin products at an inflated and artificial price (the "Novo Nordisk RICO Scheme").

271.     PBMs leveraged their dominant position in the prescription drug market to demand that insulin drug manufacturers, like Defendant, pay substantial kickbacks to have their products included or be given priority on the PBMs' formularies.

272.     Defendant facilitated the scheme by agreeing to provide substantial and increasing kickbacks to PBMs in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

273.     In furtherance of the Novo Nordisk RICO Scheme, Defendant affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the kickbacks paid to PBMs.

274.     In furtherance of the Novo Nordisk RICO Scheme, Defendants committed wire fraud by submitting and causing the submission bills, using interstate wires, for payment that were not in compliance with the AKS and therefore amounted to FCA violations or Medicare fraud.

275.     The RICO enterprise engaged in, and its activities affected, interstate and foreign commerce because the Novo Nordisk RICO Scheme involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

276.    Within the enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.

277.    The RICO enterprise used this common communication network for purposes of advertising, marketing, negotiating, contracting and furthering the RICO scheme.

278.    Each participant in the RICO enterprise had systematic linkages to each other through corporate relationships, contractual relationships, financial ties, and a continuing coordination of activities.

279.    Through the RICO enterprise, Defendant and the co-conspirators functioned as a continuing unit with the purpose of furthering the RICO scheme.

280.    Defendant participated in the operation and management of the RICO enterprise by directing its affairs, as described herein.

281.    While Defendant participated in, and is a member of, the enterprise, it has a separate existence from the enterprise, including a distinct legal status, different offices, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

282.    Defendant exerted substantial control over the RICO enterprise, and participated in the affairs of the enterprise by (a) negotiating and/or offering kickbacks for the insulin products described herein, (b) misrepresenting and/or concealing the existence, amount, or purpose of the kickbacks negotiated for the insulin products described herein, (c) misrepresenting and/or concealing the effect that the negotiated prices had on the price of the insulin products for third-party payers, (d) negotiating and/or setting the list price for the insulin products described herein, (e) misrepresenting and/or concealing the true cost of the insulin products described herein, (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin

products described herein, (g) negotiating and/or offering preferred formulary placement for the insulin product described herein, (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products, (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein, (j) collecting kickbacks, revenues, and/or profits from the sale of the insulin products described herein, and (k) ensuring that the other Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

283.    Without the willing participation of the Defendant and the co-conspirators, the RICO scheme and common course of conduct would not have been successful.

284.    Defendant directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information is possessed by Defendant and others.

B.    Predicate Acts: Mail and Wire Fraud.

285.    As stated above, Defendant submitted, or caused to be submitted, numerous bills for insulin in violation of the AKS, thus, constituting violations of the FCA.

286.    These bills were submitted and payments from the government were then transmitted through the numerous mail and/or wire facilities utilized by Defendant in furtherance of the scheme and the enterprise.

287.    To carry out, or attempt to carry out, the scheme to defraud, Defendant, as a person associated-in-fact with the RICO enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the RICO enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

288.    Specifically, the Defendant has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

289.    The multiple acts of racketeering activity which the Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

290.    The racketeering activity was made possible by Defendant's regular use of the facilities, services, distribution channels, and employees of the RICO enterprise.

291.    Defendant participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

292.    Defendant used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

293.    In devising and executing the illegal scheme, Defendant devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs' Assignors or to obtain money from Plaintiffs' Assignors by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

294.    To execute the illegal scheme, Defendant committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

295.    Defendant's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a)     Mail Fraud: Defendant violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the insulin products described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b)     Wire Fraud: Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

296.    Defendant's use of the mails and wires include, but are not limited to, the following transactions: (a) the transmission of marketing or other materials indicating, setting, or negotiating the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that the Defendant changed the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the kickback amount of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating kickbacks associated for the insulin products described herein; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates ("kickbacks") for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

297.    Defendant also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

298.    The mail and wire transmissions described herein were made in furtherance of Defendant's scheme and through a common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs.

299.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendant's books and records.

300.    Defendant has not undertaken the practices described herein in isolation but as part of a common scheme.

301.    Defendant's violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Plaintiffs' Assignors. Plaintiffs' Assignors have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

302.    Therefore, Plaintiffs seek three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III: VIOLATIONS OF 18 U.S.C. §1962(c) AND (d) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ.**
(Eli Lilly and Company)

303.    Plaintiffs incorporate by reference paragraphs 1 through 202 and the Appendix as if fully set forth herein.

304.     Defendant Eli Lilly, the identified PBMs, and additional unnamed co-conspirators are an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise.

305.     At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

306.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

307.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

308.     Defendant Eli Lilly and the identified PBMs established a fraudulent scheme designed to artificially inflate the list price of Defendant's insulin products (Humalog, and Humulin ); provide Eli Lilly with formulary status for its products without its suffering any reduction in revenue; and conceal the substantial kickbacks being covertly paid to PBMs with the overpayments extracted from the Plaintiffs' Assignors.

