**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES, LLC, a Delaware entity, MAO-MSO RECOVERY II, LLC, SERIES PMPI, a Delaware entity, and MSPA CLAIMS 1, LLC, a Florida entity, <br><br> Plaintiffs, <br> v. <br><br> SANOFI AVENTIS U.S. LLC, NOVO NORDISK     INC., and ELI LILLY AND COMPANY, <br><br> Defendants. | CASE NO.: 18-CV-02211 <br><br> FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 3

PARTIES ............................................................................................................................... 9

STANDING .......................................................................................................................... 11

JURISDICTION AND VENUE ......................................................................................... 12

FACTUAL ALLEGATIONS .............................................................................................. 13

    Insulin Therapy for Diabetics ..................................................................................... 13

    The Dramatic Rise in the Price of Analog Insulin ................................................... 14

MEDICARE ......................................................................................................................... 16

    Medicare Part D ............................................................................................................ 16

THE INSULIN PRICING SCHEME ................................................................................ 19

    Defendants' Concealment of the Insulin Pricing Scheme ....................................... 19

    Pharmaceutical Supply Chain Overview ................................................................... 19

The Insulin Pricing Scheme: Rebates Gone Awry ......................................................... 21

The List/Net Price Divergence ......................................................................................... 22

The Rise of the PBMs in the Pharmaceutical Supply Chain ......................................... 25

Defendants Admit the Insulin Pricing Scheme ............................................................... 26

High List Prices Directly Impact Plaintiffs' Ability to Provide Benefits ................... 29

TOLLING OF THE STATUTE OF LIMITATIONS ...................................................... 31

    DISCOVERY RULE TOLLING ................................................................................. 31

    FRAUDULENT CONCEALMENT TOLLING ........................................................ 31

    ESTOPPEL ..................................................................................................................... 32

CLAIMS FOR RELIEF ...................................................................................................... 32

COUNT I .............................................................................................................................. 32

A.   Defendants are culpable "persons" under RICO ................................................... 32

B.   The Manufacturer-PBM Insulin Pricing RICO Enterprises ............................... 33

1.   The Novo Nordisk-PBM Insulin Pricing Enterprises ........................................... 36

2.   The Sanofi-PBM Insulin Pricing Enterprises ........................................................ 37

3.   The Eli Lilly-PBM Insulin Pricing Enterprises ..................................................... 38

C.   The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities .......... 41

D.   Conduct of the RICO Enterprises' affairs .............................................................. 43

E.   The Defendant Drug Manufacturers' pattern of racketeering activity ............... 45

F.   The Defendant Drug Manufacturers' motive ......................................................... 48

G.   Damages caused by the Defendant Drug Manufacturers' rebate scheme ........... 48

i

**COUNT II** ..................................................................................................... **49**

   **COUNT III: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS** ............................ **52**

      **ARIZONA CONSUMER FRAUD ACT** ............................................................. **52**

      **DELAWARE CONSUMER FRAUD ACT** ........................................................... **54**

      **FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES ACT** ........................... **56**

      **ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT** ........... **58**

      **MINNESOTA PREVENTION OF CONSUMER FRAUD ACT** .................................. **60**

      **MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT** ......................... **62**

      **MISSOURI MERCHANDISING PRACTICES ACT** .............................................. **63**

      **THE NEW JERSEY CONSUMER FRAUD ACT** ................................................ **65**

      **THE NEW MEXICO UNFAIR TRADE PRACTICES ACT** .................................... **67**

   **COUNT IV: COMMON LAW FRAUD** .......................................................... **69**

   **COUNT V: UNJUST ENRICHMENT** ............................................................ **72**

**DEMAND FOR JUDGMENT** ................................................................................ **72**

**JURY DEMAND** ................................................................................................. **73**

**APPENDIX** ........................................................................................................ **1**

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC, a Delaware entity, MSPA CLAIMS 1, LLC, a Florida entity, and MAO-MSO RECOVERY II, LLC, a Delaware entity ("Plaintiffs"), bring this action against Defendants Sanofi-Aventis U.S. LLC ("Sanofi"), Novo Nordisk Inc. ("Novo Nordisk"), and Eli Lilly and Company ("Eli Lilly") (collectively, "Defendants") to redress Plaintiffs' injuries due to Defendants' insulin pricing scheme, which has driven up the cost of insulin to the substantial benefit of Defendants. Plaintiffs' allegations, proof and statistical data presented in this complaint are based on their own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, reports, and other sources.

## **INTRODUCTION**

1.      Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with the condition. In total, nearly 30 million people, 9.3% of the country, live with diabetes. Of this number, approximately six million people rely on daily insulin treatments to survive. Interruptions to or interference with insulin therapy (e.g., insufficient insulin) can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia (hyperosmolar hyperglycemic state or "HHS") and then diabetic ketoacidosis ("DKA"). Left untreated, DKA can lead to loss of consciousness and death within days. DKA is responsible for more than 500,000 hospital stays per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.

2.      As alleged in detail below, numerous third-party payers, including Medicare Advantage Organizations ("MAOs"), health maintenance organizations ("HMOs"), management service organizations ("MSOs"), and other Medicare downstream entities across the United States have assigned their recovery rights to Plaintiffs, including the right to recover payments for fraudulently-inflated prescriptions.

3.      Plaintiffs, on behalf of its assignors, bring this action against Sanofi, Novo Nordisk, and Eli Lilly ("Defendants"), manufacturers of analog insulin, for the artificial and fraudulent inflation of the price of insulin in the United States.  The analog insulin medications at issue in this complaint are: Novolog, Levemir, Apidra, Lantus, Toujeo, and Humalog.

4.      Defendants conspired with two of the largest pharmacy benefit managers (PBMs)—CVS Health and Express Scripts—to widen a secret spread between the manufacturers' published and misleading benchmark prices, and their undisclosed net selling prices for their analog insulins. Cognizant that PBM profits are tied to the size of the spread between the benchmark price and actual net selling prices, the manufacturers have engaged in an arms race of increasing their spreads by artificially inflating benchmark prices without significantly changing the net prices. This benchmark price inflation pads the pockets of PBMs, who retain a percentage of the spread between benchmark price and net price. To carry out this scheme, the Defendant Drug Manufacturers publicly report one price—the benchmark or "sticker" price—for their analog insulins while secretly offering a far lower price—the net price—to the largest PBMs. In exchange for the manufacturers' inflation of their benchmark prices (and corresponding spreads between prices), the PBMs promise preferred formulary placement to the winning bidder, *i.e.*, the manufacturer with the highest spread. As a result, formulary decisions for these important medications are increasingly made based on inflated benchmark prices (and corresponding spread inflation) rather than net prices or safety and efficacy of the analog insulins.

5.      If operated properly, PBMs should negotiate lower prices for pharmaceutical products, such as insulin. Two of the nation's most influential PBMs (CVS Health and Express Scripts), together cover eighty percent of the insured market, or 115 million lives.

6.      Over the course of the last decade, each Defendant has steadily raised the  prices of its respective analog insulin to a remarkable degree.

7.      Drugs that used to cost $25 per prescription now cost between $250 and $450, and in the last five years alone, Defendants have raised their list prices for analog insulin by over 150%.

8.      Defendants' analog insulin list price increases have been both rapid and in lock-step with one another.

9.      The skyrocketing list prices for insulin cannot be explained away with typical drug company rationalizations for high costs, such as manufacturing or supply costs.

10.     Indeed, the manufacturers admit that their list price hikes are unrelated to any jump in production or research and development costs.

11.     Instead, the increased list prices are the result of a scheme between the Defendants and the largest Pharmacy Benefit Managers ("PBM(s)"), including those identified below as unnamed co-conspirators. In this scheme (the "Insulin Pricing Scheme"), Defendants and the PBMs agree on three different prices for their insulin treatments: (1) a publicly-available "list" price, (2) a "discount" price at which the third-party payers using the PBMs will purchase the drugs, and – most importantly – (3) a "net" price that reflects a rebate, *viz.* kickback, that the Defendants will later pay to the PBMs, the amount of which neither the Defendants nor the PBMs will disclose to the third-party payers.

12.     For analog insulin, the gap between these prices has significantly increased.

13.     To understand the Insulin Pricing Scheme, and the reason it is so profitable for Defendants, it is first necessary to understand the role of PBMs in the pharmaceutical supply chain in the United States.