C.     Description of the Novo Nordisk RICO Enterprise.

309.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

310.     An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

311.    Defendant Eli Lilly and the unnamed co-conspirators, concealed from the scrutiny of the public or even the third-party payers that are Defendant's customers and the PBMs' clients, periodically negotiated the specifics of their Insulin Pricing Scheme, by which Defendant's products would be placed on the PBMs formulary in exchange for significant kickbacks.

312.    To facilitate the payment of the kickbacks to PBMs and ensure their products' position on certain formularies without impacting revenue, Defendants participated in a scheme with PBMs to increase the list price of their drugs instead of competing on actual price with other insulin manufacturers.

313.    This scheme to secretly divert revenue to the PBMs through artificially increasing the list price of medications works to the detriment of Plaintiffs' Assignors, who are left paying artificially-inflated, rapidly increasing prices for their beneficiaries' life-saving medications.

314.    At all relevant times, Defendant Eli Lilly, the identified PBMs, and additional unnamed co-conspirators operated an ongoing association-in-fact enterprise.

315.    The central purpose of this association-in-fact was to maximize revenue for Defendant and the identified PBMs through a pattern of racketeering activity under 18 U.S.C. § 1961(4).

316.    The separate legal statuses of Defendant Eli Lilly, the identified PBMs and the unnamed co-conspirators facilitated the fraudulent scheme and provided a hoped-for shield from liability for Defendant and their co-conspirators.

317.    At all relevant times, the enterprise alleged herein constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the Defendant's profit-making scheme.

318.     The enterprise alleged herein consisted of the following entities and individuals: (a) Defendant Eli Lilly, its subsidiaries, executives, employees, and agents; (b) the identified PBMs, their subsidiaries, executives, employees, and agents; and (c) other PBMs, their subsidiaries, executives, employees, and agents.

319.     While Defendant Eli Lilly acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise (a) had an existence separate and distinct from the Defendant, (b) was separate and distinct from the pattern of racketeering in which the Defendant engaged, and (c) was an ongoing and continuing organization consisting of legal entities including the Defendant and other individuals and entities, including unknown third parties.

320.     Defendant and its co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the Defendant and the other entities and individuals associated-in-fact with the enterprise's activities by selling Defendant's insulin products at an inflated and artificial price (the "Eli Lilly RICO Scheme").

321.     PBMs leveraged their dominant position in the prescription drug market to demand that insulin drug manufacturers, like Defendant, pay substantial kickbacks to have their products included or be given priority on the PBMs' formularies.

322.     Defendant facilitated the scheme by agreeing to provide substantial and increasing kickbacks to PBMs in order to gain or maintain access to its formularies and funding those discounts by artificially increasing the list price of their insulin products.

323.    In furtherance of the Eli Lilly RICO Scheme, Defendant affirmatively misrepresented or concealed the existence of the inflated and fraudulent nature of these list price increases as well as the existence, amount, and purpose of the kickbacks paid to PBMs.

324.    In furtherance of the Eli Lilly RICO Scheme, Defendants committed wire fraud by submitting and causing the submission bills, using interstate wires, for payment that were not in compliance with the AKS and therefore amounted to FCA violations or Medicare fraud.

325.    The RICO enterprise engaged in, and its activities affected, interstate and foreign commerce because the Eli Lilly RICO Scheme involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, distribution, and sale of insulin products throughout the country, and the receipt of monies from the sale of the same.

326.    Within the enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.

327.    The RICO enterprise used this common communication network for purposes of advertising, marketing, negotiating, contracting and furthering the RICO scheme.

328.    Each participant in the RICO enterprise had systematic linkages to each other through corporate relationships, contractual relationships, financial ties, and a continuing coordination of activities.

329.    Through the RICO enterprise, Defendant and the co-conspirators functioned as a continuing unit with the purpose of furthering the RICO scheme.

330.    Defendant participated in the operation and management of the RICO enterprise by directing its affairs, as described herein.

331.    While Defendant participated in, and is a member of, the enterprise, it has a separate existence from the enterprise, including a distinct legal status, different offices, bank accounts,

officers, directors, employees, individual personhood, reporting requirements, and financial statements.

332.    Defendant exerted substantial control over the RICO enterprise, and participated in the affairs of the enterprise by (a) negotiating and/or offering kickbacks for the insulin products described herein, (b) misrepresenting and/or concealing the existence, amount, or purpose of the kickbacks negotiated for the insulin products described herein, (c) misrepresenting and/or concealing the effect that the negotiated prices had on the price of the insulin products for third-party payers, (d) negotiating and/or setting the list price for the insulin products described herein, (e) misrepresenting and/or concealing the true cost of the insulin products described herein, (f) publishing, reproducing, and/or distributing documents containing the list price for the insulin products described herein, (g) negotiating and/or offering preferred formulary placement for the insulin product described herein, (h) misrepresenting and/or concealing the true nature of the relationship and agreements between the members of the enterprise and its effect on the pricing of insulin products, (i) otherwise misrepresenting and/or concealing the inflated and fraudulent nature of the pricing of the insulin products described herein, (j) collecting kickbacks, revenues, and/or profits from the sale of the insulin products described herein, and (k) ensuring that the other Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

333.    Without the willing participation of the Defendant and the co-conspirators, the RICO scheme and common course of conduct would not have been successful.