14.     The PBMs serve as both middlemen and gatekeepers between drug manufacturers on the one hand, and health insurers and patients on the other.

15.     PBMs set up tiered formularies for their third party payers clients.

16.     Whether a drug appears on a third-party payer's formulary – and in which tier – determines if, and to what proportion, the third-party payer will bear the cost of the drug for its beneficiaries. Drugs in lower tiers are available to beneficiaries at a lower out-of-pocket cost than drugs in the higher tiers.

17.     Where two medicines are largely interchangeable from a clinical standpoint, a PBM will exclude one of them or place it on a higher, less preferred tier. The purpose for all of this is supposed to be to encourage beneficiaries to use those drugs which the third-party payer can obtain at a lower cost.

18.     Conversely, however, the PBMs' power to place drugs at specific formulary tiers, combined with the scale of consumption that PBMs manage for all the beneficiaries across their many third-party payer clients, gives the PBMs great bargaining power over drug manufacturers. This power can cause a manufacturer to lower its prices in exchange for the drug's listing on a more favorable tier *vis-à-vis* its competitors in a therapeutic class. In some instances, the PBM may grant a manufacturer an exclusive listing for a drug, such that a beneficiary wishing to use a competing drug would have to pay full price, with no negotiated discount, out-of-pocket.

19.     While PBMs could and should use their market power to drive down drug prices for third-party payers and their beneficiaries the PBMs and Defendants have implemented the Insulin Pricing Scheme to cause third-party payers, and their beneficiaries, to unwittingly fund both inflated drug prices and kickbacks to the PBMs.

20.     In the more transparent phase of the Insulin Pricing Scheme, the Defendants artificially set a list price. The PBMs then obtain a discount price from the Defendants, and often get paid a fee from third party payers for purportedly using their market power to obtain the discount. This discounted price is known to all, and is the basis for which a beneficiary's out-of-pocket expenses are determined.

21.     What is not fully known to the third-party payers (or their beneficiaries) is how much of a kickback the Defendants separately pay to the PBMs, a further effective reduction in price that is not fully realized by the third-party payers (or their beneficiaries).

22.     These kickbacks are given different labels—rebates, credits, concession fees, etc. Regardless of the label, the kickbacks are a *quid pro quo* to the PBM for formulary inclusion and/or preferred tier placement.

23.     In the context of this complaint, the kickbacks include all payments or financial benefits of any kind conferred by Defendants to PBMs, either directly or indirectly via intermediaries controlled by Defendants.

24.     The result of the Scheme is a wide difference between the list price and the final, secret net price realized by Defendants after the kickbacks are paid.

25.     While the PBMs <u>may</u> pass a portion of kickbacks on to some of their third-party payer clients, the PBMs will not disclose the full amount of the kickbacks it receives from the Defendants.

26.     As a result of the Scheme and its lack of transparency, the Defendants are able to obtain or maintain formulary status without any significant reduction in profits, while forcing third-party payers (and their beneficiaries) to pay not just for the drugs, but also for the undisclosed kickbacks that are paid to the PBMs.

27.     To make matters worse, since the Defendants are not competing to transparently reduce the price of the drugs to third-party payers, but instead are competing to offer the PBMs greater hidden kickbacks, the prices of each of the Defendants' drugs – both the "list" price and the "discount price" – have risen steadily, a phenomenon which has no legitimate economic cause.

28.     An arms race in the escalation of reported benchmark prices – and consequently spreads – has ensued between the defendants. Each Defendant has incrementally raised its benchmark prices just a bit more than its competitors, encouraging the large PBMs to keep its insulin on the formulary or in a preferred formulary position. Yet, the manufacturers' net selling prices have largely remained stagnant. Plaintiffs' assignors are injured by this list and net price divergence.

29.     In an investigative piece published in 2016, exploring the role of middlemen PBMs in skyrocketing insulin prices, the Wall Street Journal used the following graph to illustrate the price gap for Lantus, Defendant Sanofi's top-selling insulin:



Denise Roland, *Insulin Prices Climb, Fueled by Middlemen*, Wall St. J., Oct. 10, 2016.

30.    If the relationship between the Defendant manufacturers, PBMs, and consumers (meaning third-party payers and their beneficiaries) worked as it should, Defendants would feel the economic "pain" and reduce their margins as far as possible, to the benefit of consumers because the branded insulin products at issue are in the same therapeutic category and have similar effectiveness and safety profiles. Instead, the Scheme allows Defendants to maintain or increase their margins, surreptitiously provide additional revenue to the PBMs, and transfer all economic "pain" to consumers.

31.    In January 2016, Eli Lilly spokeswoman Julie Williams described the Insulin Pricing Scheme alleged herein:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price. For example, the net price for Humalog—our most commonly used insulin—increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

Mike Hoskins, *The High Cost of Insulin (Plus a Plea to Lilly, Novo, and Sanofi)*, Healthline, (February 22, 2016), https://www.healthline.com/diabetesmine/high-cost-insulin-and-plea-to-lilly#1.   What is

left unsaid is that the reason the consumer "experience" (price inflation) greatly outpaces the "net price" for Humalog is because of the kickback scheme that consumers are being forced to finance.

32.    In 2016, an op-ed piece in the New York Times called for transparency in the insulin market:

> In the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.

Kasia  Lipska, "Break Up the Insulin Racket," *N.Y. Times* (Feb. 20, 2016),

https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html (last visited

June 22, 2018).

33.    As alleged in greater detail below, the Defendants' participation in the Insulin Pricing Scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and the consumer protection statutes of several states.

34.    Defendants' Insulin Pricing Scheme caused third party payers, including the Plaintiffs' assignors, to overpay for these life-saving medications on behalf of thousands of individual beneficiaries throughout the United States, including in New Jersey.

35.    Therefore, this action seeks damages, damage multipliers, and injunctive relief to put an end to the anti-consumer, fraudulent, and non-transparent Insulin Pricing Scheme.

## PARTIES

36.    MSP Recovery Claims, Series LLC, is a Delaware entity with its principal place of business located at 5000 S.W. 75th Avenue, Suite 400, Miami, FL 33155.

37.    Plaintiff MSPA Claims 1, LLC is a Florida entity, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, FL 33134.

38.     Plaintiff, MAO-MSO Recovery II, LLC, Series PMPI, is a Delaware entity with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626.

39.     Plaintiffs have been assigned recovery rights for multiple Medicare Advantage plans, including Medicare Advantage Organizations ("MAOs"), health maintenance organizations ("HMOs"), and management service organizations ("MSOs"). (Collectively, "Plaintiffs' Assignors".)Attached hereto is an Appendix detailing representative individual assignments between entities providing Medicare Part D benefits and Plaintiffs. During this litigation, additional MA Plans are likely to assign rights to Plaintiffs.

40.     Plaintiffs' Assignors paid Medicare benefits on behalf of the Medicare-eligible beneficiaries enrolled under the Medicare Advantage program. MAOs and/or their Assignees paid or otherwise incurred losses for insulin through Defendants' racketeering and unlawful practice(s).

41.     Defendant, Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its headquarters in Bridgewater, New Jersey. Sanofi manufactures Apidra, a rapid- acting insulin, and Lantus, a long-acting insulin. For 2015, the Sanofi group reported that Lantus "was the Group's leading product … representing 17.2% of the Group's aggregate net sales for the year." Defendant Sanofi-Aventis U.S. LLC can be served through Corporation Service Company located at Princeton South Corporate CTR STE 160, 100 Charles Ewing Blvd, Ewing, NJ 08628, their authorized agent for service of process in the State of New Jersey.

42.     Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation. Its headquarters are in Plainsboro, New Jersey. Novo Nordisk manufactures insulin products including NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. Defendant Novo Nordisk Inc. can be served at The Corporation Trust Company, 820 Bear Tavern Road, West Trenton, NJ 08628, their authorized agent for service of process in the State of New Jersey.

43.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation, and its principal place of business is in Indianapolis, Indiana. Eli Lilly produces the rapid-acting insulin

product Humalog. Defendant Eli Lilly and Company markets, distributes, and sells its products throughout the state of New Jersey, and maintains a registered agent in the state, which is located at 820 Bear Tavern Rd., West Trenton, NJ 08628. Defendant "manufactures [its] products and sells them in interstate commerce to certain selected New Jersey wholesalers," wherein "these wholesalers then sell the products in intrastate commerce to New Jersey hospitals, physicians and retail drug stores, and these retail stores in turn sell them, again in intrastate commerce, to the general public." (obtained from *Eli Lilly Co. v. Sav-On-Drugs, Inc*., 366 U.S. 276, 278 (1961)). Plaintiff maintains an office at 440 Route 22 East, Bridgewater, NJ 08807.