334.    Defendant directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information is possessed by Defendant and others.

B.      Predicate Acts: Mail and Wire Fraud.

335.    As stated above, Defendant submitted, or caused to be submitted, numerous bills for insulin in violation of the AKS, thus, constituting violations of the FCA.

336.    These bills were submitted and payments from the government were then transmitted through the numerous mail and/or wire facilities utilized by Defendant in furtherance of the scheme and the enterprise.

337.    To carry out, or attempt to carry out, the scheme to defraud, Defendant, as a person associated-in-fact with the RICO enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the RICO enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

338.    Specifically, the Defendant has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

339.    The multiple acts of racketeering activity which the Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

340.    The racketeering activity was made possible by Defendant's regular use of the facilities, services, distribution channels, and employees of the RICO enterprise.

341.    Defendant participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

342.    Defendant used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

343.    In devising and executing the illegal scheme, Defendant devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs' Assignors or to obtain money from Plaintiffs' Assignors by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

344.    To execute the illegal scheme, Defendant committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

345.    Defendant's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

(a)    Mail Fraud: Defendant violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, price, and/or sell the insulin products described herein by means of false pretenses, misrepresentations, promises, and omissions.

(b)    Wire Fraud: Defendant violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

346.    Defendant's use of the mails and wires include, but are not limited to, the following transactions: (a) the transmission of marketing or other materials indicating, setting, or negotiating

61

the price of the insulin products described herein; (b) the transmission of marketing or other materials indicating or advertising that the Defendant changed the price of the insulin products described herein; (c) written, telephone, or electronic communications regarding and/or negotiating the kickback amount of the insulin products described herein; (d) written, telephone, or electronic communications regarding and/or negotiating kickbacks associated for the insulin products described herein; (e) written, telephone, or electronic communications regarding the existence, amount, or purpose of discounts and/or rebates ("kickbacks") for the insulin products described herein; (f) the transmission and/or distribution of the insulin products described herein through the mails; and (g) the use of the mails or wires to bill for or collect discounts, revenues, and/or profits from the sale of such insulin products described herein.

347.   Defendant also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

348.   The mail and wire transmissions described herein were made in furtherance of Defendant's scheme and through a common course of conduct designed to increase the cost of insulin medication and fraudulently extract hundreds of millions of dollars of revenue from Plaintiffs.

349.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendant's books and records.

350.   Defendant has not undertaken the practices described herein in isolation but as part of a common scheme.

351.    Defendant's violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Plaintiffs' Assignors. Plaintiffs' Assignors have been injured in their business and/or property in multiple ways, including but not limited to paying excessive and inflated prices for the insulin products described herein.

352.    Therefore, Plaintiffs seek three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT V: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS
(All Defendants)

353.    Plaintiffs incorporates by reference paragraphs 1 through 202 as if fully set forth herein.

## ARIZONA CONSUMER FRAUD ACT
(Ariz. Rev. Stat. § 44-1521, et seq.)

354.    Defendants and Plaintiffs, are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44- 1521(6).

355.    The insulin products described herein are "goods" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

356.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, ... misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale ... of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

357.    As detailed above, Defendants employed deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of the Arizona CFA by the insulin pricing scheme.

358.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

359.    Defendants knew or should have known that their conduct was in violation of the Arizona CFA.

360.    Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs, and continued to engage in unfair and deceptive practices in violation of the Arizona CFA.

361.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public, who in many cases would not have purchased the insulin products but for the fraudulent pricing scheme. As such, the Defendants' unlawful acts and practices complained of herein affect the public interest.

362.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

363.    Defendants material misrepresentations proximately caused Plaintiffs' Assignors to pay for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the pricing scheme, as described herein, until this lawsuit was filed,

the statute of limitation for filing claims against Defendants under the Arizona CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

364.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products described herein.

365.     Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

366.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## DELAWARE CONSUMER FRAUD ACT
### (6 Del. Code § 2513, et seq.)

367.     Plaintiffs and Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

368.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

369.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Delaware CFA by perpetuating the fraudulent insulin pricing scheme as described herein.

370.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

371.    Defendants knew or should have known that their conduct was in violation of the Delaware CFA.

372.    Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the characteristics of the insulin pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Delaware CFA.

373.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

374.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products which they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Delaware CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

375.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of the insulin products as described herein.

376.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

377.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

378.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, et seq.)

379.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the insulin products described herein in Florida, to Plaintiffs, and throughout the United States.

380.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." Fla. Stat. § 501.204(1).

381.   As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of FDUTPA by perpetuating the fraudulent insulin pricing scheme as described herein.

382.   Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

383.   Defendants knew or should have known that their conduct was in violation of FDUTPA.

384.   Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the insulin pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of FDUTPA.

385.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

386.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the FDUTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

387.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or

misrepresentations, at a minimum, in the form of inflated prices of insulin products as described herein.