44.     Although not named as parties, the following are co-conspirators, pursuant to 18 U.S.C.§§ 1962(c) and (d), who actively participating in Defendants' scheme to inflate the price of insulin and conceal Defendants' role in participating in this scheme, which had the intended result of defrauding Plaintiffs' Assignors into paying unlawfully inflated prices for insulin.

a.     CVS Health Corporation and its subsidiaries, including Caremark Rx, L.L.C. and Caremark Rx, Inc.

b.     Express Scripts, Inc. and its corporate parent, Express Scripts Holding Company.

## **STANDING**

45.     Plaintiffs Assignor administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

46.     Representative assignments to Plaintiffs, which are alleged in the Appendix to this First Amended Complaint, are valid and binding contracts.

47.    At all material times hereto, one or more of Plaintiffs' assignors provided Medicare benefits to beneficiaries, including payment for the beneficiaries' insulin prescription. Attached hereto as Exhibit A is a non-exhaustive list of instances wherein Plaintiffs' assignors paid for insulin prescriptions for beneficiaries.[1]

48.    Plaintiffs' Assignors provided payment for their beneficiaries' prescribed insulin in New Jersey and across the United States.

## JURISDICTION AND VENUE

49.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) as this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

50.    This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

51.    The Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. 15 U.S.C. § 22 provides for nationwide service of process.

52.    This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

---

[1] In Exhibit A, MSP Mrd ID, is the unique internal patient code, which is an internal number used in place of an individual's name; source NDC codes are unique codes for pharmaceuticals that delineates the labeler, the drug, and the dosage; product name is the name of the pharmaceutical; MSP DOS is the date of service; the value is how much Plaintiffs' assignors paid for the pharmaceutical; address, city, and zip, is the address of the pharmaceutical provider.

53.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, has a principal place of business in, and/or has agents in New Jersey and because some of the actions giving rise to the complaint took place within this district.

54.     Venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside or may be found in this District and some or all fiduciary breaches or other violations for which relief is sought occurred in or originated in this District.

55.     Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

56.     Venue is also proper in this District pursuant to 15 U.S.C. § 22 because most Defendants inhabit, are found, have an agent, or transact business in this District.

## FACTUAL ALLEGATIONS

### Insulin Therapy for Diabetics

57.     Diabetes is a condition in which the body does not properly process food for use as energy.

58.     In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the bloodstream to be effectively used, by the body, as energy.

59.     People with diabetes are unable to make enough insulin or cannot use insulin as effectively as necessary, causing glucose, or sugar, to build up in the blood-stream.

60.     High levels of blood glucose can pose several serious health risks including heart disease, blindness, kidney failure, and lower-extremity amputations. Though treatable, diabetes can be fatal or severely debilitating if left untreated.

61.    As of 2014, 29.1 million people in the United States, or 9.3 percent of the population, had diabetes and that number continues to grow.

62.    The main types of diabetes in the U.S. are type 1, type 2, and gestational diabetes. All type 1 diabetics rely on regular insulin injections to survive. Some, but not all type 2 diabetics require insulin therapy. Gestational diabetes is the onset of high blood sugar during pregnancy for women who were not previously diagnosed with diabetes. Some women with gestational diabetes require insulin therapy during pregnancy.

63.    Plaintiffs' Assignors have paid for over one million prescriptions of insulin in the past ten years.

64.    Revenue from the top selling analog insulin manufacturers tops $15.9 billion ($6.98 billion for Sanofi's Lantus and $376 million for its Apidra; $3.03 billion for Novo Nordisk's NovoLog and $2.68 billion for its Levemir; and $2.84 billion for Eli Lilly's Humalog).

**The Dramatic Rise in the Price of Analog Insulin**

65.    Since 2003, the cost of one vial of insulin or one box of five insulin pens has increased by more than 500%; an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this time period.

66.    These price increases have occurred even in the face of supposed competition between manufacturers with similar drugs.

67.    Since the mid-1990s, there have been more than two dozen increases of the list price on a vial of Humalog insulin, as represented in the graph below from an article in the Washington Post, outlining the brief history of insulin and price increases:



Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, (Oct. 31, 2016),

https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-

for-95-years/?utm_term=.ce231b04502f (last accessed June 22, 2018).

68.    The nearly identical trajectory in price increases across both categories of analog

insulins (rapid and long-acting) is remarkable as well, as this graph illustrates:



Rebecca Robbins, *The insulin market is heading for a shakeup. But patients may not benefit*, (Oct. 14,

2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/ (last accessed June 22, 2018).

69.    Thus, nearly a century after its discovery, there is still no inexpensive supply of insulin

for people living with diabetes in the United States.

70.     Instead, third-party payers, like Plaintiffs' Assignors, who provide medical treatments and supplies to beneficiaries who need insulin to survive are stuck in Defendants' Insulin Pricing Scheme.

## MEDICARE

71.     Plaintiffs are the assignees of Medicare Part C and/or Medicare Part D prescription drug coverage providers (MAOs and related entities) who provide benefits to thousands of individual beneficiaries.

72.     The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).

73.     The Medicare Act consists of five parts — Part A, B, C, D and E.

74.     Part A and Part B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." *In re Avandia Mktg. Sales Practices and Products Liability Litigation*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).

75.     Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits to them. 42 U.S.C. §§ 1395w-21-29.

76.     Further, Part D provides for prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

77.     An enrollee's health coverage with a MAO is strictly construed and regulated by CMS. *Id*.

### Medicare Part D

78.     Medicare Part D coverage is voluntary prescription drug benefits program for Medicare beneficiaries established in 2003.

79.     A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

80.     Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private market model, wherein Medicare contracts with private entities, known as Part D "sponsors" to administer prescription drug plans.

81.     The Part D plan sponsor must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

82.     A Plan D sponsor submits a bid to become a benefits contractor, thereunder, the bid contains a per member per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

83.     If the Plan D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium.

84.     CMS (the U.S. Government) then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

85.     As illustrated below, in 2017, for Medicare Part D beneficiaries, there is an initial $400 deductible phase during which many Medicare Part D plan participants must foot the entire bill for the inflated cost of insulin.

86.     After meeting the $400 deductible, Medicare Part D sponsors are responsible for 75% of all payments in the second phase.

87.     Beneficiaries stay in this phase until they and the plan have spent a total of $3,700 on covered drugs.

88.     MAOs pay 75% of an inflated price injures for these participants.

89.     Upon hitting the second coverage breakpoint, the beneficiary is in what is known as the Medicare Part D "Donut Hole," which refers to a coverage gap phase where the beneficiary must pay for branded drugs at 40% of the list price, the manufacturer discounts branded drugs by 50%, and the plan pays the remaining 10%.

90.     Again, the percentage-of-cost requirement means that inflated insulin prices hurt Part D sponsors in this third coverage phase.

91.     A beneficiary leaves the coverage gap and is covered again after spending total $4,950 out-of-pocket—which is also when total drug costs covered by the participant, the plan, and discounts reach $7,425. At which point, the Part D Sponsor pays 15% of the list price, while original Medicare pays 80%.



## Standard Medicare Prescription Drug Benefit, 2017

NOTE: Some amounts rounded to nearest dollar. [1]Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

The Medicare Part D Prescription Drug Benefit, The Kaiser Family Foundation (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/   (last accessed June 22, 2018); Joseph Walker, *Middlemen Faulted on Drug Prices*, Wall St. J., Oct. 3, 2016

## THE INSULIN PRICING SCHEME

92.     The prices that Plaintiffs' Assignors paid and continue to pay for Defendants' analog insulin are inflated because of Defendants' Insulin Pricing Scheme, which requires payers to pay for both the drug and the undisclosed kickback to the PBMs. Had Plaintiffs' assignors known of this unlawful *quid pro quo* situation they would not have paid the inflated prices.

### Defendants' Concealment of the Insulin Pricing Scheme

93.     Defendants have not disclosed the details of the Insulin Pricing Scheme to Plaintiffs' Assignors. Upon information and belief, Defendants have kept these material details of PBM kickbacks confidential for the nefarious purpose of obtaining preferred formulary placement without reducing their net revenue.