388.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

389.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

390.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, et seq. and 720 ILCS 295/1a)

391.    Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

392.    Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

393.    The Illinois Consumer Fraud ("ICFDPA"), 815 ILCS 505/1 *et seq.*, prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact[.]"

394.    In addition, the Illinois Deceptive Business Practices Act ("IUDTPA"), 815 ILCS 510/2 *et seq.*, prohibits the use of various deceptive trade practices, including: "(11) mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

395.    As detailed above, Defendants engaged in unfair and deceptive acts in violation of the ICFDPA and the IUDTPA by perpetuating the insulin pricing scheme as described herein.

396.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

397.    Defendants knew or should have known that their conduct was in violation of the ICFDPA and the IUDTPA.

398.    Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs, and continued to engage in unfair and deceptive practices in violation of the ICFDPA and the IUDTPA.

399.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

400.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products described that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the ICFDPA and the IUDTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

401.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or

misrepresentations, at a minimum, in the form of inflated prices for purchases of the insulin products as described herein.

402.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

403.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Defendants in the amount of their actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

404.    Plaintiffs also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

**MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(Minn. Stat. § 325f.68, et seq.)**

405.    The insulin products described herein constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

406.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

407.    As detailed above, Defendants engaged in deceptive acts in violation of the Minnesota CFA by perpetuating the insulin pricing scheme as described herein.

408.     Defendants owed and continue to owe Plaintiffs' Assignors a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

409.     Defendants knew or should have known that their conduct was in violation of the Minnesota CFA.

410.     Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota CFA.

411.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

412.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

413.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of the insulin products as described herein.

414.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest. Pursuant to Minn. Stat. § 8.31(3)(a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

415.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Minn. Stat. § 325d.43-48, et seq.)

416.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, including the following enumerated actions, "(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" or "(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

417.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Minnesota DTPA by perpetuating the insulin pricing scheme as described herein.

418.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

419.    Defendants knew or should have known that their conduct was in violation of the Minnesota DTPA.

420.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing

scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota DTPA.

421. Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

422. Defendants' material misrepresentations proximately caused Plaintiffs to pay inflated prices for the insulin products that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota DTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

423. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

424. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

425. Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

426.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, et seq.)

427.     Defendants, Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

428.     Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

429.     The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

430.     As detailed above, Defendants engaged in unfair, false, and deceptive practices in violation of the above-noted provisions of the Missouri MPA by perpetuating the insulin pricing scheme as described herein.

431.     Defendants conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

432.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

433.     Defendants knew or should have known that their conduct was in violation of the Missouri MPA.

434.     Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the inflated prices of the insulin products described herein, with the intent to mislead regulators, Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the Missouri MPA.

435.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs.

436.     Defendants' material misrepresentations proximately caused Plaintiff to pay inflated prices for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Missouri MPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

437.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

438.     As such Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

**THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. §§ 56:8-1, et seq.)**

439.     Plaintiffs and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

440.     Defendants are engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e).

441.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce within the meaning of the New Jersey Consumer Fraud Act.

442.     The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. § 56:8-2.

443.     In the course of their business, Defendants engaged in unfair and deceptive practices in violation of the New Jersey CFA by perpetuating the insulin pricing scheme as described herein.

444.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the pricing of the insulin products as described herein.

445.     Defendants knew or should have known that their conduct was in violation of the New Jersey CFA.

446.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the inflated prices of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the New Jersey CFA.

447.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

448.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Jersey CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

449.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

450.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, et seq.)

451.   Defendants and Plaintiffs are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

452.   Defendants actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

453.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to:  "(11) making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction;" and "(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive."

454.   In the course of their business, Defendants engaged in unfair and misleading acts in violation of the New Mexico UTPA by perpetuating the insulin pricing scheme as described herein.

455.   Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

456.   Defendants knew or should have known that their conduct was in violation of the New Mexico UTPA.

457.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing of the insulin products described herein, with the intent to mislead regulators and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the New Mexico UTPA.

458.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

459.    Defendants' material misrepresentations proximately caused Plaintiffs to pay inflated prices for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Mexico UTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

460.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

461.    Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs they seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT VI: COMMON LAW FRAUD
### (Against All Defendants)

462.   Plaintiffs incorporates by reference paragraphs 1 through 202 as if fully set forth herein.

463.   As alleged extensively above, Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (a) The true cost and/or price of the insulin products described herein; (b) The inflated and/or fraudulent nature of the list price(s) set and/or charged by Defendants for the insulin products described herein; (c) The existence, amount, and/or purpose(s) of discounts and/or rebates (kickbacks) offered and/or negotiated by Defendants for those products; and (d) The role that Defendants' played in the price paid for the insulin products described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

464.   Defendants valued their profits over the trust, health, and safety of beneficiaries of Plaintiffs' Assignors who purchased insulin at the Wal-Mart in New Jersey and other locations throughout the United States.

465.   Necessarily, Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to consumers, including Plaintiffs.

466.   Defendants' knowingly false representations and omissions were material to Plaintiffs.

467.   Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely.

468.   Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because they possessed exclusive knowledge regarding the nature of insulin pricing, intentionally

concealed the foregoing from Plaintiffs and the public, and made incomplete or negligent representations about the pricing of the insulin products and Defendants' role in that pricing, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

469.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health.