94.     Likewise, the unnamed co-conspirator PBMs have not disclosed the material details of the kickbacks that are paid by the  Defendants, including the gross amount of the kickbacks and what, if any, portion of the kickback revenue is passed through to the Plaintiffs' assignors and other third-party payers.

### Pharmaceutical Supply Chain Overview

95.     The pharmaceutical supply chain in the United States consists of four major actors: drug manufacturers, wholesale distributors, pharmacies, and PBMs.

96.     Pharmaceutical products generally originate in manufacturing sites and then are transferred to wholesale distributors, transferred and stocked at retail, mail-order, and other types of pharmacies, then are subject to price negotiations and processed through quality and utilization management screens by PBMs, are dispensed by pharmacies, and, ultimately, are delivered to and taken by beneficiaries.

97.     PBMs are paid to administer a third party payer's drug program, , including developing the drug formulary (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies, and negotiating with pharmaceutical manufacturers. PBMs are

paid to control drug costs. Instead, Defendants and the PBMs conspire to increase the price for their own profit.

98.    Third party payers provide copies of their PBMs' formularies to providers, pharmacists ("network prescribers"), and patients in their network to aid prescribers' adherence to the formulary.

99.    Being included in the various payer formularies and obtaining favorable placement of a drug within a formulary (i.e. "Tier-1 placement") drives demand for that drug within the PBM's entire network of physicians, pharmacists, and participating plans. Thus, manufacturer's view placement as a guarantee for drug utilization.

100.    Formulary inclusion is critical to Defendants' business, as it allows them to increase sales of drugs, including insulin.

101.    As described more fully below, PBMs contract with a network of retail and community pharmacies.

102.    In addition, and of significance here, PBMs have contractual relationships with pharmaceutical manufacturers, retail pharmacies, and pharmaceutical wholesalers, negotiating rebates, fees and other concessions.

103.    These relationships allow PBMs to exert tremendous influence and control over what drugs are made available to health plans and ultimately the public.

104.    The following chart, published by the Wall Street Journal, broadly illustrates the pharmaceutical supply chain, and the PBMs central role in it:



Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, WALL ST. J. (Oct. 3, 2016, 12:43 PM), https://www.wsj.com/articles/drugmakers-point-finger-atmiddlemen-for-rising-drug-prices-1475443336.

### The Insulin Pricing Scheme: Rebates Gone Awry

105.    PBMs generate revenue in three primary ways. First, their third party payer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, third party payers pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists and manufacturers. Third, PBMs receive "rebates" and other fees from Defendants and other pharmaceutical manufacturers.

106.    Indeed, PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make ostensibly interchangeable products—i.e., drugs within the same therapeutic class.

107.    In such a scenario, the drug manufacturers should compete on price, as in normal competitive markets, for the PBMs' business.

108.    This rebate arrangement, if operated ethically and honestly, would create an incentive for PBMs to negotiate lower net drug prices.

109.    However, the arrangement is not operated ethically and honestly, Rather, Defendants and PBMs are gaming the system.

110.    Defendants and PBMs have realized that they both benefit if, instead of forcing Defendants to sell their drugs to the PBMs for cheaper, Defendants raise their publicly reported list price, but largely maintain net prices between Defendants and PBMs.

111.    The scheme allows PBMs to leverage formulary control for kickbacks while also allowing Defendants to maintain or increase their profit margins and maintain their sales volume as preferred formulary members.

112.    Thus, far from using their prodigious bargaining power to lower drug prices, the PBMs abuse their position to benefit themselves.

**The List/Net Price Divergence**

113.    While Defendants often obscure the true net realized prices for insulin, the escalating list price is a matter of public record and has skyrocketed largely in lock-step between Defendant manufacturers.

114.    Defendants have sold similar, frequently interchangeable drugs for decades; however, the list prices continue to rise in tandem with each competing drug.

115.    The list price continues to rise because Defendants are not competing on price, but are instead competing on higher rebates and other fees paid to the PBMs.

116.    This anti-competitive, market-distorting conspiracy explains why the list price of insulin continues to rise spectacularly but the net realized prices for Defendants remain relatively constant.

117.   The figures below showing percentage price changes—included in a press release by Novo Nordisk—illustrate this phenomenon.





Novo     Nordisk     Press     Release     (Nov.     30,     2016),     http://press.novonordisk-us.com/leadershipperspectives?item=1.

118.   As indicated in the below diagrams prepared by SSER Health, a health- industry research firm, the same widening spread has occurred for the other major analog insulins:



Robert Langreth, et al., Decoding Big Pharma's Secret Drug Pricing Practices, Bloomberg (June 29, 2016), https://www.bloomberg.com/graphics/2016-drug-prices/.

119.   Defendants' spread-increasing behavior is also visible from data on these companies' aggregate rebates to PBMs and insurers.

120.   The below figure illustrates Novo Nordisk's aggregate rebates from 2007 to 2014.



Jeffrey Balin, et al., Global Pharma: Rising US Rebates Limit Margin Expansion, Credit Suisse, 23 (May 1, 2015).

121.     Finally, Eli Lilly has greatly increased its rebates off the inflated list prices.

122.     Contrary to Novo Nordisk, for which insulin represents a substantial amount of gross revenues, Eli Lilly is an extremely diversified manufacturer.

123.     As a result, the impact of the very steep insulin rebating that has gained Lilly the lion's share of the U.S. insulin market in recent years is attenuated in the graph below by less aggressive rebating on other drug classes.

124.     Eli Lilly's Reported Rebates as a Percentage of U.S. Gross Sales from 2007- 2014:



Jeffrey Balin, et al., Global Pharma: Rising US Rebates Limit Margin Expansion, Credit Suisse, 23 (May 1, 2015).

**The Rise of the PBMs in the Pharmaceutical Supply Chain**

125.     In the 1990s, drug manufacturers began acquiring PBMs, which caused an egregious conflict of interest, prompting the Federal Trade Commission to undo those deals.

126.     In the early and late 2000s, PBMs started buying pharmacies, which has caused a similar conflict of interest.

127.    When a PBM combines with a pharmacy, they lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive drugs; indeed, they may collude in them.

128.    The power of the largest PBMs has continued to grow and has allowed them to distort the pharmaceutical supply chain to their own financial advantage.

129.    Drug manufacturers understand the power of PBMs. Due to the PBMs size and many thousands of health plan clients they represent, PBMs can steer business between manufacturers based on which will pay the larger kickback to the PBM, maximizing PBM profits.

130.    While the role of PBMs in the supply chain is known, the size of the rebates and other fees they extract from drug companies for formulary placement, and the portion of these payments they pocket (the "PBM kickbacks") is a carefully guarded secret.

131.    PBMs depend on the lack of transparency to conduct their business and have vigorously resisted any requirement that they disclose the details of their agreements with drug manufacturers, and the kickbacks they receive from them.

132.    PBMs manage pharmacy benefits for over 266 million Americans, with a few large companies dominating the PBM market.

133.    From 2014 to 2015, Express Scripts' net income increased by $468.8 million, or 23.4 percent.

134.    During the same time, gross profit for CVS' pharmacy services segment, which includes the PBM CVS Caremark, increased 9.6 percent.

135.    These PBMs earnings increased further in 2016, with a 37.5% and 9.6% increase, respectively.

**Defendants Admit the Insulin Pricing Scheme**

136.    Defendants have come up with a variety of excuses for the escalating insulin list prices.

137.    For example, Novo Nordisk offered as one justification the "clinical benefit" of their drugs—a nonsensical explanation given that both the drugs and the benefits have been the same for years.

138.    Yet, in the face of widespread criticism of insulin prices spinning out of control— Defendants have admitted the true reasons for the price escalation.

139.    On November 30, 2016, Novo Nordisk issued a press release stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker. We believe that is misleading and here's why: **As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines,** which we call payers. **This is necessary in order for our medicines to stay on their preferred drug list or formulary**. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.

Novo Nordisk US, *Our Perspectives on Pricing and Affordability*, Our Perspectives, (Last visited February 9, 2018) http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html

140.    In its 2016 annual report[2], Novo Nordisk admitted to the practice of exchanging rebates for preferential formulary placement noting as follows:

> Increasingly, PBMs and health plans play a key role in negotiating price concessions with drug manufacturers on behalf of private payers for both the commercial and government channels, and determining the list of drugs covered in the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall drug costs has resulted in greater focus on negotiating higher rebates from drug manufacturers. Private payers are increasingly keen to adopt narrow formularies that exclude certain drugs, while securing increased rebates from the preferred brand.