470.    Indeed, as a direct result of Defendants' actions, access to live-saving insulin medication has been limited, denied, or forgone.

471.    Defendants owed Plaintiffs a duty to disclose, truthfully, all the facts concerning the true cost of the insulin products described herein and the inflated and fraudulent nature of their pricing; the existence, amount, and purpose of rebated and discounts negotiated for those products; and the role that Defendants played in increasing the price of the insulin products described herein.

472.    Defendants hatched their deceptive schemes and knew that their customers, including Plaintiffs, did not know about (and could not reasonably discover) the manner in which it sought to artificially inflate the price of the insulin medications.

473.    Defendants not only concealed all the facts concerning the true cost of the insulin products described herein, but went further to make affirmative misrepresentations in marketing materials and other communications that Defendants worked to lower the ultimate cost of prescription medications.

474.    Defendants engaged in this fraudulent concealment at the expense of Plaintiffs making such material misrepresentations to induce Plaintiffs to rely on such, to their detriment.

475.    Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they reasonably relied on Defendants' representations.

476.    As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

477.    Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

478.    Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COUNT VII: UNJUST ENRICHMENT
(Against All Defendants)

479.    Plaintiffs incorporates by reference paragraphs 1 through 202 as if fully set forth herein.

480.    Defendants have benefitted from selling, setting prices for and negotiating discounts for insulin products marketed and sold at an artificially inflated price.

481.    Defendants have received and retained unjust benefits from the Plaintiffs, in the form of costs paid, copayments, and coinsurance payments, and inequity has resulted.

482.    It is inequitable and unconscionable for Defendants to retain these benefits.

483.    Because Defendants concealed their fraud and deception, Plaintiffs was not aware of the true facts concerning the Insulin Pricing Scheme described herein and did not benefit from Defendants' misconduct.

484.    Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

485.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully demands that this Court:

D.      Enter judgments against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

E.      Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, including, inter alia, an order prohibiting Defendants from engaging in the unlawful acts described above; an order requiring Defendants or their agents to disclose the existence and/or amount of any rebates, discounts, fees, or other payments received by the PBM Defendants for including the prescription insulin medications described herein on any formulary, and an order requiring Defendants or their agents to disclose the true net price of the prescription insulin medication described herein collected by the Drug Manufacturer Defendants;

F.      Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

G.      Award the Plaintiffs damages (i.e. three times overcharges) in an amount to be determined at trial;

H.      Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, the common fund doctrine, and applicable state law;

I.      Find that Defendants are jointly and severally liable for all claims;

J.      Order that Defendants must notify each individual who paid a copayment or coinsurance for covered prescription drugs that exceeded the true cost of the drug about the pendency of this action so that they may obtain relief from Defendants for their harm; and

K.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED,

**COHEN PLACITELLA AND ROTH PC**

/s/Christopher Placitella
Christopher M. Placitella (027781981)
Dennis M. Geier (035272006)

127 Maple Avenue
Red Bank, New Jersey 07701
Phone: 732-747-9003
Facsimile: 732-747-9004

*Attorneys for Plaintiff*

## APPENDIX

Assignments to Plaintiffs

A1.     On 9/21/2015, 7th Avenue Medical Plaza, Inc. entered into an assignment with MSP Recovery 15-473, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-473, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from 7th Avenue Medical Plaza, Inc.  This assignment was made pursuant to the Series 15-09-32 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A2.     On 12/10/2015, Alianza Profesional de Cuidado Medico, Inc. entered into an agreement with MSP Recovery 15-627, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The

assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-627, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Alianza Profesional de Cuidado Medico, Inc.  This assignment was made pursuant to the Series 15-12-404 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A3.    On 8/12/2015, America's 1st Choice Health Plans, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from America's 1st Choice Health Plans, Inc.  This assignment was made pursuant to the Series 15-08-16 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A4.    On 8/12/2015, America's 1st Choice of South Carolina, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient

hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from America's 1st Choice of South Carolina, Inc.  This assignment was made pursuant to the Series 15-08-16 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A5.    On 12/16/2015, Arse, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments assigned from Arse, Inc.  This assignment was made pursuant to the Series 15-12-406 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind

the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A6.     On 3/1/2016, Asomante Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Asomante Medical Group, Inc.  This assignment was made pursuant to the Series 16-03-444 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A7.      On 2/26/2016, Asociacion Medico Selecto de la Montana, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered

into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover as assigned from Asociacion Medico Selecto de la Montana, Inc.  This assignment was made pursuant to the Series 16-03-441 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A8.     On 2/18/2016, Broward Primary Partners, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Broward Primary Partners, LLC.  This assignment was made pursuant to the Series 16-02-437 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A9.     On 2/4/2016, Canovanas Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's

right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Canovanas Medical Group, Inc.  This assignment was made pursuant to the Series 16-02-427 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A10.    On 1/19/2017, Ortho Miami (CE Ceballos MD LLC) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On

6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Ortho Miami (CE Ceballos MD LLC)." This assignment was made pursuant to the Series 17-03-584 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A11. On 5/2/2016, Centro Ceski, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Centro Ceski. This assignment was made pursuant to the Series 16-02-445 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in

executing these assignments.