---

[2] Novo Nordisk Inc., Annual Report, Letter from the Chairman (February 1, 2017). *See also* Novo Nordisk Inc., Annual Report, Letter from Lars Rebien Sørensen, (February 1, 2017) (stating "[i]n 2017, we will see lower net prices in the U.S. as we had to increase the rebates we offer to the pharmaceutical benefit managers (PBMs) in order to ensure broad market access for our products). Attached as Exhibit "B".

141.   As a consequence, the report stated that Novo Nordisk had announced contract negotiations for 2017 with higher-than-anticipated rebates to obtain broader coverage for its products.

142.   Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions: "[t]he reason drug makers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."

143.   In June 2016, CEO of Eli Lilly, John C. Lechleiter, further explained that those "higher rebates can be an incentive for a payer to stick with—with essentially a higher-priced product."

144.   Sanofi has admitted to the same practices. In February 2015, Peter Guenter, Sanofi's Executive Vice President, explained that: "[a]s expected, increased rebates in the U.S. to secure favorable formula repositions for Lantus with key payers have kicked in since January 1, 2015."

145.   Defendants, thus, acknowledge that the Insulin Pricing Scheme drives up list prices.

146.   While the message they appear to be trying to send is that the "PBMs made them do it," the fact of the matter is they could compete for access to formularies by lowering the list prices for their insulin products and refusing to rebate.

147.   This, however, would cut into their bottom line, as it would require Defendants to compete with one another on price.

148.   While not "real" for the PBMs, the list price is real for third party payers as they pay this amount regardless of any rebate portions that *may* be provided later.

149.   Even with price negotiation, an artificially high "base price" is still harmful and unlawful.

150.   Thus, the Insulin Pricing Scheme benefits Defendants and PBMs at the expense of the public, including third party payers, MAOs and the Medicare Trust Fund.

151.   Furthermore, Medicare Part D beneficiaries are also left paying inflated amounts in all phases as soaring prices cause them to speed toward the Donut Hole.

152.   Defendants' scheme results in third party payers, including Plaintiffs' Assignors, being saddled with soaring costs based on inflated prices with MA Plans being relatively powerless in maximizing benefits for their beneficiaries prior to the "donut hole."

### High List Prices Directly Impact Plaintiffs' Ability to Provide Benefits

153.   A drug that used to cost seven cents a week in 1924, now costs hundreds of dollars a month. Plan D beneficiaries are generally on a fixed income and may not be able to afford the "donut hole" price of insulin, leaving these beneficiaries to sacrifice their health by compromising their treatment regimen, resulting in a higher likelihood of hospitalization for which the MAOs would be responsible.

154.   Doctors are speaking up about the number of diabetes patients coming in with poorly controlled blood sugar who explain that they were not taking their insulin because of its expense.

155.   Patients who are worried about the cost of insulin may ration their insulin, frequently not taking it when they need to, cutting their doses in half, or refilling their pump hours after the insulin runs out, even though it means their blood sugar will go up.

156.   Patients may also deprive themselves of food to keep their blood sugar low and avoid the need for insulin.

157.   The less controlled an individual's blood sugar, the higher their risk for complications including cardiovascular disease, nerve damage that can lead to amputation of limbs, kidney disease and failure, eye damage such as blindness or glaucoma, skin conditions, hearing impairment, and Alzheimer's disease.

158.   The American Diabetes Association estimates that the average person diagnosed with diabetes has about $13,700 in medical expenditures each year, of which about $7,900 is attributable to diabetes.

159.    Costs for people with type 1 diabetes are typically much higher, as the ADA averages include many type 2 patients who manage on low-cost oral medications alone.

160.    The financial burden of diabetes means that many beneficiaries, in the "donut hole", do not receive the care they need for a disease that has been treatable for almost a century.

161.    Insulin rationing is common, as is patients allowing themselves to go into DKA to get insulin in emergency rooms.

162.    While the PBMs continue to conceal the amount they make on kickbacks,  Defendants have attempted to blunt criticism through various actions.

163.    For example, in its November 30, 2016, press release, Novo Nordisk made a modest commitment to limit any potential future list price increases for medicines to no more than single- digit percentages annually. Similar statements made on behalf of other manufacturers have occurred as well.

164.    These measures do not end or even address the insidious practice of competing for formulary placement based on kickbacks.

165.    Defendants continue to game the system and the insulin market in the United States as it's an ideal source of profit for unethical middlemen and drug manufacturers, like  Defendants, causing third-party payers covering beneficiaries with diabetes to continue paying the price.

166.    About six million Americans use insulin, and although it has been commercially produced for almost a hundred years, in the United States only three major pharmaceutical companies hold patents that allow them to manufacture the drug.

167.    These three manufacturers "compete" with each other not on price, but by offering rebates for insulin to PBMs who profit from every list price increase through the kickbacks they receive.

168.    Defendants deliberately and intentionally published benchmark prices for the analog insulins that did not reflect the actual market prices of the drugs. Instead, these benchmark prices were fabricated overstatements to create net-to-benchmark price spread that Defendants could market to

30

PBMs in exchange for formulary status. Without the fraudulent spread scheme, Defendants would have to compete for PBM market share by lowering prices.

169.    To do so, Defendants closely guarded their pricing structures and sales figures for their analog insulins. Each Defendant kept the net prices it offered to the three largest PBMs a secret.

170.    As a result of Defendants' Insulin Pricing Scheme, Plaintiffs' Assignors have overpaid for analog insulin for their beneficiaries, depleting finite resources available to provide MA Plan benefits.

<u>**TOLLING OF THE STATUTE OF LIMITATIONS**</u>
**DISCOVERY RULE TOLLING**

171.    Plaintiffs' assignors had no way of knowing about Defendants' scheme and deception with respect to insulin pricing.

172.    The manufacturers and PBMs refuse to disclose the real, net prices of insulin, labeling them trade secrets, hence a reasonable plaintiff could not discover the truth.

173.    Within the applicable statutes of limitation, Plaintiffs' Assignors could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

174.    Plaintiffs' Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect, that the defendants were engaged in the scheme and were publishing phony benchmark prices, nor would a reasonable diligent investigation have disclosed the true facts.

175.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

**FRAUDULENT CONCEALMENT TOLLING**

176.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

## ESTOPPEL

177.    Defendants were under a continuous duty to disclose to plaintiffs the true character, quality, and nature of the benchmark prices and any rebates upon which their payments for insulin were based.

178.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)

179.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this amended complaint.

180.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

### A.    Defendants are culpable "persons" under RICO.

181.    This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against Defendants on behalf of the plaintiffs.

182.    Plaintiffs and Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

183.    The following pharmacy benefit managers are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895; and (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121.

## B.    The Manufacturer-PBM Insulin Pricing RICO Enterprises

184.    For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the two largest PBMs—CVS or Express Scripts—that administers purchases of the Defendant Drug Manufacturers' analog insulins (Novo Nordisk's Levemir and Novolog, Sanofi's Apidra, Lantus, and Toujeo, and Eli Lilly's Humalog), and (b) one of the Defendant Drug Manufacturers, including its directors, employees, and agents. These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

185.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the analog insulins to Plaintiffs' assignors and other third party payers and deriving secret profits from these activities (the spread scheme). These profits are greater than either the Defendant Drug Manufacturers or the PBMs could obtain absent their fraudulent concealment of the Kickbacks from Defendant Drug Manufacturers to PBMs.

186.    To accomplish this common purpose, the Defendant Drug Manufacturers periodically inflate the benchmark prices of the analog insulins. They do so willfully. The Manufacturer-PBM Insulin Pricing Enterprises conceal from Plaintiffs' Assignors, the amount of Kickbacks and PBM receives and how much is passed back to the Assignor.

187.    Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin benchmark prices as the basis for consumer cost-sharing and out-of- pocket payments in the pharmaceutical industry. With respect to the Defendant Drug

Manufacturers, these corporations would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated benchmark prices, their profits on the spread between benchmark and net prices would collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBMs, to a large extent, keep; (ii) pocketing secret spreads between net and benchmark analog insulin prices; and (iii) keeping secret discounts the drug manufacturers provide in association with the PBMs' mail order operations.