A12.    On 2/22/2016, Centro Medico de Salinas, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments assigned from Centro Medico de Salinas, Inc.  This assignment was made pursuant to the Series 16-02-438 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A13.    On 11/23/2015, Century HealthCare, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP

Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Century HealthCare, Inc. This assignment was made pursuant to the Series 15-08-24 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A14.    On 12/16/2015, Corporacion Medica Oriental, Corp. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Corporacion Medica Oriental, Corp. This assignment was made pursuant to the Series 15-12-407 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A15.    On 3/31/2016, Corporacion Puertorriquena de Salud, Inc. (CPS) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any

of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Corporacion Puertorriquena de Salud, Inc. (CPS)."  This assignment was made pursuant to the Series 16-04-448 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A16.    On 11/23/2015, Doctor's Group Management, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered

into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Doctor's Group Management, Inc.  This assignment was made pursuant to the Series 15-08-26 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A17.   On 8/14/2015, Family Medicine Group, Inc. entered into an agreement with MSP Recovery 15-222, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-522, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Family Medicine Group, Inc.  This assignment was made pursuant to the Series 15-09-281 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A18.   On 6/19/2017, Fallon Community Health Plan, Inc. entered into an agreement with MSP Recovery LLC.  Said assignment included the following language "[c]lient hereby

irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Massachusetts law.  On 6/20/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Fallon Community Health Plan, Inc.  This assignment was made pursuant to the Series 17-04-631 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A19.   On 10/9/2015, Farid Marquez, MD, PA entered into an agreement with MSP Recovery 529, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of

sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 529, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Farid Marquez, MD, PA.  This assignment was made pursuant to the Series 15-09-284 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A20.   On 2/26/2016, First Medical Center, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from First Medical Center, Inc.  This assignment was made pursuant to the Series 16-03-442 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A21.   On 8/12/2015, Foothill Accountable Medical Group, Inc. entered into an agreement

with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Foothill Accountable Medical Group, Inc. This assignment was made pursuant to the Series 15-08-15 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A22.    On 8/12/2015, Freedom Health, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Freedom Health, Inc. This was made pursuant to the Series 15-08-16 agreement. This

second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A23.    On 12/10/2015, Grupo de Cuidado Medico Integral, Inc. entered into an agreement with MSP Recovery 15-626, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery 15-626, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo de Cuidado Medico Integral, Inc.  This assignment was made pursuant to the Series 15-12-403 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A24.    On 2/4/2016, Grupo Medico Aliado Del Noreste, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo Medico Aliado Del Noreste, Inc.  This assignment was made pursuant to the Series 16-02-433 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A25.   On 2/2/2015, Grupo Medico del Noreste, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo Medico del Noreste, Inc.  This assignment was made pursuant to the Series 16-02-429 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A26.   On 2/4/2016, Grupo Medico del Yunque, Inc. entered into an agreement with MSP

Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Grupo Medico del Yunque, Inc. This assignment was made pursuant to the Series 16-02-428 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A27.   On 4/28/2016, Health First Administrative Plans, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The

assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Health First Administrative Plans, Inc. This assignment was made pursuant to the Series 16-05-456 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A28. On 8/28/2015, Healthcare Advisors Services, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Healthcare Advisors Services, Inc. This assignment was made pursuant to the Series 15-08-27 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A29. On 10/8/2015, Healthcare Alliance Group, Inc. entered into an agreement with

MSP Recovery 15-475, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery 15-475, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Healthcare Alliance Group, Inc. This assignment was made pursuant to the Series 15-09-273 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A30.   On 9/14/2015, Hygea Health Holdings, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Hyega Health Holdings, Inc. This assignment was made pursuant to the Series 15-08-19

agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A31.    On 8/11/2015, Intervalley Health Plan, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments as assigned from Intervalley Health Plan, Inc.  This assignment was made pursuant to the Series 15-09-242 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A32.    On 12/10/2015, MCA Health Group, LLC entered into an agreement with MSP Recovery 15-625, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any

party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-625, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from MCA Health Group, LLC.  This assignment was made pursuant to the Series 15-12-402 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

    A33.   On 12/10/2015, Medico-Caribe CSP, Inc. entered into an agreement with MSP Recovery 15-623, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-623, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Medico-Caribe CSP, Inc. (medico)."  This assignment was made pursuant to the Series 15-12-400 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A34.    On 2/18/2016, Medical IPA of the Palm Beaches, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Medical IPA of the Palm Beaches, Inc.  This assignment was made pursuant to the Series 16-02-436 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A35.    On 12/10/2015, Metro Medical Health Group, Inc. entered into an agreement with MSP Recovery 15-622, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-622, LLC entered into an agreement with MSP Recovery Claims, Series LLC,  irrevocably  assigning  its  right  to  recover

payments   as assigned from Metro Medical Health Group, Inc.  This assignment was made pursuant to the Series 15-12-399 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A36.   On 2/28/2017, Miami Institute for Joint Reconstruction (Arturo Corces, MD PA) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Miami Institute for Joint Reconstruction (Arturo Corces, MD PA)."  This assignment was made pursuant to the Series 17-02-565 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in

executing these assignments.