188.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant Drug Manufacturer and each PBM that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each Defendant Drug Manufacturer and each PBM share information on a regular basis, including information regarding the analog insulin benchmark prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each Defendant Drug Manufacturer and each PBM functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific Defendant Drug Manufacturer for to carry out the spread scheme.

189.    At all relevant times, the PBMs have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct,

and have reaped profits from that conduct. The PBMs strike rebate deals with the Defendant Drug Manufacturers to conceal the true net prices of the analog insulins and profit from the inflated benchmark prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of the analog insulins: the benchmark prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and benchmark price, the PBMs would have had the incentive to disclose the fraudulence of the Defendant Manufacturers' benchmark prices. By failing to disclose this information, the PBMs and Defendant Drug Manufacturers perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

190.    Further, the PBMs took instructions and commands from the Defendant Drug Manufacturers regarding use of the analog insulin benchmark prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

191.    In order to garner all of these fees from the Defendant Drug Manufacturers, each PBM and each Defendant Drug Manufacturer meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities, and coordination of all of the above.

192.    There is a common communication network between each PBM and each manufacturer for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefit the Defendant Drug Manufacturers.

193.    At all relevant times, each one of the PBMs was aware of the Defendants Drug Manufacturers' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

194.    For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

**1.    The Novo Nordisk-PBM Insulin Pricing Enterprises**

195.    The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Novolog and Levemir, including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS association- in-fact enterprise; and (2) the Novo Nordisk-Express Scripts association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo Nordisk and CVS and Novo Nordisk and Express Scripts. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises,

there is a common communication network by which Novo Nordisk and CVS and Novo Nordisk and Express Scripts share information on a regular basis. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, Novo Nordisk and CVS and Novo Nordisk and Express Scripts function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk to carry out the spread scheme.

## 2. The Sanofi-PBM Insulin Pricing Enterprises

196. The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in- fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS association-in-fact enterprise; and (2) the Sanofi-Express Scripts association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS and Sanofi and Express Scripts. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS and Sanofi and Express Scripts share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises,

Sanofi and CVS and Sanofi and Express Scripts function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi to carry out the spread scheme.

### 3. The Eli Lilly-PBM Insulin Pricing Enterprises

197.    The Eli Lilly-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Eli Lilly's Humalog, including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Eli Lilly-CVS association- in-fact enterprise; and (2) the Eli Lilly-Express Scripts association-in-fact enterprise. Each of the Eli Lilly-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli-Lilly's rapid-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS and Eli Lilly and Express Scripts. As to each of these Eli Lilly-PBM Insulin Pricing Enterprises, there is a common communication network by which Eli Lilly and CVS and Eli Lilly and Express Scripts share information on a regular basis. As to each of these Eli Lilly-PBM Insulin Pricing Enterprises, Eli Lilly and CVS and Eli Lilly and Express Scripts function as continuing but separate units. At all relevant times, each of the Eli Lilly-PBM Insulin Pricing Enterprises was operated and conducted by Eli Lilly to carry out the spread scheme.

198.    The Manufacturer-PBM Insulin Pricing Enterprises (Novo Nordisk-CVS, Novo Nordisk-Express Scripts, Sanofi-CVS, Sanofi-Express Scripts, Eli Lilly-CVS, and Eli Lilly-Express Scripts) knowingly made material misrepresentations to the general public in furtherance

of the fraudulent scheme regarding:

      a.   The net prices of the analog insulins;[34]

      b.   The extent to which the net prices of the analog insulins departed from their artificially-inflated benchmark prices;

      c.   That the analog insulins' benchmark prices served as a reasonable cost- sharing benchmark and that this benchmark price was a fair basis on which to base payments from third party payer;

      d.   The extent to which the Defendant Drug Manufacturers and the PBMs negotiated the rebates discounting the benchmark prices of the analog insulins in good faith and for a proper purpose;

      e.   Whether the rebates were intended to benefit plan members and/or the general public;

      f.   Whether the rebates saved third party payers, plan members and the general public money;

---

[34] The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Novolog and Levemir. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog. All references to "analog insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

g.   Whether the "preferred" formulary status of the analog insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

h.   Whether the analog insulins would have been placed in "preferred" formulary positions absent the spreads; and

i.   The extent to which the spread schemes forced Plaintiffs' assignors to incur additional expenses for their beneficiaries' analog insulins prescriptions.

199.   The Defendant Drug Manufacturers alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBMs. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured lower prices. The lower prices were fictitious, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

200.   The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, *i.e.*, the increased spreads between the benchmark and net prices of the analog insulins are still being maintained and increased.

201.   The foregoing evidences that the Defendant Drug Manufacturers and PBMs were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, *i.e.*, to increase profits for both the Defendant

Drug Manufacturers and the PBMs through kickbacks to the PBMs and continued formulary status without net price reductions for the Defendant Drug Manufacturers.

C.   **The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities**

202.   Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of the analog insulins; the setting of the prices of the analog insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the analog insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the analog insulins. During the class period, the Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the analog insulins to millions of individuals located throughout the United States.

203.   During the class period, Novo Nordisk, Sanofi, and Eli Lilly's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

204.   The nature and pervasiveness of the Defendant Drug Manufacturers' spread scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBMs.

205.   Most of the precise dates of Defendant Drug Manufacturers' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and

records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon secrecy, and as alleged above. And the Defendant Drug Manufacturers took deliberate steps to conceal their wrongdoing. However, the plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the spread scheme.

206.    The Defendant Drug Manufacturers' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period including, inter alia:

    a.  Marketing materials about the benchmark prices for the analog insulins and the available spreads, which Defendant Drug Manufacturers sent to PBMs located across the country;

    b.  Written and oral representations of the analog insulin benchmark prices that the Defendant Drug Manufacturers made at least annually and, in many cases, several times during a single year;

    c.  Thousands of written and oral communications discussing, negotiating, and confirming the placement of a Defendant Drug Manufacturer's analog insulin or insulins on a particular PBM's formulary;

    d.  Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for the analog insulins, and/or to conceal those prices or the spread scheme;

    e.  Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate for one Defendant Drug Manufacturers' analog insulin over a competitor's product;

f. Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the benchmark prices were, or that were intended to deter investigations into the true nature of the benchmark prices or to forestall changes to reimbursement based on something other than benchmark prices;

g. Written and oral communications with health insurers and patients;

h. Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Defendant Drug Manufacturers' spread scheme; and

i. In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the spread scheme. These mails include some of the documents referenced in this First Amended Complaint.

### D. Conduct of the RICO Enterprises' affairs

207. During the class period, each of the Defendant Drug Manufacturers has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a. Each of the Defendant Drug Manufacturers has directly controlled the benchmark and net prices for its analog insulins, which determines the amount of each of the PBMs' compensation;

b.  Each of the Defendant Drug Manufacturers has directly controlled the benchmarks prices that it publicly reports;

c.  Each of the Defendant Drug Manufacturers has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its analog insulins;

d.  Each of the Defendant Drug Manufacturers has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

e.  Each of the Defendant Drug Manufacturers has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that Defendant Drug Manufacturer's analog insulin or insulins on a PBM's formulary or advocate the use of a certain analog insulins. These inducements include the Defendant Drug Manufacturers' payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to retain a significant portion of the rebates. Furthermore, PBMs usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance

standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

> f.   The Defendant Drug Manufacturers intended that the PBMs would (and did) distribute, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like Plaintiffs' assignors money on their prescription; and

> g.   The Defendant Drug Manufacturers represented to the general public, by stating the analog insulins' benchmark prices without stating that these benchmark prices differed substantially from those net prices offered to the PBMs, that the analog insulins' benchmark prices reflected or approximated analog insulins' true price.

208.   Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.

209.   In violation of Section 1962(c) of RICO, each of the Defendant Drug Manufacturers has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated benchmark prices for the analog insulins and by misrepresenting to Plaintiffs' assignors through the publication of their benchmark prices that these benchmark prices were reasonable bases for plaintiff and class member out-of-pocket payments, thereby inducing plaintiffs and class members to pay inflated amounts for the analog insulins.

### E.      The Defendant Drug Manufacturers' pattern of racketeering activity

210.   Each of the Defendant Drug Manufacturers has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of

racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendant Drug Manufacturers' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their spread schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendant Drug Manufacturers intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

211.    Each Defendant Drug Manufacturer's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the benchmark prices for its analog insulins, thereby creating a spread between net and benchmark prices. Each Defendant Drug Manufacturers then used those spreads to induce each of the PBMs to advocate and favor that particular Defendant Drug Manufacturer's drugs.