A37.    On 12/10/2015, Millennium Medical, Inc. entered into an agreement with MSP Recovery 15-621, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-621, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Millennium Medical, Inc.  This assignment was made pursuant to the Series 15-12-398 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A38.    On 6/12/2017, MMM Holdings, LLC entered into an agreement with MSP Recovery, LLC Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer

protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/20/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from MMM Holdings, LLC. This assignment was made pursuant to the Series 17-02-554 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A39. On 12/10/2015, Opcion MCA, Inc. entered into an agreement with MSP Recovery 15-624, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery 15-624, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from Opcion MCA, Inc. This assignment was made pursuant to the Series 15-12-401 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these

assignments.

A40.   On 8/12/2015, Optimum Healthcare and Affiliates, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from Optimum Healthcare and Affiliates, Inc.  This assignment was made pursuant to the Series 15-08-14 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A41.   On 11/8/2016, OrthoNow, LLC (Doral) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to

the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from OrthoNow, LLC (Doral)."  This assignment was made pursuant to the Series 16-11-524 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A42.   On 12/23/2015, Palm Beach Primary Care Associates, Inc. entered into an agreement with MSP Recovery 16-1, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 16-1, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Palm Beach Primary Care Associates, Inc.  This assignment was made pursuant to the Series 16-01-409 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given

between each party in executing these assignments.

A43.    On 10/29/2015, Physician Access Urgent Care Group, LLC (PAUG) entered into an agreement with MSP Recovery 15-580, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery 15-580, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Physician Access Urgent Care Group, LLC (PAUG)." This assignment was made pursuant to the Series 15-10-362 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A44.    On 10/9/2015, PDP Health Management, Inc. entered into an agreement with MSP Recovery 15-333, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery 15-333, LLC entered into an agreement

with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from PDP Health Management, Inc.  This assignment was made pursuant to the Series 15-09-293 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A45.   On 12/3/2015, Physicians HMO (IPA 951) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Physicians HMO (IPA 951).  This assignment was made pursuant to the Series 15-12-396 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A46.   On 12/13/2016, Plum Healthcare Group, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and

assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Plum Healthcare Group, LLC.  This assignment was made pursuant to the Series 16-10-504 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A47.   On 5/6/2016, Policlinicas Medicas Asociadas, Inc. entered into an agreement with MSP Recovery, LLC, Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with

MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover as assigned from Policlinicas Medicas Asociadas, Inc.  This assignment was made pursuant to the Series 16-05-457 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A48.    On 5/6/2016, Policlinicas Medicas Asociadas, Inc. entered into an agreement with MSP Recovery, LLC, irrevocably assigning its right to recover   payments.  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Policlinicas Medicas Asociadas, Inc.  This assignment was made pursuant to the Series 16-05-457 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A49.    On 4/16/2016, Ponce Advance Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all

rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Ponce Advance Medical Group, Inc. This assignment was made pursuant to the Series 16-04-454 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A50. On 2/18/2016, Preferred Primary Care, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered into under Florida law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Preferred Primary Care, LLC. This assignment was made pursuant to the Series 16-02-435 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered

into under Delaware law.   Consideration was given between each party in executing these assignments.

A51.   On 8/13/2015, Presgar Imaging of CMI North, LLC entered into an agreement with MSP Recovery 200, LLC.   Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery 200, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments   as assigned from Presgar Imaging of CMI North, LLC.  This assignment was made pursuant to the Series 15-08-21 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A52.   On 1/15/2016, Primary Physicians Medical Services, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[i]n order to pursue the Primary Payors Claims, and as limited to the Primary Payors Claims client hereby assigns, transfers, conveys, sets over and delivers to MSP or its Assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party (the "Assigned Claims")." This includes, but is not limited to, primary payors

and/or third parties that may be liable to client arising from or relating to the Assigned Claims. The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law. On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Primary Physicians Medical Services, LLC.  This assignment was made pursuant to the Series 16-01-413 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A53.   On 4/20/2015, Primum HealthCare, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Primum HealthCare, LLC.  This assignment was made pursuant to the Series 15-11-384 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A54.   On 10/29/2015, Puerto Rico Performance Medical Group, Inc. entered into an agreement with MSP Recovery, 15-604 LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, 15-604 LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Puerto Rico Performance Group, Inc.  This assignment was made pursuant to the Series 15-11-383 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A55.   On 2/26/2016, Quality Care Physicians, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as

assigned from Quality Care Physicians, LLC.  This assignment was made pursuant to the Series 16-03-440 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A56.   On 9/21/2015, Quality Medical Association of West Delray, Inc. entered into an agreement with MSP Recovery 16-2, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 16-2, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Quality Medical Association of West Delray, Inc.  This assignment was made pursuant to the Series 16-01-410 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A57.   On 2/22/2016, Quality Medical Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to

pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Quality Medical Group, Inc.  This assignment was made pursuant to the Series 16-02-439 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A58.    On 2/18/2016, Healthy Partners/Risk Watchers, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Healthy Partners / Risk Watchers, Inc.  This assignment was made pursuant to the Series 15-09-31 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these

assignments.