212.    The spread scheme was calculated and crafted such that plaintiffs and members of the class would pay for the analog insulins based on the artificially inflated, benchmark prices. In designing and implementing the spread scheme, the Defendant Drug Manufacturers were cognizant, at all times, of the fact those plaintiffs and class members were not part of the enterprise and relied upon the integrity of the Defendant Drug Manufacturers in setting the benchmark prices.

213.    By intentionally and artificially inflating the benchmark prices, and by subsequently failing to disclose such practices to the plaintiffs' assignors, each of the Defendant Drug Manufacturers engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

214.    The Defendant Drug Manufacturers' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendant Drug Manufacturers was related, had similar intended purposes, involved similar participants and methods

of execution, and had the same results affecting the same victims, including Plaintiffs' assignors. Each of the Defendant Drug Manufacturers has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

215.    The Defendant Drug Manufacturers' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes. Plaintiffs' assignors, all of whom provide Medicare benefits, paid for the insulin prescriptions at issue in violation of the Federal Anti-Kickback statute.

216.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

217.    The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor. First, they are neither "discounts" or "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the benchmark price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM can make more money. This is a classic kickback.

F.      **The Defendant Drug Manufacturers' motive**

218.    The Defendant Drug Manufacturers' motive in creating and operating the spread scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits from their analog insulins.

219.    The spread scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Defendant Drug Manufacturers' analog insulins. Thus, each of the Defendant Drug Manufacturers used the spread scheme to sell more of its drugs, thereby fraudulently gaining sales, market share, and profits.

G.      **Damages caused by the Defendant Drug Manufacturers' rebate scheme**

220.    The Defendant Drug Manufacturers' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs' assignors to be injured in their business or property. The plaintiffs and class members have paid many hundreds of millions of dollars in inflated payments based on the fictitious benchmark prices for the analog insulins.

221.    The Defendant Drug Manufacturers sent billing statements through the U.S. mails or by interstate wire facilities and reported the benchmark prices and other information by the same methods in furtherance of their spread scheme. Plaintiffs' assignors have made inflated payments for the analog insulins based on and/or in reliance on reported and false benchmark prices.

222.    The amount of each of these cash payments is based on the Defendant Drug Manufacturers' benchmark prices. Therefore, when each Defendant Drug Manufacturer artificially inflated each analog insulin's benchmark price and then used each Manufacturer- PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflated the amount paid by Plaintiffs' assignors.

223.    Plaintiffs' assignors' injuries were proximately caused by the Defendant Drug Manufacturers' racketeering activity. But for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins and the scheme that the

Manufacturer-PBM Insulin Pricing Enterprises employed, Plaintiffs' assignors would have paid less for their beneficiaries' analog insulins.

224.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the Defendant Drug Manufacturers are jointly and severally liable to Plaintiffs for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)
### BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962

225.    The plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

226.    This count is against all Defendants.

227.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

228.    The Defendant Drug Manufacturers have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Manufacturer-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

229.    As set forth in detail above, the Defendant Drug Manufacturers' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, the defendants inflated the stated benchmark prices of the analog insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of their analog insulins; and made false or misleading statements or material omissions regarding the existence and amount of their analog insulins' benchmark-to-net price spread. The truth about the net prices of the analog insulins as distinguished from the inflated benchmark prices are material.

230.    From the outset, Defendants knew, but did not disclose, that the benchmark prices they selected and published for the analog insulins did not reflect the net prices of those products. The Defendant Drug Manufacturers knew that the benchmark prices they selected were not reasonable approximations of the true market prices of their analog insulins. Yet they held out these benchmark prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for consumer cost-sharing obligations with respect to these medicines. The Defendant Drug Manufacturers substantially inflated the benchmark prices of their analog insulins so they could offer larger spreads to the PBMs in exchange for favorable formulary positions. The defendants knew, but did not disclose, that the benchmark-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased their analog insulins based on benchmark price. The Defendant Drug Manufacturers knowingly and deliberately misled consumers regarding the pricing of the analog insulins.

231.    The nature of the above-described Defendant Drug Manufacturers' co- conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d)

violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

232.    The Defendant Drug Manufacturers have and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

   a.    Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

   b.    Multiple instances of wire fraud in violations of 18 U.S.C. § 1343;

   c.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952;

   d.    Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. Ann. § 2C:21-10(a).

233.    The Defendant Drug Manufacturers' violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. The plaintiffs and members of the class have been injured in their property by reason of these violations: the plaintiffs and class members have made billions of dollars in payments for the analog insulins that they would not have made but for the Defendant Drug Manufacturers' conspiracy to violate 18 U.S.C. § 1962(c).

234.    The Defendant Drug Manufacturers' racketeering activity directly and proximately injured the plaintiffs and members of the class: the plaintiffs and class members substantially overpaid for their analog insulins when they paid for these medicines at the point of sale based on the defendants' benchmark prices.

235.    By virtue of these violations of 18 U.S.C. § 1962(d), the Defendant Drug Manufacturers are jointly and severally liable to plaintiffs and the class for three times the

damages the plaintiffs and class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III:
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

236.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### ARIZONA CONSUMER FRAUD ACT
### (Ariz. Rev. Stat. § 44-1521, et seq.)

237.    Defendants and Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44- 1521(6).

238.    The insulin products described herein are "goods" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

239.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, ... misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale ... of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

240.    As detailed above, Defendants employed deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of the Arizona CFA by the insulin pricing scheme.

241.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

242.    Defendants knew or should have known that their conduct was in violation of the Arizona CFA.

243.    Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs, and continued to engage in unfair and deceptive practices in violation of the Arizona CFA.

244.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public, who in many cases would not have purchased the insulin products but for the fraudulent pricing scheme. As such, the Defendants' unlawful acts and practices complained of herein affect the public interest.

245.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

246.    Defendants material misrepresentations proximately caused Plaintiffs' Assignors to pay for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the pricing scheme, as described herein, until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Arizona CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

247.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products described herein.

248.    Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

249.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## DELAWARE CONSUMER FRAUD ACT
### (6 Del. Code § 2513, et seq.)

250.    Plaintiffs and Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

251.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

252.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Delaware CFA by perpetuating the fraudulent insulin pricing scheme as described herein.

253.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

254.    Defendants knew or should have known that their conduct was in violation of the Delaware CFA.

255.    Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the characteristics of the insulin pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Delaware CFA.

256.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

257.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products which they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Delaware CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

258.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of the insulin products as described herein.

259. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

260. Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

261. Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, et seq.)

262. Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the insulin products described herein in Florida, to Plaintiffs, and throughout the United States.

263. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce..." Fla. Stat. § 501.204(1).

264. As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of FDUTPA by perpetuating the fraudulent insulin pricing scheme as described herein.

265. Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

266.   Defendants knew or should have known that their conduct was in violation of FDUTPA.

267.   Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the insulin pricing scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of FDUTPA.

268.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

269.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the FDUTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

270.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of insulin products as described herein.

271.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

272.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

273.    Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, et seq. and 720 ILCS 295/1a)

274.    Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

275.    Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

276.    The Illinois Consumer Fraud ("ICFDPA"), 815 ILCS 505/1 *et seq.*, prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact[.]"

277.    In addition, the Illinois Deceptive Business Practices Act ("IUDTPA"), 815 ILCS 510/2 *et seq.*, prohibits the use of various deceptive trade practices, including: "(11) mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

278.    As detailed above, Defendants engaged in unfair and deceptive acts in violation of the ICFDPA and the IUDTPA by perpetuating the insulin pricing scheme as described herein.

279.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

280.     Defendants knew or should have known that their conduct was in violation of the ICFDPA and the IUDTPA.

281.     Despite knowing the true nature of their pricing scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs, and continued to engage in unfair and deceptive practices in violation of the ICFDPA and the IUDTPA.

282.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

283.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products described that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the ICFDPA and the IUDTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

284.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices for purchases of the insulin products as described herein.

285.     Defendants' violations present a continuing risk to Plaintiff as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

286.     Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Defendants in the amount of their actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

287.     Plaintiffs also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, et seq.)

288.     The insulin products described herein constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

289.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

290.     As detailed above, Defendants engaged in deceptive acts in violation of the Minnesota CFA by perpetuating the insulin pricing scheme as described herein.