A59.    On 7/26/2016, SE Primary Services, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Puerto Rico law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from SE Primary Services, Inc.  This assignment was made pursuant to the Series 16-07-481 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Delaware law. Consideration was given between each party in executing these assignments.

A60.    On 1/18/2016, Southern Healthcare Group, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to

pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Southern Healthcare Group, Inc.  This assignment was made pursuant to the Series 16-01-420 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A61.   On 5/12/2017, SummaCare, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Ohio law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right

to recover payments as assigned from SummaCare, Inc.  This assignment was made pursuant to the Series 16-11-509 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A62.    On 9/21/2015, Suncoast Medical Network 2, Inc. entered into an agreement with MSP Recovery, 220, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.    On 6/12/2017, MSP Recovery 220, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments    as assigned from Suncoast Medical Network 2, Inc.  This assignment was made pursuant to the Series 15-08-10 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A63.    On 11/9/2015, Suncoast Provider Network, Inc. entered into an agreement with MSP Recovery 15-608, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information

used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-608, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments  as assigned from Suncoast Provider Network, Inc.  This assignment was made pursuant to the Series 15-11-387 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A64.   On 11/3/2015, Transatlantic Healthcare entered into an agreement with MSP Recovery 15-131, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-131, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Transatlantic Healthcare.  This assignment was made pursuant to the Series 15-11-385 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these

assignments.

A65.   On 11/3/2015, Trinity Physicians, LLC entered into an agreement with MSP Recovery 15-592, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery 15-592, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover  payments  as assigned from Trinity Physicians, LLC.  This assignment was made pursuant to the Series 15-11-371 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.  Consideration was given between each party in executing these assignments.

A66.   On 11/23/2015, University Health Care MSO, Inc. entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP

Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from University Health Care MSO, Inc.  This assignment was made pursuant to the Series 15-08-25 agreement. This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law.   Consideration was given between each party in executing these assignments.

A67.    On 4/7/2016, Verimed IPA, LLC entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 6/12/2017, MSP Recovery, LLC entered into an agreement with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover   payments   as assigned from Verimed IPA, LLC.  This assignment was made pursuant to the Series 15-09-108 agreement.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Delaware law. Consideration was given between each party in

executing these assignments.

A68.    On 4/28/2015, Choice One Medical Group, LLC entered into an agreement with MSPA Claims II, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims II, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from Choice One Medical Group, LLC.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Choice One Medical Group, LLC and MSPA Claims II, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

A69.    On 6/2/2015, Meridian Health Systems ACO, Corp. (Meridian Holdings) entered into an agreement with MSPA Claims VIII, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or

has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims VIII, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover payments   as assigned from Meridian Holdings.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.   On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Meridian Holdings and MSPA Claims VIII, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

A70.   On 5/14/2015, Pasteur Medical Centers entered into an agreement with MSP Claims III, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSP Claims III, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from Pasteur Medical Centers.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments  as assigned from Pasteur Medical Centers and MSP Claims III, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law. Consideration was given between each party in executing these assignments.

     A71.   On 6/25/2015, Professional Health Choice entered into an agreement with MSP Claims XI, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  On 1/21/2016, MSP Claims XI, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover  payments  as assigned from Professional Health Choice.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments   as assigned from Professional Health Choice and MSP Claims XI, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law. Consideration was given between each party in executing these assignments.

A72.    On 6/2/2015, Texas Physicians ACO entered into an agreement with MSPA Claims X, LLC. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."    The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims X, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from Texas Physicians ACO.   This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This second assignment was entered into under Florida law.   On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments   as assigned from Texas Physicians ACO and MSPA Claims X, LLC.   This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.   This third assignment was entered into under Florida law. Consideration was given between each party in executing these assignments.

A73.    On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an agreement with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that

Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 2/20/2015, MSP Recovery, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Interamerican Medical Center Group, LLC (IMC)."  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.

A74.   On 8/25/2015, MedConnect Solutions, Inc. entered into an agreement with MSPA Claims III. Said assignment included the following language "[c]lient hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims")."   The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.   On 1/21/2016, MSPA Claims III, LLC entered into an agreement with MSP Recovery Services, LLC, irrevocably assigning its right to recover   payments   as assigned from MedConnect Solutions, Inc.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second

assignment was entered into under Florida law.   On 1/21/2016, MSP Recovery Services, LLC entered into an agreement with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments   as assigned from MedConnect Solutions, Inc. and MSPA Claims III, LLC.  This third assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This third assignment was entered into under Florida law. Consideration was given between each party in executing these assignments.

   A75. On 4/27/2017, Reliance ACO, LLC entered into an agreement with MSP Recovery Claims, Series LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered into under Florida law.  Consideration was given between each party in executing these assignments.