291.     Defendants owed and continue to owe Plaintiffs' Assignors a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme described herein.

292.     Defendants knew or should have known that their conduct was in violation of the Minnesota CFA.

293.     Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing

scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota CFA.

294.   Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

295.   Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

296.   Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of the insulin products as described herein.

297.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest. Pursuant to Minn. Stat. § 8.31(3)(a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

298.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

**MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325d.43-48, et seq.)**

299.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, including the following enumerated actions, "(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" or "(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

300.    As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Minnesota DTPA by perpetuating the insulin pricing scheme as described herein.

301.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

302.    Defendants knew or should have known that their conduct was in violation of the Minnesota DTPA.

303.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing scheme of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota DTPA.

304.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

305.    Defendants' material misrepresentations proximately caused Plaintiffs to pay inflated prices for the insulin products that they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota DTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

306.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

307.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

308.    Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

309.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, et seq.)

310.    Defendants, Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

311.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

312.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

313.    As detailed above, Defendants engaged in unfair, false, and deceptive practices in violation of the above-noted provisions of the Missouri MPA by perpetuating the insulin pricing scheme as described herein.

314.    Defendants conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

315.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

316.    Defendants knew or should have known that their conduct was in violation of the Missouri MPA.

317.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the inflated prices of the insulin products described herein, with the intent to mislead regulators, Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the Missouri MPA.

318.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors, and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs.

319.    Defendants' material misrepresentations proximately caused Plaintiff to pay inflated prices for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Missouri MPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

320.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

321.    As such Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. §§ 56:8-1, et seq.)

322.    Plaintiffs and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

323.    Defendants are engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e).

324.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce within the meaning of the New Jersey Consumer Fraud Act.

325.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. § 56:8-2.

326.    In the course of their business, Defendants engaged in unfair and deceptive practices in violation of the New Jersey CFA by perpetuating the insulin pricing scheme as described herein.

327.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the pricing of the insulin products as described herein.

328.    Defendants knew or should have known that their conduct was in violation of the New Jersey CFA.

329.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the inflated prices of the insulin products described herein, with the intent to mislead regulators, and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the New Jersey CFA.

330.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

331.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Jersey CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

332.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

333.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, et seq.)

334.    Defendants and Plaintiffs are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

335.    Defendants actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

336.    The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the

person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to: "(11) making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction;" and "(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive."

337.    In the course of their business, Defendants engaged in unfair and misleading acts in violation of the New Mexico UTPA by perpetuating the insulin pricing scheme as described herein.

338.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

339.    Defendants knew or should have known that their conduct was in violation of the New Mexico UTPA.

340.    Despite knowing the true nature of their pricing scheme for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the pricing of the insulin products described herein, with the intent to mislead regulators and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the New Mexico UTPA.

341.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

342.     Defendants' material misrepresentations proximately caused Plaintiffs to pay inflated prices for the insulin products when they otherwise would not have paid. Because Defendants did not reveal the true nature of the insulin pricing scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Mexico UTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

343.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

344.     Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs they seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT IV: COMMON LAW FRAUD

345.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this amended complaint.

346.     As alleged extensively above, Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (a) The true cost and/or price of the insulin products described herein; (b) The inflated and/or fraudulent nature of the list price(s) set and/or charged by Defendants for the insulin products described herein; (c) The existence, amount, and/or purpose(s) of discounts and/or rebates (kickbacks) offered and/or negotiated by Defendants for those products; and (d) The role that Defendants' played in the price paid for the

insulin products described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

347.    Defendants valued their profits over the trust, health, and safety of beneficiaries of Plaintiffs' Assignors who purchased insulin at the Wal-Mart in New Jersey and other locations throughout the United States.

348.    Necessarily, Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to consumers, including Plaintiffs.

349.    Defendants' knowingly false representations and omissions were material to Plaintiffs.

350.    Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely.

351.    Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because they possessed exclusive knowledge regarding the nature of insulin pricing, intentionally concealed the foregoing from Plaintiffs and the public, and made incomplete or negligent representations about the pricing of the insulin products and Defendants' role in that pricing, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

352.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health.

353.    Indeed, as a direct result of Defendants' actions, access to live-saving insulin medication has been limited, denied, or forgone.

354.    Defendants owed Plaintiffs a duty to disclose, truthfully, all the facts concerning the true cost of the insulin products described herein and the inflated and fraudulent nature of their

pricing; the existence, amount, and purpose of rebated and discounts negotiated for those products; and the role that Defendants played in increasing the price of the insulin products described herein.

355.   Defendants hatched their deceptive schemes and knew that their customers, including Plaintiffs, did not know about (and could not reasonably discover) the manner in which it sought to artificially inflate the price of the insulin medications.

356.   Defendants not only concealed all the facts concerning the true cost of the insulin products described herein, but went further to make affirmative misrepresentations in marketing materials and other communications that Defendants worked to lower the ultimate cost of prescription medications.

357.   Defendants engaged in this fraudulent concealment at the expense of Plaintiffs making such material misrepresentations to induce Plaintiffs to rely on such, to their detriment.

358.   Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they reasonably relied on Defendants' representations.

359.   As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

360.   Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

361.   Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## <u>COUNT V: UNJUST ENRICHMENT</u>

362.    Plaintiffs incorporates by reference paragraphs 1 through 202 as if fully set forth herein.

363.    Defendants have benefitted from selling, setting prices for and negotiating discounts for insulin products marketed and sold at an artificially inflated price.

364.    Defendants have received and retained unjust benefits from the Plaintiffs, in the form of costs paid, copayments, and coinsurance payments, and inequity has resulted.

365.    It is inequitable and unconscionable for Defendants to retain these benefits.

366.    Because Defendants concealed their fraud and deception, Plaintiffs was not aware of the true facts concerning the Insulin Pricing Scheme described herein and did not benefit from Defendants' misconduct.

367.    Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

368.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## <u>DEMAND FOR JUDGMENT</u>

WHEREFORE, Plaintiffs respectfully demands that this Court:

A.    Enter judgments against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

B.    Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, including, inter alia, an order prohibiting Defendants from engaging in the unlawful acts described above; an order requiring Defendants or their agents to disclose the existence and/or amount of any rebates, discounts, fees, or other payments received by the PBM Defendants for including the prescription insulin medications described herein on any

formulary, and an order requiring Defendants or their agents to disclose the true net price of the prescription insulin medication described herein collected by the Drug Manufacturer Defendants;

C.     Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

D.     Award the Plaintiffs damages (i.e. three times overcharges) in an amount to be determined at trial;

E.     Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, the common fund doctrine, and applicable state law;

F.     Find that Defendants are jointly and severally liable for all claims;

G.     Order that Defendants must notify each individual who paid a copayment or coinsurance for covered prescription drugs that exceeded the true cost of the drug about the pendency of this action so that they may obtain relief from Defendants for their harm; and

H.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

**COHEN PLACITELLA AND ROTH PC**

/s/Christopher Placitella
Christopher M. Placitella (027781981)
Dennis M. Geier (035272006)
127 Maple Avenue
Red Bank, New Jersey 07701
Phone: 732-747-9003
Facsimile: 732-747-9004

*Attorneys for Plaintiff*

A1.     On 5/3/2016, Preferred Medical Plan, Inc. entered into an assignment with MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims",[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered under Florida law.  On 8/8/2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc.  Said assignment included the following language "[a]ssignor, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims…whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered under New York law. Consideration was given between each party in executing these assignments.

A2.     On 5/12/2017, SummaCare, Inc. entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"..." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered under Ohio law.   On 6/12/2017, MSP Recovery, LLC entered into an assignment with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from SummaCare, Inc.  Said assignment included the following language "Assignor,…irrevocably assigns, sells, transfers, conveys, sets over and Delivers to Assignee and its successors and assigns, any and all of Assignors right, title ownership and interest in and to the "Assigned Claims", "Claims', ["][sic]Assigned Assets" and "Assigned Documents" ….whether based in contract, tort, statutory right, and any and all rights (including but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/r third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.  This second assignment contract was executed by individuals of majority, of sound mind, and with legal

authority to bind the respective parties.  This second assignment was entered under Delaware law.  Consideration was given between each party in executing these assignments.

A3.     On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…."  The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  The assignment was entered under Florida law.   On 2/20/2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover   payments   as assigned from Interamerican Medical Center Group, LLC (IMC)."  Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties.  This second assignment was entered under Florida law.