# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MSP RECOVERY CLAIMS, SERIES LLC, a
Delaware series limited liability company,
SERIES PMPI, a designated series of MAO-
MSO RECOVERY II, LLC, a Delaware series
limited liability company, and MSPA CLAIMS
1, LLC, a Florida limited liability company,

       Plaintiffs,

v.

SANOFI-AVENTIS U.S. LLC, a Delaware
limited liability company, NOVO NORDISK
INC., a Delaware corporation, and ELI LILLY
AND COMPANY, an Indiana corporation,

       Defendants.

CASE NO.: 18-CV-02211

SECOND AMENDED
COMPLAINT AND DEMAND
FOR JURY TRIAL

Table of Contents

Introduction ........................................................................................................................ 1

Parties ................................................................................................................................. 9

Jurisdiction and Venue ..................................................................................................... 13

Factual Allegations .......................................................................................................... 14

Insulin Therapy for Diabetics .......................................................................................... 14

The Dramatic Rise in the Price Of Insulin ...................................................................... 15

Medicare ........................................................................................................................... 17

Medicare Part D ............................................................................................................... 18

The Insulin Pricing Scheme ............................................................................................. 20

Defendants' Concealment of the Insulin Pricing Scheme ............................................... 20

A Pharmaceutical Supply Chain Overview ..................................................................... 21

Drug Pricing ..................................................................................................................... 24

The List/Net Price Divergence ........................................................................................ 26

The Rise Of The PBMs in the Pharmaceutical Supply Chain ......................................... 30

Defendants Admit to the Insulin Pricing Scheme ........................................................... 31

High List Prices Directly Impact Plaintiffs' Assignors' Ability to Provide Benefits ...... 36

Tolling Of The Statute Of Limitations ............................................................................. 37

Discovery Rule Tolling .................................................................................................... 37

Fraudulent Concealment Tolling ...................................................................................... 38

Estoppel ............................................................................................................................ 38

A.   Defendants Are Culpable "Persons" Under Rico. ................................................... 39

B.   The Manufacturer-Pbm Insulin Pricing Rico Enterprises ...................................... 39

    1.   The Novo Nordisk-PBM Insulin Pricing Enterprises ...................................... 44

    2.   The Sanofi-PBM Insulin Pricing Enterprises .................................................. 44

    3.   The Eli Lilly-PBM Insulin Pricing Enterprises ............................................... 45

C.   Defendants' Use Of The U.S. Mails And Interstate Wire Facilities ....................... 46

D.   Conduct Of The Rico Enterprises' Affairs ............................................................. 49

E.   Defendants' Pattern Of Racketeering Activity ....................................................... 51

F.   Defendants' Motive ................................................................................................. 53

G.   Damages Caused By Defendants' Rebate Scheme .................................................. 54

**Count I** ...................................................................................................... 55

**Count II** ..................................................................................................... 56

**Count III** ................................................................................................... 59

**Count IV** ................................................................................................... 60

    Alaska Unfair Trade Practices And Consumer Protection Laws........................... 60

    Arizona Consumer Fraud Act.......................................................................... 61

    Arkansas Deceptive Trade Practices Act.......................................................... 63

    Connecticut Unfair Trade Practices Act .......................................................... 65

    Delaware Consumer Fraud Act........................................................................ 66

    Florida Deceptive and Unfair Trade Practices Act ........................................... 68

    Hawaii Unfair or Deceptive Acts And Practices .............................................. 70

    Idaho Consumer Protection Act...................................................................... 71

    Indiana Deceptive Consumer Sales Act........................................................... 72

    Massachusetts Regulation of Business Practice & Consumer Protection Act....................... 73

    Michigan Consumer Protection Act ................................................................ 75

    Minnesota Private Attorney General Statute & Consumer Fraud Act................... 76

    Minnesota Uniform Deceptive Trade Practices Act .......................................... 77

    Nebraska Consumer Protection Act................................................................. 79

    Nevada Deceptive Trade Practices Act ............................................................ 80

    New Hampshire Consumer Protection Act....................................................... 81

    New Mexico Unfair Trade Practices Act.......................................................... 82

    New York General Business Law..................................................................... 84

    North Dakota Consumer Fraud Act ................................................................ 85

    Ohio Deceptive Trade Practices Act................................................................ 86

    Pennsylvania Unfair Trade Practices and Consumer Protection Law ................... 86

    South Carolina Unfair Trade Practices Act ...................................................... 88

    South Dakota Deceptive Trade Practices and Consumer Protection Law ............. 89

    Tennessee Consumer Protection Act................................................................ 91

    Virginia Consumer Protection Act of 1977 ..................................................... 91

    West Virginia Consumer Credit and Protection Act ......................................... 93

    Wisconsin Deceptive Trade Practices Act........................................................ 94

**Count V** .................................................................................................... 95

**Count VI** .................................................................................................... 98

**Count VII** .................................................................................................. 99

Demand For Judgment .................................................................................. 100

Jury Demand .................................................................................................. 101

**INTRODUCTION**

1. Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with the condition. In total, nearly 30 million people, or 9.3% of the country, live with diabetes. Of this number, approximately six million people rely on daily insulin treatments to survive. Interruptions to insulin therapy (e.g., insufficient insulin) can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia (hyperosmolar hyperglycemic state or "HHS") and then diabetic ketoacidosis ("DKA"). Left untreated, DKA can lead to loss of consciousness and death. DKA is responsible for more than 500,000 hospital stays per year at an estimated annual cost of $2.4 billion.

2. Although insulin has been commercially produced for almost a hundred years, only three major pharmaceutical companies in the United States hold patents allowing them to manufacture the drug.

3. Numerous third-party payers ("TPPs") have assigned recovery rights to Plaintiffs, including the right to recover payments for fraudulently inflated prescriptions (the "Plaintiffs' Assignors" or "Assignors"). On behalf of its Assignors, Plaintiffs bring this action against those three insulin manufacturers, Sanofi, Novo Nordisk, Eli Lilly, for damages caused by Defendants' conspiratorial scheme to deliberately conceal, suppress, and affirmatively misrepresent the list price, Average Wholesale Price ("AWP"), and Wholesale Acquisition Price ("WAP") (herein collectively referred to as the "List Price") of insulin. Artificially inflated List Prices lead to misinformed placement of the insulin on insurers' formularies, enabling Defendants to maintain

or increase the market share of their insulins in the United States. The insulin medications at issue in this Complaint are: Novolog, Levemir, Apidra, Lantus, Toujeo, Humulin R, Humulin N, and Humalog (the "Subject Insulins").

4.      Defendants conspired with pharmacy benefit managers ("PBMs") to widen a secret spread between Defendants' published and misleading List Prices, and the undisclosed net selling price of their insulins (the "Insulin Pricing Scheme"). Cognizant that PBM profits are tied to the size of the spread between the List Price and actual net selling prices, Defendants engaged in an arms race with each other by artificially inflating List Prices without significantly changing the net prices, thus increasing spreads. This List Price inflation pads the pockets of PBMs, who retain a percentage of the spread between List Price and net price.

5.      To carry out this scheme, Defendants publicly report one price—the List Price—for their insulins while secretly offering a far lower price—the net price—to the largest PBMs. In exchange for Defendants' inflation of their List Prices (and corresponding spreads between prices), the PBMs provide favorable formulary placement to the winning bidder, i.e., the manufacturer with the highest spread. As a result, formulary decisions for these important medications are increasingly made based on kickbacks, made possible by inflated List Prices (and corresponding spread inflation), instead of properly considering factors such as price savings to the TPPs, safety, or the efficacy of the insulins.

6.      PBMs CVS Health and Express Scripts are two of the nation's most influential PBMs, together covering roughly 49% of the insured market.

7.      If operated properly, PBMs should negotiate lower prices for pharmaceutical products, such as insulin.

8.      However, over the last decade, Defendants' Insulin Pricing Scheme caused insulin prices to steadily rise to a remarkable degree.

9.      Insulin that cost $25 per prescription in the mid-1970s now costs between $250 and $450 per prescription. In the last five years alone, Defendants raised the List Price of insulin by over 150%.

10.     Defendants "compete" with each other by offering rebates on insulin sales to PBMs in exchange for favorable placement on their TPP clients' formularies, including those of Plaintiffs' Assignors. The PBMs profit from every list price increase through the kickbacks they receive.

11.     As a result, Defendants' List Price increases for the Subject Insulins have been both rapid and in lock-step with one another.

12.     The skyrocketing List Prices for insulin cannot be explained away with typical drug company rationalizations for high costs, such as manufacturing or supply costs.

13.     Indeed, Defendants admit that their List Price hikes are unrelated to any jump in production or research and development costs.

14.     Instead, higher Subject Insulin List Prices are a direct result of the Insulin Pricing Scheme. In this scheme, Defendants conspire with the PBMs to agree on three different prices for the Subject Insulins: (1) a publicly-available "List Price," (2) a "discount" price at which the TPPs using the PBMs will purchase the drugs, and – most importantly – (3) a "net" price that reflects a rebate(s), viz. kickback(s), that the manufacturers will later pay to the PBMs, the amount of which Defendants and the PBMs do not disclose to TPPs.

15.     For the Subject Insulins, the gap between these prices has significantly increased.

16.     To understand the Insulin Pricing Scheme, and the reason it is so profitable for Defendants, it is necessary to understand the role of PBMs in the pharmaceutical supply chain.

17.     PBMs perform a variety of roles in the pharmaceutical supply chain. TPPs contract with PBMs to: (i) develop and maintain drug formularies, (ii) contract with pharmacies, (iii) negotiate discounts and rebates with drug manufacturers, and (iv) process and pay prescription drug claims. In addition, PBMs operate mail-order pharmacies that dispense 90-day supplies of select medications to patients with longer-term needs.

18.     TPPs contract with PBMs because of their supposed superior industry knowledge and aggregated demand, enabling them to negotiate reduced pharmaceutical costs for the TPPs.

19.     Whether a drug appears on a TPP's formulary—and in which tier—determines if, and to what proportion, the TPP will bear the cost of the drug for its beneficiaries. Drugs in lower tiers are available to beneficiaries at a lower out-of-pocket cost than those in higher tiers.

20.     Where two drugs are largely interchangeable from a clinical standpoint, PBMs should exclude the higher priced drug, or place it on a higher, less preferred tier, thus encouraging beneficiaries to use those drugs that the TPP can obtain at a lower cost.

21.     Conversely, however, the PBMs' power to place drugs at specific formulary tiers, combined with the scale of consumption that PBMs manage for all the beneficiaries across their many TPP clients, gives the PBMs great bargaining power over drug manufacturers like Defendants. This power can influence manufacturers to lower List Prices in exchange for favorable formulary placement vis-à-vis its competitors in a therapeutic class. In some instances, PBMs may grant manufacturers an exclusive listing for a drug, such that beneficiaries wishing to use a competing drug would have to pay full price, without the benefit of a negotiated discount.

22.     Although the TPPs contract with PBMs to provide, among other things, formulary placement services, the PBMs breach their duties to the TPPs by: (i) conspiring with drug manufacturers to increase the rebates they receive through higher drug List Prices instead of negotiating lower drug prices for the benefit of the TPPs and their enrolled beneficiaries, (ii) including insulins on the TPPs' formularies that result in the most profit for the PBMs, and (iii) directing insulin sales to their own PBM owned mail-order pharmacies to maximize profit rather than protect the interests of the TPPs and their beneficiaries.

23.     Specifically, while PBMs can and should use their market power to drive down the TPP's costs for Subject Insulins, they instead participate in the Insulin Pricing Scheme with Defendants, causing TPPs to unwittingly pay inflated drug prices that subsidize kickbacks paid by the Defendants to the PBMs.

24.     In the more transparent phase of the Insulin Pricing Scheme, Defendants set an artificial List Price. The PBMs then obtain a discount price from Defendants (often receiving a fee from TPPs for purportedly using their market power to obtain the discount as well). This discounted price is known to all and is the basis for which a beneficiary's out-of-pocket expenses are determined.

25.     What is not fully known to the TPPs is how much of a kickback Defendants pay to the PBMs, in the form of a further effective price reduction or other administrative fee that is not fully realized by the TPPs.

26.     These kickbacks are given different labels—rebates, credits, concession fees, etc. Regardless of the label, the kickbacks are a quid pro quo to the PBM for formulary inclusion and preferred tier placement.

27.     In the context of this Complaint, the kickbacks include all payments or financial benefits of any kind conferred by Defendants to the PBMs, either directly or indirectly via intermediaries controlled by Defendants.

28.     The result of the Insulin Pricing Scheme is a wide spread between the List Price and the final, secret net price realized by Defendants after the kickbacks are paid.

29.     While the PBMs may pass a portion of the kickbacks on to some of their TPP clients, the PBMs do not disclose the amount of the kickback received.

30.     As a result of this opaque Insulin Pricing Scheme, Defendants obtain or maintain formulary status without any significant reduction in profits, thus forcing TPPs to pay for the insulin, **and** the undisclosed kickbacks that are paid to the PBMs.

31.     In a 2016 investigative piece exploring the role of middlemen PBMs in skyrocketing insulin prices, the Wall Street Journal used the following graph to illustrate the price gap for Lantus, Sanofi's top-selling insulin:



Denise Roland, *Insulin Prices Climb, Fueled by Middlemen*, Wall St. J., Oct. 10, 2016.

32.      If the relationship between Defendants, PBMs, and consumers (including TPPs) worked as it should, Defendants would be forced to compete on price because the Subject

Insulins are in the same therapeutic category and have similar effectiveness and safety profiles. Instead, the Insulin Pricing Scheme enables Defendants to maintain or increase their margins, surreptitiously providing additional revenue to the PBMs, by passing additional costs to TPPs such as Plaintiffs' Assignors, and insulin users.

33.    In January 2016, Eli Lilly spokeswoman Julie Williams described the Insulin Pricing Scheme alleged herein:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price. For example, the net price for Humalog—our most commonly used insulin— increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

Mike Hoskins, *The High Cost of Insulin (Plus a Plea to Lilly, Novo, and Sanofi)*, Healthline (Feb. 22, 2016), https://www.healthline.com/diabetesmine/high-cost-insulin-and-plea-to-lilly#1. What is left unsaid is that List Price inflation greatly outpaces the "net price" for Humalog because of the Insulin Pricing Scheme that consumers, such as Plaintiffs' Assignors, are financing.

34.    A 2016 op-ed piece in the New York Times called for transparency in the insulin market:

> In the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and

7

> have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.

Kasia Lipska, *Break Up the Insulin Racket*, N.Y. Times (Feb. 20, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

35.     To further complicate matters, many PBMs, including CVS Health and Express Scripts, have established their own mail-order pharmacies through which they dispense drugs, including insulin.

36.     These PBM owned mail-order pharmacies introduce additional conflicts of interest between the PBMs and the TPPs because of the PBMs' power to determine formulary placement of drugs, enabling them to direct prescriptions to their own facilities, and through the Insulin Pricing Scheme, set prices and obtain rebates from the Defendants.

37.     TPPs, such as Plaintiffs' Assignors, purchase insulin directly from the PBM owned mail-order pharmacies for the benefit of their beneficiaries.

38.     As alleged in greater detail below, Defendants' participation in the Insulin Pricing Scheme violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq*.,* and the consumer protection statutes of several states.

39.     As a result of Defendants' Insulin Pricing Scheme, TPPs, including Plaintiffs' Assignors, included the Subject Insulins on their drug formularies without knowing that the PBM they contracted with to negotiate lower costs had instead conspired with Defendants to raise List Prices of the Subject Insulins, which funded kickbacks to the PBMs in exchange for favorable formulary placement.

40.     Plaintiffs' Assignors were denied the opportunity to make fully informed decisions about whether and how to include the Subject Insulins on their formularies. As a result,

the Assignors unknowingly paid more for the Subject Insulins than they otherwise would have, were market forces unfettered by Defendants' violations.

41.    Defendants' Insulin Pricing Scheme caused TPPs, including Plaintiffs' Assignors, to overpay for these life-saving medications on behalf of thousands of individual beneficiaries throughout the United States, including in New Jersey, as well as increased out-of-pocket costs of their beneficiaries (the "Enrollees") and the general public. This increased insulin spending exacerbates the financial burden on the Medicare system, Medicare beneficiaries, and the general public, while providing no additional benefit to Plaintiffs

42.    Therefore, this action seeks damages, damage multipliers, and injunctive relief to end the opaque, fraudulent, and anti-consumer Insulin Pricing Scheme.

43.    The allegations, proof, and statistical data presented in this Complaint are based on Plaintiffs' own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, reports, and other sources.

## PARTIES

44.    Plaintiff MSP Recovery Claims, Series LLC is a Delaware series limited liability company with its principal place of business located at 2701 S. Le Jeune Rd., 10th Floor, Coral Gables, FL 33134.

45.    Plaintiff MSPA Claims 1, LLC is a Florida limited liability company, with its principal place of business located at 2701 S. Le Jeune Rd., 10th Floor, Coral Gables, FL 33134.

46.    Plaintiff, SERIES PMPI, a designated series of MAO-MSO RECOVERY II, LLC, is a Delaware series limited liability company with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626.

47.     Plaintiffs have been assigned recovery rights for Medicare Advantage plans ("MA Plans"), including Medicare Advantage organizations ("MAOs"), health maintenance organizations ("HMOs"), management service organizations ("MSOs") and other first-tier and downstream entities across the United States (collectively, the "Assignors" or "Plaintiffs' Assignors"). Attached hereto is an Appendix consisting of sample assignments between Plaintiffs and Assignor entities that provide health insurance benefits pursuant to Medicare Part C and Part D.[12]

48.     Plaintiffs' Assignors paid Medicare benefits or otherwise incurred financial damages by paying fraudulently inflated prices for the Subject Insulins as a result of Defendants' racketeering and unlawful practices.

49.     Defendant, Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi manufactures Apidra, a rapid-acting insulin, and long-acting insulins Lantus and Toujeo. For 2015, the Sanofi group reported that Lantus "was the Group's leading product . . . representing 17.2% of the Group's aggregate net sales for the year." Sanofi can be served through Corporation Service Company, their authorized agent for service of process in the State of New Jersey, located at Princeton South Corporate Ctr. Suite 160, 100 Charles Ewing Blvd, Ewing, NJ 08628.

---

[1] During the course of this litigation, additional third-party payers are likely to assign rights to Plaintiffs, and additional claims will likely be identified as existing Assignors provide claims data to Plaintiffs.

[2] Plaintiffs will make the relevant assignment agreements available for Defendants' review once a protective order is in place.

50.     Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation with its principal place of business at 800 Scudders Mill Rd., Plainsboro, New Jersey 08536. Novo Nordisk manufactures insulin products including NovoLog, a rapid-acting insulin, and Levemir, a long-acting insulin. Novo Nordisk can be served through their authorized agent for service of process in the State of New Jersey, The Corporation Trust Company, located at 820 Bear Tavern Road, West Trenton, NJ 08628.

51.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly produces the rapid-acting analog insulin product Humalog, the rapid-acting human insulin product Humulin R, and the intermediate-acting human insulin product Humulin N. Eli Lilly markets, distributes, and sells its products throughout the United States, including the state of New Jersey. Eli Lilly can be served through their authorized agent for service of process in the State of New Jersey, The Corporation Trust Company, located at 820 Bear Tavern Road, West Trenton, NJ 08628.

52.     In this complaint, Defendants Sanofi, Novo Nordisk, and Eli Lilly are collectively referred to as "Defendants."

53.     Although not named as defendants, CVS Health Corporation and its subsidiaries Caremark Rx, LLC and Caremark Rx, Inc. (collectively "CVS Health") and Express Scripts, Inc. and its corporate parent Express Scripts Holding Company (collectively "Express Scripts") are Defendants' PBM co-conspirators, pursuant to 18 U.S.C. §§ 1962(c) and (d), who actively participate in Defendants' Insulin Pricing Scheme, and conceal Defendants' role in the scheme, to intentionally defraud Plaintiffs' Assignors into paying unlawfully inflated prices for the Subject Insulins. CVS Health and Express Scripts also operate mail-order pharmacies from

whom Plaintiffs' Assignors directly purchase the Subject Insulins. In this Complaint, CVS Health and Express Scripts will be collectively referred to as the "PBM Co-conspirators."

### STANDING

54.     Plaintiffs' Assignors administer Medicare benefits for Medicare beneficiaries under Medicare Part C and Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

55.     Sample assignment agreements between Plaintiffs' Assignors and Plaintiffs are alleged in the Appendix, and are valid and binding contracts. At all material times hereto, one or more of Plaintiffs' Assignors provided Medicare benefits to their Enrollees, including payments for the Enrollees' Subject Insulin prescriptions. Attached hereto as Exhibit A is a non-exhaustive list of instances wherein Plaintiffs' Assignors paid for Subject Insulin prescriptions for their beneficiaries.[3] Plaintiffs' Assignors provided payment for their Enrollees' prescribed Subject Insulins throughout the United States, including in the state of New Jersey.

---

[3] In Exhibit A, MSP Mrd ID is the unique internal patient code, which is an internal number used in place of an individual's name; source NDC codes, or product names are included, NDC codes are unique codes for pharmaceuticals that delineate the labeler, the drug, and the dosage; product name is the name of the pharmaceutical; MSP DOS is the date of service; the value is how much Plaintiffs' Assignors paid for the pharmaceutical; National Provider Identification ("NPI") number is the address of the pharmaceutical provider.

## JURISDICTION AND VENUE

56.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) as this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

57.     This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

58.     This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and committed overt acts in furtherance of the illegal scheme and conspiracy alleged herein throughout the United States, including in this District. The scheme and conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. 15 U.S.C. § 22 provides for nationwide service of process.

59.     This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

60.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, has a principal place of business in, and/or has agents in New Jersey, and because a significant portion of the actions giving rise to the complaint took place within this District.

61.     Venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside or may be found in this District, and some or all fiduciary breaches or other violations for which relief is sought occurred in or originated in this District.

62.    Venue is also proper in this District pursuant to 18 U.S.C. § 1965 because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

63.    Venue is also proper in this District pursuant to 15 U.S.C. § 22 because most Defendants inhabit, are found, have an agent, or transact business in this District.

## FACTUAL ALLEGATIONS

### Insulin Therapy for Diabetics

64.    Diabetes is a condition in which the body does not properly process food for use as energy.

65.    In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the bloodstream to be effectively used, by the body, as energy.

66.    People with diabetes are unable to make enough insulin or cannot use insulin as effectively as necessary, causing glucose, or sugar, to build up in the blood-stream.

67.    High levels of blood glucose can pose several serious health risks including heart disease, blindness, kidney failure, and lower-extremity amputations. Though treatable, diabetes can be fatal or severely debilitating if left untreated.

68.    As of 2014, 29.1 million people in the United States, or 9.3% of the population, had diabetes and that number continues to grow.

69.    The main types of diabetes are type 1, type 2, and gestational diabetes. Type 1 diabetics rely on regular insulin injections to survive. Some, but not all type 2 diabetics require insulin therapy. Gestational diabetes is the onset of high blood sugar during pregnancy for

women who were not previously diagnosed with diabetes. Some women with gestational diabetes require insulin therapy during pregnancy.

70.     Plaintiffs' Assignors have paid for over one million prescriptions of insulin in the past ten years.

71.     Combined revenue from the top selling insulin drugs tops $17.2 billion ($6.98 billion for Sanofi's Lantus and $376 million for its Apidra; $3.03 billion for Novo Nordisk's NovoLog and $2.68 billion for its Levemir; and $2.84 billion for Eli Lilly's Humalog and $1.34 billion for Humulin).

### The Dramatic Rise in the Price of Insulin

72.     Since 2003, the cost of one vial of insulin or one box of five insulin pens has increased by more than 500%—an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in the same time period.

73.     These price increases have occurred even in the face of supposed competition between manufacturers with similar drugs.

74.     Since the mid-1990s, there have been more than two dozen increases of the list price on a vial of Humalog insulin, as represented in the graph below from a Washington Post article discussing the historical price increases of insulin:



Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, Wash. Post (Oct. 31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/?utm_term=.ce231b04502f.

75.     The nearly identical trajectory in price increases across both categories of insulins (rapid and long-acting) is remarkable as well, as this graph illustrates:



Rebecca Robbins, *The insulin market is heading for a shakeup. But patients may not benefit.*, Stat (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

76.     Thus, nearly a century after its discovery, there is still no inexpensive supply of insulin for people living with diabetes in the United States.

77.     Instead, TPPs, like Plaintiffs' Assignors, that provide medical treatments and supplies to their beneficiaries who need insulin to survive, are impacted by Defendants' Insulin Pricing Scheme.

## **MEDICARE**

78.     Plaintiffs are assignees of Medicare Part C and Part D prescription drug coverage providers (MA Plans and related entities) that provide benefits to thousands of individual beneficiaries.

79.     The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).

80.     The Medicare Act consists of five parts—Parts A, B, C, D and E.

81.     Parts A and B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." *In re Avandia Mktg. Sales Practices and Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).

82.     Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to provide their Medicare benefits. 42 U.S.C. §§ 1395w-21-29.

83.     Part D provides prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

84.     An enrollee's health coverage with a MA Plan is strictly construed and regulated by the Centers for Medicare and Medicaid Services ("CMS"). *Id*.

**Medicare Part D**

85.     Medicare does not directly offer prescription drug coverage to its beneficiaries. Instead, prescription drug coverage is an optional benefit provided by insurance companies and other private companies approved by CMS.

86.     Medicare beneficiaries have two options for obtaining Part D prescription drug coverage: (1) through an MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan.

87.     Generally, MA Plans that offer Part C benefits include prescription drug benefits.

88.     Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

89.     Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2019, the limit on out-of-pocket costs is $5,100.00.[4] After that, the MA Plan pays most of the costs for the drug throughout the remainder of the year.

90.     MA Plans may require a deductible be met prior to paying for drug coverage. In 2019, the maximum deductible a beneficiary can be charged is $415.00.[5] During the deductible stage, the beneficiary pays all costs for their prescriptions.

---

[4] *Catastrophic Coverage*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage.

[5] *Yearly Deductible for Drug Plans*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/yearly-deductible-for-drug-plans.

91.     Once the deductible is met, the initial coverage period begins. During this period, the beneficiary pays a portion of the drug's cost and the MA Plan pays the remainder. The amount paid by the beneficiary will be either a copayment or coinsurance. A copayment is a set amount for all drugs based on what tier the drug falls into on the MA Plan's drug formulary (e.g., $50 for brand-name drugs on Tier 1, $25 for brand-name drugs on Tier 2). With coinsurance, a beneficiary will pay a percentage of the cost (e.g., 25%) of the drug's cost.

92.     Most Part D plans have a coverage gap called the "Donut Hole" wherein there is a temporary limit on what the Part D plan will cover. The coverage gap begins after the beneficiary and MA Plan have paid a certain amount for covered drugs. In 2019, once the cost has reached $3,820.00 spent on prescriptions, a beneficiary will enter the coverage gap.[6]

93.     During the coverage gap, the beneficiary pays 25% of the price for brand-name drugs and the MA Plan pays 75%. For generic drugs, the MA Plan pays 63% of the price and beneficiary pays 37%.[7]

94.     This percentage-of-cost requirement means that inflated insulin prices hurt Part D sponsors in this third coverage phase.

95.     Once the beneficiary and MA Plan have spent $5,100.00, the beneficiary is out of the coverage gap. Once out of the coverage gap, the beneficiary automatically gets "catastrophic coverage." This means the beneficiary only pays their copayment or coinsurance amount for the rest of the year.

---

[6] *Costs in the Coverage Gap*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/costs-in-the-coverage-gap.

[7] *Id.*

| | |
|---|---|
| **Annual Deductible** | • You pay for your drugs until you reach the deductible amount set by your plan.<br>• Not all Part D plans have a deductible.<br>• If your plan does not have a deductible, your coverage starts with the first prescription you fill. |
| **Initial Coverage** | • You pay a copay or coinsurance and the plan pays the rest.<br>• You stay in this stage until your **total drug costs** reach **$3,820**. |
| **Coverage Gap (Donut Hole)** | • You pay:<br>  • 25% of the costs for brand name drugs<br>  • 37% of the costs for generic drugs<br>• You stay in this stage until your total **out-of-pocket costs** reach **$5,100**. |
| **Catastrophic Coverage** | • You pay a small copay or coinsurance amount.<br>• You stay in this stage for the rest of the plan year. |

"Medicare Made Clear, Part D Coverage & Costs," UnitedHealthcare (May 8, 2018),

https://www.medicaremadeclear.com/basics/medicare-coverage-and-costs/medicare-part-d.

## THE INSULIN PRICING SCHEME

96.     The prices that Plaintiffs' Assignors paid and continue to pay for the Subject

Insulins are inflated because of Defendants' Insulin Pricing Scheme, causing TPPs to pay for

both the drug and the undisclosed kickback to the PBMs. Had Plaintiffs' Assignors known of this

unlawful quid pro quo situation, they would not have allowed placement of the Subject Insulins

on their formularies or paid the inflated prices.

### Defendants' Concealment of the Insulin Pricing Scheme

97.     Defendants have, and continue to, conceal the details of the Insulin Pricing

Scheme from TPPs, including Plaintiffs' Assignors. Upon information and belief, Defendants

keep the material details of the Insulin Pricing Scheme confidential, including the gross amount

of the kickbacks and what portion, if any, of the kickback is passed through to Plaintiffs'

Assignors, for the nefarious purpose of generating ill-gotten gains at the Assignors' expense.

## A Pharmaceutical Supply Chain Overview

98.     The pharmaceutical supply chain in the United States consists of four major actors: pharmaceutical manufacturers, wholesale distributors, pharmacies, and PBMs.

99.     Pharmaceutical manufacturers produce drugs which are distributed to wholesale distributors, who further distribute to retail or mail-order pharmacies, such as those operated by the co-conspirator PBMs. Pharmacies dispense the prescription drugs to beneficiaries for consumption. Prescription drugs are subject to price negotiations and processed through quality and utilization management screens by PBMs.

100.    TPPs contract with and pay PBMs to administer their drug programs. PBMs are tasked with developing drug formularies (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies, and negotiating with pharmaceutical manufacturers. TPPs, including Plaintiffs' Assignors, pay PBMs to control prescription drug costs. Instead, the PBMs conspire with Defendants to provide favorable formulary placement for the Subject Insulins on Plaintiffs Assignors' formularies, and increase insulin List Prices for the sole purpose of providing additional funds to kickback to the PBMs, thus increasing Defendants' profits at Plaintiffs' Assignors' expense Plaintiffs and that of the general public, yet providing no additional benefit.

101.    PBMs should assess prescription drugs for clinical safety, efficacy, and cost effectiveness to determine if and where a drug should be placed on a formulary. Where a PBM finds that a drug has an advantage over competing drugs, that drug should be given preferred formulary placement.

102.    Plaintiffs' Assignors allowed the Subject Insulins to be included on their formularies, and placed favorably, based on Defendants' and their PBM Co-conspirators'

misrepresentations that the Subject Insulins were cost effective insulins in their therapeutic class. But for Defendants' and the PBM Co-conspirators' fraudulent conduct, Plaintiffs' Assignors would have excluded the Subject Insulins from their formularies.

103.    The formulary placement corresponds with the amount that a plan participant must contribute as a co-payment when purchasing a drug—the higher the placement, the lower the co-payment, and the higher likelihood that the drug will be purchased by plan beneficiaries in lieu of a more expensive alternative, and vice versa. As such, higher formulary placement increases the likelihood that a doctor will prescribe the drug. This system is well known to Defendants.

104.    TPPs provide copies of their PBMs' formularies to providers, pharmacists, and patients in their network to aid prescribers' adherence to the formulary.

105.    Being included in the various payer formularies and obtaining favorable placement of a drug within a formulary (i.e. "Tier-1 placement") drives demand for that drug within the PBM's entire network of physicians, pharmacists, and participating plans. Thus, manufacturers view favorable placement as a guarantee for drug utilization.

106.    Formulary inclusion is critical to Defendants' business, as it results in increased drug sales, including the Subject Insulins.

107.    As described more fully below, PBMs contract with a network of retail and community pharmacies.

108.    In addition, and of significance here, PBMs have contractual relationships with pharmaceutical manufacturers, retail pharmacies, and pharmaceutical wholesalers, and negotiate rebates, fees, and other concessions.

109.    These relationships allow PBMs to exert tremendous influence and control over which drugs are made available to health plans and ultimately the public.

110.    The following chart, published by the Wall Street Journal, broadly illustrates the pharmaceutical supply chain, and the PBMs central role in it:



Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, Wall St. J. (Oct. 3, 2016, 12:43 PM), https://www.wsj.com/articles/drugmakers-point-finger-atmiddlemen-for-rising-drug-prices-1475443336.

111.    TPPs, such as Plaintiffs' Assignors relied on Defendants' misrepresentations regarding the List Price of the Subject Insulins published by the Defendants, and relied on the PBM Co-conspirators' decisions regarding formulary placement of said insulins, causing Plaintiffs' Assignors to finance the Insulin Pricing Scheme that lined Defendants' pockets at Plaintiffs Assignors' expense.

112.    The Insulin Pricing Scheme is surreptitiously carried out by Defendants conspiring with the PBMs to raise the List Price of the Subject Insulins for the purposes of generating additional revenue, which is used to pay the PBMs in exchange for favorable formulary placement

of the Subject Insulins, thus enabling Defendants to maintain or increase market share, all at the expense of TPPs like Plaintiffs' Assignors. Making matters worse, TPPs, including Plaintiffs' Assignors, contract with the PBMs to, among other things, act in their best interest to determine if and where prescription drugs should be included in their formularies.

113.    Defendants deceive TPPs, including Plaintiffs' Assignors, by fraudulently inflating the List Price of the Subject Insulins, and failing to disclose the full extent of any rebates paid to the PBMs. The PBMs deceive TPPs, including Plaintiffs' Assignors, by failing to disclose the kickback scheme, and by including the Subject Insulins on their TPP client formularies without disclosing the conflict of interest inherent in the receipt of undisclosed kickbacks from the Defendants for said formulary placement.

## Drug Pricing

114.    Manufacturers have the most control over the price of their drugs. The manufacturers establish the Wholesale Acquisition Cost ("WAC"). After the WAC is established, the Average Wholesale Price ("AWP"), or List Price, is established by the manufacturer or a company that publishes a price compendium. Only the WAC and AWP are publicly available.

115.    The AWP is most commonly used by TPPs as a basis for reimbursement (e.g., AWP minus 5 or 25 percent). The AWP is the basis for Plaintiffs' Assignors' payments in this case.

116.    The List Price is the base price for negotiations between PBMs and manufacturers, i.e., the basis for reimbursement. As discussed above, PBMs create formularies for their TPP clients. The TPPs will cover all or a portion of their beneficiaries' drug costs based on whether and where drugs fall on their formulary. Defendants offer the PBM Co-conspirators

"rebates," i.e. discounts off the List Price, to influence the PBM Co-conspirators' decision on where to place the drugs in formularies.

### The Insulin Pricing Scheme: Rebates Gone Awry

117.   PBMs generate revenue in three primary ways. First, their TPP clients: (i) pay them service fees for processing prescriptions, and (ii) purchase prescription drugs directly from them through their mail-order pharmacies. Second, TPPs pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists and manufacturers. Third, PBMs receive "rebates" and other fees from manufacturers such as Defendants.

118.   Indeed, PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make ostensibly interchangeable products—i.e., drugs within the same therapeutic class.

119.   In such a scenario, manufacturers should compete for formulary placement on price, as in normal competitive markets, for favorable formulary placement.

120.   This rebate arrangement, if operated ethically and honestly, would create an incentive for PBMs to negotiate lower net drug prices.

121.   However, the arrangement is not operated ethically and honestly, Rather, Defendants and the PBMs conspire to exploit the system.

122.   Defendants and the PBMs discovered that they both benefit if, instead of forcing Defendants to compete on price, Defendants can raise their publicly reported List Price, while maintaining nearly constant net prices, thus increasing the spread between the two prices, and the resulting rebate to the respective PBM.

123.    The scheme allows the PBMs to leverage formulary control for kickbacks while also allowing Defendants to maintain or increase their profit margins by maintaining their sales volume through preferred formulary placement.

124.    TPPs pay the ultimate price by including these drugs on their formularies at a higher cost.

125.    Plaintiffs' Assignors' damages arise from these higher costs that directly result from the inflationary effect of Defendants' (and their PBM Co-conspirators) misrepresentations regarding the cost effectiveness of the Subject Insulins and their concealment of the Insulin Pricing Scheme.

126.    Thus, rather than use their prodigious bargaining power to negotiate lower drug prices, the PBMs conspire with Defendants to exploit the system to their exclusive benefit at the expense of TPPs, including Plaintiffs' Assignors, and the general public.

## The List/Net Price Divergence

127.    While Defendants often obscure the true net realized prices for the Subject Insulins, the escalating List Price is a matter of public record and has skyrocketed largely in lock-step between the Defendants.

128.    Defendants have sold similar, frequently interchangeable drugs for decades; however, the List Prices continue to rise in tandem with each competing drug.

129.    The List Price continues to rise because Defendants are not competing on price but are instead competing by paying higher rebates and other fees to the PBMs in exchange for favorable formulary placement.

130.    For example, Eli Lilly raised the List Price of Humalog from $35 per vial in 2001 to $234.00 per vial in 2015, a 568% increase. In 2004, the List Price for a 20 ml vial of Humulin

R was $175.57; in 2019 that same vial costs as much as $1862. From 2010 to 2015 alone, the price of Humulin R rose 325%.

131.    When Novo Nordisk's Levemir was released in 2006, it cost $66.96 per vial; today Levemir costs $367.19 per vial. From 2010 to 2015 alone, the price of Levemir rose 169%. The List Price for Novolog rose from approximately $40 per vial in 2002 to $361.70 per vial at the end of 2018.

132.    Sanofi's Lantus, the top-selling insulin, rose from $88.20 per vial in 2007 to $307.20 per vial at the end of 2017. From 2010 to 2015 alone, the price of Lantus rose 168%. The List Price per vial of Apidra rose from $95 in 2008 to $337.39 in 2018, and the list price for a package of Apidra pens rose from $180 in 2008 to $651.76 in 2018.

133.    This anti-competitive, market-distorting conspiracy explains why the List Prices of the Subject Insulins continue to rise spectacularly but the net realized prices for Defendants remain relatively constant.

134.    The figures below show percentage price changes—included in a press release by Novo Nordisk—illustrating this phenomenon:





Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-

us.com/leadershipperspectives?item=1.

135.    As indicated in the below diagrams prepared by SSER Health, a health-industry

research firm, the same widening spread has occurred for other major insulins:



Robert Langreth, et al., *Decoding Big Pharma's Secret Drug Pricing Practices*, Bloomberg

(June 29, 2016), https://www.bloomberg.com/graphics/2016-drug-prices/.

136.    Defendants' spread-increasing behavior is also visible from data on these

companies' *aggregate* rebates to PBMs.

137.    The below figure illustrates Novo Nordisk's aggregate rebates from 2007 to 2014.

28



Figure 69: **Reported rebates as % of US Gross sales**

Source: Company data, Credit Suisse estimates

Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

138.    Eli Lilly has greatly increased its rebates off the inflated List Prices.

139.    Unlike Novo Nordisk, for which insulin represents a substantial amount of gross revenues, Eli Lilly is an extremely diversified manufacturer.

140.    As a result, the impact of the very steep insulin rebating that has gained Eli Lilly the lion's share of the U.S. insulin market in recent years is attenuated in the graph below by less aggressive rebating on other drug classes.

141.    Eli Lilly's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014:



Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

### The Rise of the PBMs in the Pharmaceutical Supply Chain

142.    Today, PBMs manage pharmacy benefits for over 266 million Americans, with a few large companies dominating the PBM market.

143.    While the role of PBMs in the supply chain is known, the size of the rebates and other fees they extract from the manufacturers for formulary placement, and the portion of these payments they retain, is a carefully guarded secret.

144.    PBMs rely on a lack of transparency to conduct their business, and have vigorously resisted any requirement to disclose the details of their agreements with manufacturers, including the kickbacks they receive.

145.    When a PBM combines with, or operates, a pharmacy, they lose objectivity and any incentive to police against pharmaceutical manufacturer schemes to steer patients to more expensive drugs; indeed, they can and do collude in such illegal schemes.

146.    The illegal conduct alleged herein contributed to Express Scripts' net income increase from $2,008,000 in 2014 to $4,517,000 in 2017, a 125% increase. CVS Health's

pharmacy services segment, which includes its PBM CVS Caremark, also saw its annual revenue

steadily increase from $88 billion in 2014 to $134 billion in 2018, a 52% increase that the

conduct alleged herein contributed to.

147.    Plaintiffs' Assignors purchased, and continue to purchase, the Subject Insulins

directly from CVS Health and Express Scripts' mail-order pharmacies on their Enrollees' behalf.

## Defendants Admit to the Insulin Pricing Scheme

148.    Defendants offer a variety of excuses for the escalating List Prices of the Subject

Insulins.

149.    For example, Novo Nordisk offered as one justification the "clinical benefit" of

their drugs—a nonsensical explanation given that both the drugs and the benefits have been

unchanged for many years.

150.    In the face of widespread criticism regarding insulin prices spinning out of

control, Defendants admitted the true reasons for the price escalation.

151.    For example, on November 30, 2016, Novo Nordisk issued a press release stating:

> We hear from more and more people living with diabetes about the challenges they
> face affording healthcare, including the medicines we make . . . News reports on
> drug prices have left the public with an impression that companies like ours realize
> all the profits from the "list price" increases we've made over the last decade. In
> other words, a list price increase by XX percent leads to an automatic XX percent
> profit for the drug maker. We believe that is misleading and here's why: **As the
> manufacturer, we do set the "list price" and have full accountability for those
> increases. However, after we set the list price, we negotiate with the companies
> that actually pay for the medicines,** which we call payers. **This is necessary in
> order for our medicines to stay on their preferred drug list or formulary**. The
> price or profit we receive after rebates, fees and other price concessions we provide
> to the payer is the "net price." The net price more closely reflects our actual profits.

Novo Nordisk US, *Our Perspectives on Pricing and Affordability*, Our Perspectives (Last visited

February 9, 2018, emphasis added) http://www.novonordisk-

us.com/blog/perspectives/2016/november/

our_perspectives.html.

152.    In its 2016 annual report,[8] Novo Nordisk admitted to the practice of exchanging

rebates for preferential formulary placement noting as follows:

> Increasingly, PBMs and health plans play a key role in negotiating price
> concessions with drug manufacturers on behalf of private payers for both the
> commercial and government channels, and determining the list of drugs covered in
> the health plan's formulary. Specifically, . . . Payer pressure to reduce the overall
> drug costs has resulted in greater focus on negotiating higher rebates from drug
> manufacturers. Private payers are increasingly keen to adopt narrow formularies
> that exclude certain drugs, while securing increased rebates from the preferred
> brand.

153.    As a consequence, the report stated that Novo Nordisk had announced contract

negotiations for 2017 requiring the payment of higher-than-anticipated rebates to obtain broader

coverage for its products.

154.    Enrique Conterno, president of Eli Lilly's diabetes business, also admitted that Eli

Lilly raises List Prices as a quid pro quo for formulary positions, stating that "[t]he reason drug

makers sharply raise [List Prices] without a corresponding increase in net price is that PBMs

demand higher rebates in exchange for including the drug on their preferred-drug lists."[9]

155.    In June 2016, John C. Lechleiter, CEO of Eli Lilly, further explained that those

"higher rebates can be an incentive for a payer to stick with—with essentially a higher-priced

---

[8] Novo Nordisk Inc., Annual Report, Letter from the Chairman (February 1, 2017). *See also*
Novo Nordisk Inc., Annual Report, Letter from Lars Rebien Sørensen, (February 1, 2017)
(stating "[i]n 2017, we will see lower net prices in the U.S. as we had to increase the rebates
we offer the pharmaceutical benefit managers (PBMs) in order to ensure broad market access
for our products."). Attached as Exhibit "B."

[9] Denise Roland, *Insulin Prices Soar While Drugmakers' Share Stays Flat*, Wall St. J. (Oct. 11,
2016), http://www.wsj.com/articles/insulin-prices-soar-while-drugmakers-share-stays-flat-
1475876764.

product."[10]

156.    Sanofi has admitted to the same practices. In February 2015, Peter Guenter, Sanofi's Executive Vice President, explained that: "[a]s expected, increased rebates in the U.S. to secure favorable formulary positions for Lantus with key payors have kicked in since January 1, 2015."[11]

157.    As such, Defendants acknowledge that the Insulin Pricing Scheme drives up List Prices.

158.    While the message conveyed by Defendants is "PBMs made them do it," they could compete for access to formularies by simply lowering the List Prices for their insulin products, and refusing to rebate.

159.    This, however, would cut into their bottom line, as it would require Defendants to compete with one another on price.

160.    While not "real" for the PBMs, the List Price is real for TPPs as they pay this amount regardless of any rebate portions that *may* be provided later.

161.    Even with price negotiation, an artificially high "base price" is still harmful and unlawful.

162.    The benefit to PBMs was highlighted in another pharmaceutical case involving the manipulation of the spread between List Prices and real prices in *New England Carpenters Health Benefits Fund v. First DataBank, Inc*., 244 F.R.P. 2007 (D. Mass 2007). The district court

---

[10] *Bernstein Thirty-Second Annual Strategic Decisions Conference* 2016 (June 2, 2016), available at: https://cc.talkpoint.com/bern001/060116a_ae/?entity=60_XQX7ENW.

[11] Sanofi, *2014 Full Year's Results Conference Call* (Feb. 5, 2015), https://seekingalpha.com/article/2892016-sanofis-sny-q4-2014-results-earnings-call-transcript.

certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, conspired to inflate the list prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had been aware of the phony increase in the spread, and promptly acted to offset the spread by seeking rebates for its TPP clients. However, the district court rejected this argument as there was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of their TPPs:

> Because these PBMs benefited from the increased [List Price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [TPPs] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal [Express Scripts] e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[12]

163.    Thus, the Insulin Pricing Scheme benefits Defendants and PBMs at the expense of the public, including TPPs, MA Plans, and the Medicare Trust Fund.

164.    Defendants' scheme results in TPPs, including Plaintiffs' Assignors, being saddled with soaring costs based on inflated prices with MA Plans being relatively powerless in maximizing benefits for their Enrollees prior to the Donut Hole.

165.    While the PBMs continue to conceal the amount they make on kickbacks, Defendants have attempted to blunt criticism through various actions.

166.    For example, in a November 30, 2016, press release, Novo Nordisk made a modest commitment to limit any potential future List Price increases for medicines to no more

---

[12] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass. 2008) (internal citations omitted).

than single-digit percentages annually. Similar statements made on behalf of other manufacturers have been made as well.

167.    These measures do nothing to address the insidious practice of competing for formulary placement based on kickbacks.

168.    Defendants continue to illegally exploit the U.S. insulin market as an ideal source of profit, causing TPPs with diabetic beneficiaries to pay the price.

169.    Defendants deliberately and intentionally publish List Prices for the Subject Insulins that do not reflect the actual market prices of the drugs. Instead, these List Prices are fabricated overstatements to create a net-to-List Price spread that Defendants market to PBMs in exchange for formulary status. Without the fraudulent Insulin Pricing Scheme, Defendants would be forced to compete for favorable formulary placement by lowering prices.

170.    To perpetuate the Insulin Pricing Scheme, Defendants closely guard their pricing structures and insulin sales figures. Each Defendant keeps the net prices offered to the PBMs a secret.

171.    Defendants influence the PBMs to place the Subject Insulins on their formularies at inflated prices by offering undisclosed kickbacks to the PBMs.

172.    As a result of Defendants' Insulin Pricing Scheme, TPPs, including Plaintiffs' Assignors, include the overpriced insulin products on their formularies, while overpaying for said insulin for their beneficiaries, depleting finite resources available to provide MA Plan benefits.

173.    But for Defendants' Insulin Pricing Scheme, TPPs, including Plaintiffs' Assignors, would have paid less for their Enrollees' insulin. Without the Insulin Pricing Scheme,

Defendants would be forced to compete for formulary placement by offering lower prices instead of offering increasingly larger rebates to PBMs for preferential formulary placement.

**<u>High List Prices Directly Impact Plaintiffs' Assignors' Ability to Provide Benefits</u>**

174.     A drug that cost seven cents a week in 1924, now costs hundreds of dollars a month, far outpacing inflation. Plan D beneficiaries that cannot afford to pay the copayment or coinsurance for insulin may cut back or discontinue their treatment regimen, resulting in an increased incidence of hospitalization, the cost for which TPPs, including Plaintiffs' Assignors, are responsible.

175.     Costs for people with type 1 diabetes are typically much higher, as the American Diabetes Association ("ADA") averages include many type 2 patients who manage on low-cost oral medications alone.

176.     The financial burden of treating diabetes means that many beneficiaries in the Donut Hole do not receive the care they need for a disease that has been treatable for almost a century.

177.     Patients concerned with the cost of insulin may self-ration their insulin, frequently not taking it when they need to, cutting their doses in half, or refilling their pump hours after the insulin runs out, even though it means their blood sugar will go up.

178.     Insulin self-rationing is common, as is patients allowing themselves to go into DKA to get insulin in emergency rooms.

179.     Patients may also deprive themselves of food to keep their blood sugar low and avoid the need for insulin.

180.     The less controlled an individual's blood sugar, the higher their risk for complications including cardiovascular disease, nerve damage that can lead to amputation of

limbs, kidney disease and failure, eye damage such as blindness or glaucoma, skin conditions, hearing impairment, and Alzheimer's disease.

181.    Doctors are expressing concern regarding the increasing number of diabetic patients presenting symptoms of poorly controlled blood sugar that explain that they were not taking their insulin because of its expense.

182.    The ADA estimates that the average person diagnosed with diabetes has about $13,700 in medical expenditures each year, of which about $7,900 is attributable to diabetes.

## PLAINTIFFS' TOLLING OF THE STATUTE OF LIMITATIONS

### DISCOVERY RULE TOLLING

183.    Plaintiffs' Assignors had no way of knowing about Defendants' concealed Insulin Pricing Scheme.

184.    Defendants and PBMs refuse to disclose the real net prices of the Subject Insulins, labeling them trade secrets, hence a reasonable plaintiff could not discover the truth.

185.    Within the applicable statutes of limitation, Plaintiffs' Assignors could not have discovered, through the exercise of reasonable diligence, that Defendants were concealing the conduct complained of herein and misrepresenting the true cost of the Subject Insulins.

186.    Plaintiffs' Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme and were publishing artificially and fraudulently inflated List Prices, nor would a reasonably diligent investigation have disclosed the true facts.

187.    Accordingly, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to claims as to all of the Subject Insulin products identified herein.

## CONTINUING VIOLATION TOLLING

188.    Defendants' Insulin Pricing Scheme constitutes a systemic violation of law, involving ongoing policies and practices which continue to date, causing Plaintiffs' Assignors to include the Subject Insulins on their formularies at fraudulently inflated prices.

189.    Plaintiffs' Assignors paid for or reimbursed, and continue to pay for or reimburse, the cost of the Subject Insulins for their Enrollees within the applicable statutory limitation periods.

190.    Plaintiffs' Assignors were harmed, and suffered separate injuries and claims against Defendants, each and every time they paid for or reimbursed the artificially and fraudulently inflated Subject Insulin prices, for Subject Insulins that were included in their formularies, or given preferred formulary status, as a result of Defendants' fraudulent Insulin Pricing Scheme.

## FRAUDULENT CONCEALMENT TOLLING

191.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

## ESTOPPEL

192.    Defendants were under a continuous duty to disclose to Plaintiffs' Assignors the true character, quality, and nature of the List Prices and any rebates upon which their payments for the Subject Insulins were based.

193.    However, as set forth herein, Defendants breached this duty.

194.    Accordingly, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## RICO ALLEGATIONS

195.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

### A.    Defendants are culpable "persons" under RICO.

196.    Count I of this Complaint alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c) by Defendants.

197.    Plaintiffs and Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

### B.    The Manufacturer-PBM Insulin Pricing RICO Enterprises

198.    For purposes of the RICO counts in this complaint, the RICO "enterprises" are associations-in-fact consisting of (a) one of the two PBM Co-conspirators—CVS Health or Express Scripts—including its directors, employees, and agents, that administer purchases of the Subject Insulins, and (b) one of the Defendants, including its directors, employees, and agents. These association-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

199.    Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are, and have been, associated for the common and shared purposes of selling, purchasing, and administering the Subject Insulins to Plaintiffs' Assignors and other TPPs, and deriving secret profits from these activities. These profits are greater than Defendants could obtain absent their fraudulent concealment of the kickbacks.

200.    Each Manufacturer-PBM Insulin Pricing Enterprise also shares a common purpose of perpetuating the use of insulin List Prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. With respect to Defendants, these corporations would not be able to market large spreads to the PBM Co-conspirators in exchange for favorable formulary positions without the use of the inflated List Prices as the basis for consumer cost-sharing in the pharmaceutical industry. The PBM Co-conspirators share this common purpose because, without the use of the inflated List Prices, their profits on the spread between List Prices and net prices would collapse. As a result, the PBM Co-conspirators have, with the knowing and willful participation and assistance of Defendants, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from Defendants that the PBM Co-conspirators, to a large extent, keep; (ii) pocketing secret spreads between List Prices and net prices for the Subject Insulins; and (iii) keeping secret discounts that the Defendants provide in association with the PBM Co-conspirators' mail-order operations.

201.    To accomplish this common purpose, Defendants periodically inflate the List Prices of the Subject Insulins. They do so willfully. The Manufacturer-PBM Insulin Pricing Enterprises conceal from Plaintiffs' Assignors, the amount of kickbacks the PBM Co-conspirators receive and how much is passed back to Plaintiffs' Assignors, if any.

202.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant and each PBM Co-conspirator that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which Defendants share information on a regular basis, including information

regarding the insulin List Prices and net prices. Each Manufacturer-PBM Insulin Pricing Enterprises functions as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises were operated by the specific defendant and PBM Co-conspirator to carry out the spread scheme.

203.    At all relevant times, the PBM Co-conspirators have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBM Co-conspirators strike rebate deals with Defendants to include the insulin products on their formularies, to conceal the true net prices of the insulins, and to profit from the inflated List Prices. The PBM Co-conspirators have represented to the public that the rebates they negotiate save TPPs (including Plaintiffs' Assignors) money on their prescription drug costs. But they know that the increasing spreads did not and do not actually decrease the net prices of the insulins. The List Prices were and are falsely inflated while the net prices have largely remained constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and List Price, the PBM Co-conspirators would have had the incentive to disclose the fraudulent nature of Defendants' List Prices. By failing to disclose this information, Defendants perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

204.    Further, the PBM Co-conspirators took instructions and commands from Defendants regarding use of the insulin List Prices, not only so that they could keep part of the spread, but also so as to continue to earn from the manufacturers: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market

41

share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

205.    In order to garner all of these fees from Defendants, each PBM Co-conspirator and each Defendant meet on a regular basis to discuss insulin prices, spreads, marketing opportunities, and coordination of all of the above.

206.    There is a common communication network between each PBM Co-conspirator and each Defendant for the purpose of implementing the Insulin Pricing Scheme and for the exchange of financial rewards for the PBM Co-conspirators' conduct that benefits the Defendants, i.e. preferential placement of Defendants' Subject Insulins on the PBM Co-conspirators' drug formularies.

207.    At all relevant times, each of the PBM Co-conspirators was aware of Defendants' spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. The Manufacturer-PBM Insulin Pricing Enterprises knowingly made material misrepresentations to the general public in furtherance of the fraudulent scheme regarding:

   a.    The net prices of the Subject Insulins;[13]

   b.    The extent to which the net prices of the Subject Insulins departed from their artificially-inflated List Prices;

   c.    That the Subject Insulins' List Prices served as a reasonable cost-sharing benchmark and that this List Price was a fair basis on which to base payments from TPPs;

   d.    The extent to which the Defendants and the PBM Co-

---

[13] The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Novolog and Levemir. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog, Humulin R, and Humulin N. All references to "insulins" refer to the specific insulins relevant to each Manufacturer-PBM Insulin Pricing Enterprise.

<table>
<tr><td></td><td>conspirators negotiated the rebates discounting the List Prices of the Subject Insulins in good faith and for a proper purpose;</td></tr>
<tr><td>e.</td><td>Whether the rebates were intended to benefit plan members and/or the general public;</td></tr>
<tr><td>f.</td><td>Whether the rebates saved TPPs, plan members and the general public money;</td></tr>
<tr><td>g.</td><td>Whether the "preferred" formulary status of the Subject Insulins reflect the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBM Co-conspirators' formulary committees;</td></tr>
<tr><td>h.</td><td>Whether the Subject Insulins would have been placed in "preferred" formulary positions absent the spreads; and</td></tr>
<tr><td>i.</td><td>The extent to which the spread schemes forced Plaintiffs' Assignors to incur additional expenses for their beneficiaries' insulin prescriptions.</td></tr>
</table>

208.   Defendants alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBM Co-conspirators  And the PBM Co-conspirators did so through misrepresentations: they told clients, potential clients, and investors that they secured lower prices. The lower prices were fictitious, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Insulin Pricing Enterprises could not have achieved their common purpose.

209.   The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are ongoing, i.e., the increased spreads between the List Prices and net prices of the Subject Insulins are still being maintained and increased, and the Subject Insulins continue to receive preferred formulary placement resulting in ongoing financial injury to Plaintiffs' Assignors.

210.   For purposes of the RICO related counts in this Complaint, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

### 1.      The Novo Nordisk-PBM Insulin Pricing Enterprises

211.     The "Novo Nordisk-PBM Insulin Pricing Enterprises" are two separate associations-in-fact consisting of each of the PBM Co-conspirators that administered purchases of Novo Nordisk's Subject Insulins, including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS Health association-in-fact enterprise; and (2) the Novo Nordisk-Express Scripts association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanging kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo Nordisk and CVS Health and Novo Nordisk and Express Scripts. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication network by which Novo Nordisk and CVS Health and Novo Nordisk and Express Scripts share information on a regular basis.

212.     The Novo Nordisk-PBM Insulin Pricing Enterprises function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk and the PBM Defendants to carry out the Insulin Pricing Scheme.

### 2.      The Sanofi-PBM Insulin Pricing Enterprises

213.     The "Sanofi-PBM Insulin Pricing Enterprises" are two separate associations-in-

fact consisting of each of the PBMs that administered purchases of Sanofi's Subject Insulins, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS Health association-in-fact enterprise; and (2) the Sanofi-Express Scripts association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanging kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS Health and Sanofi and Express Scripts. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS Health and Sanofi and Express Scripts share information on a regular basis.

214.    The Sanofi-PBM Insulin Pricing Enterprises function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi and the PBM Defendants to carry out the Insulin Pricing Scheme.

### 3.    The Eli Lilly-PBM Insulin Pricing Enterprises

215.    The "Eli Lilly-PBM Insulin Pricing Enterprises" are two separate associations-in-fact consisting of each of the PBMs that administered purchases of Eli Lilly's Subject Insulins, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS Health association-in-fact enterprise; and (2) the Eli Lilly-Express Scripts association-in-fact enterprise. Each of the Eli Lilly-PBM Insulin Pricing

Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanging kickbacks or "rebates" for preferred formulary positions for Eli-Lilly's rapid-acting analog insulin product, Humalog, rapid-acting human insulin product, Humulin R, and intermediate-acting human insulin product, Humulin N, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS Health and Eli Lilly and Express Scripts. As to each of these Eli Lilly-PBM Insulin Pricing Enterprises, there is a common communication network by which Eli Lilly and CVS Health and Eli Lilly and Express Scripts share information on a regular basis.

216.    The Eli Lilly-PBM Insulin Pricing Enterprises function as continuing but separate units. At all relevant times, each of the Eli Lilly-PBM Insulin Pricing Enterprises was operated and conducted by Eli Lilly and the PBM Defendants to carry out the spread scheme.

217.    The foregoing evidences that the Defendants and PBM Co-conspirators were each willing participants in the Manufacturer-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the Defendants and the PBM Co-conspirators through kickbacks to the PBM Co-conspirators and continued formulary status without net price reductions for the Defendants.

### C.    Defendants' use of the U.S. mails and interstate wire facilities

218.    Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engaged in the following activities across state

boundaries: the sale, purchase and/or administration of the Subject Insulins; the setting of the prices of the Subject Insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the Subject Insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the Subject Insulins. The Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the Subject Insulins to millions of individuals located throughout the United States.

219.    Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

220.    The nature and pervasiveness of Defendants' Insulin Pricing Scheme, which was orchestrated out of Defendants' corporate headquarters, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBM Co-conspirators.

221.    Most of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon secrecy. Accordingly, Defendants took deliberate steps to conceal their wrongdoing. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts furthered the spread scheme.

222. Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications, *inter alia*:

    a.    Marketing materials about the List Prices for the Subject Insulins and the available spreads, which Defendants sent to PBM Co-conspirators located across the country;

    b.    Written and oral representations of the Subject Insulin List Prices that the Defendants made at least annually and, in many cases, several times during a single year;

    c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of a Defendant's Subject Insulins on a particular PBM Co-conspirator's formulary;

    d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBM Co-conspirators paid for the Subject Insulins, and/or to conceal those prices or the spread scheme;

    e.    Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBM Co-conspirators to persuade them to advocate for one Defendants' Subject Insulin over a competitor's product;

    f.    Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the List Prices were, or that were intended to deter investigations into the true nature of the List Prices or to forestall changes to reimbursement based on something other than List Prices;

    g.    Written and oral communications with health insurers and patients;

    h.    Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme; and

    i.    In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or

divisions, in furtherance of the spread scheme. These mails include some of the documents referenced in this Second Amended Complaint.

### D.      Conduct of the RICO Enterprises' affairs

223.     Each of Defendants has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of Defendants have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.      Each Defendant has directly controlled the List Prices and net prices for its Subject Insulins, which determines the amount of each of the PBM Co-conspirators' compensation;

b.      Each Defendant has directly controlled the List Prices that it publicly reports;

c.      Each  has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBM Co-conspirators of the profit potential of its Subject Insulins;

d.      Each Defendant has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBM Co-conspirators; and

e.      Each Defendant has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that Defendant's Subject Insulin or Insulins on a PBM Co-conspirator's formulary or advocate the use of a certain insulins. These inducements include the Defendants' payment to the PBM Co-conspirators of: (i) access rebates for placement of products on the PBM Co-conspirators' formulary; (ii) market share rebates for garnering higher market share than established targets;

(iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBM Co-conspirators typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM Co-conspirator often is able to retain a significant portion of the rebates. Furthermore, PBM Co-conspirators usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM Co-conspirator has received in connection with the health plan client.

f.    Each he Defendant intended that the PBM Co-conspirators would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like Plaintiffs' Assignors money on their prescription; and

g.    Each Defendant represented to the general public, by stating the Subject Insulins' List Prices without stating that these List Prices differed substantially from those net prices offered to the PBM Co-conspirators, that the Subject Insulins' List Prices reflected or approximated insulins' true price.

224.    Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective Defendant.

225.    In violation of Section 1962(c) of RICO, each Defendant has conducted the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated List Prices for the Subject Insulins and by misrepresenting to Plaintiffs' Assignors through the publication of their List Prices that these List Prices were reasonable bases for Plaintiffs' Assignors' out-of-pocket payments, thereby inducing the PBM Co-conspirators to provide preferred formulary placement to their Subject Insulins, and causing Plaintiffs' Assignors to pay artificially and fraudulently inflated prices for the Subject Insulins.

### E.   Defendants' pattern of racketeering activity

226.   Each  Defendant has conducted and participated in the affairs of their respective

Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity,

including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. §

1343, relating to wire fraud. Defendants' pattern of racketeering likely involved thousands, if not

hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities

in furtherance of their Insulin Pricing Scheme. Each of these fraudulent mailings and interstate

wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. §

1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within

the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiffs'

Assignors and others.

227.   Each Defendants' role in the fraudulent and unlawful Insulin Pricing Scheme

consisted, in part, of deliberately overstating the List Prices for its Subject Insulins, thereby

creating a spread between net and List Prices. Each Defendant then used those spreads to induce

each of the PBM Co-conspirators to advocate and favor that particular Defendant's Subject

Insulin.

228.   For their part, the PBM Co-conspirators conspired with Defendants to artificially

and fraudulently increase the List Price of the Subject Insulins to enable the Defendants to pay

them kickbacks in the form of rebates in exchange for favorable formulary placement on

formularies of TPPs, including those of Plaintiff's Assignors.

229.   The Insulin Pricing Scheme was calculated and crafted such that TPPs, including

Plaintiffs' Assignors, would pay for the Subject Insulins based on artificially inflated List Prices.

In designing and implementing the Insulin Pricing Scheme, Defendants were cognizant, at all

times, of the fact those TPPs were not part of the enterprise and relied upon the integrity of the Defendants in setting the List Prices, and relied on the PBM Co-conspirators to fulfill their contractual duty to act in Plaintiffs' Assignors' best interest when determining formulary placement.

230.    By intentionally and artificially inflating the List Prices, and by subsequently failing to disclose such practices to Plaintiffs' Assignors, Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

231.    Defendants racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiffs' Assignors. Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs' Assignors. Defendants engaged in a pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

232.    Defendants' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes. Plaintiffs' Assignors, all of whom provide Medicare benefits, paid for the Subject Insulin prescriptions at issue in violation of the Federal Anti-Kickback statute.

233.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to

induce the purchase of drugs paid for by Medicare Part D or any other federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any state health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

234. The purported "discounts" or "rebates" afforded by the Defendants to the PBM Co-conspirators do not fall within the subsection (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce Defendants' net selling price—to the extent that Defendants have increased the List Price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM Co-conspirators can make more money. This is a classic kickback.

### F. Defendants' motive

235. Defendants' motive in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to obtain favorable formulary placement of their Subject Insulin products which would increase the sales and profits of the Subject Insulins.

236. The Insulin Pricing Scheme was designed to, and did, encourage others, including health care providers, to advocate the use of Defendants' Subject Insulins. Thus, Defendants used the Insulin Pricing Scheme to sell more of its drugs, thereby fraudulently gaining sales, market share, and profits.

237. The PBM Co-conspirators reap abundant benefits from the Insulin Pricing

Scheme as well. The artificially and fraudulently inflated prices that Defendants conspired to raise enables Defendants to pay ever increasing rebates in exchange for favorable formulary placement, improving the PBM Co-conspirators' bottom lines. Consequently, despite numerous conflicts of interest, the PBM Co-conspirators generate substantial revenue from Defendants and Plaintiffs' Assignors.

### G.     Damages caused by Defendants' rebate scheme

238.    Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs' Assignors to be injured in their business or property. Plaintiffs' Assignors have paid many hundreds of millions of dollars in inflated payments based on the fictitious List Prices for the Subject Insulins.

239.    Defendants sent billing statements through the U.S. mails or by interstate wire facilities and reported the List Prices and other information by the same methods in furtherance of their Insulin Pricing Scheme. Plaintiffs' Assignors have made inflated payments for the Subject Insulins in reliance on falsely inflated List Prices.

240.    The amount of each of these cash payments is based on Defendants' List Prices. Therefore, when each Defendant artificially inflated each Subject Insulin's List Price and then used each Manufacturer-PBM Insulin Pricing Enterprise to sell those insulins, they also artificially inflated the amount paid by Plaintiffs' Assignors.

241.    Plaintiffs' Assignors' injuries were proximately caused by Defendants' racketeering activity. But for the misrepresentations that Defendants made regarding the List Prices of their Subject Insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, Plaintiffs' Assignors would have refused to include the Defendants Subject Insulins on their formularies, or would have paid less for their Enrollees' Subject

Insulins. In addition, the PBM Co-conspirators' failed to act in Plaintiffs' Assignors best interest by participating in and concealing the Insulin Pricing Scheme. Plaintiffs' Assignors were denied material information necessary to make an informed decision about the formulary placement of the Defendants' Subject Insulins, causing them to pay for or reimburse the inflated cost of insulins that they otherwise would not have paid.

242.     Plaintiffs' Assignors directly relied on the racketeering activity of Defendants and their Manufacturer-PBM Insulin Pricing Enterprises. Plaintiffs' Assignors directly and indirectly relied on the fraudulently inflated List Price of Subject Insulins published by Defendants. Because Defendants controlled and concealed all knowledge of the insulin pricing models upon which formulary inclusion and placement was based, Plaintiffs' Assignors were obligated to rely on Defendants' representations about the insulin pricing.

## COUNT I
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

243.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

244.     This count is against all Defendants.

245.     Defendants created and continue to operate the Manufacturer-PBM Insulin Pricing Enterprises, which are enterprises affecting interstate commerce.

246.     Defendants were each associated with Manufacturer-PBM Insulin Pricing Enterprises that affected, and continue to affect, interstate commerce as set forth herein.

247.     Defendants each participated directly or indirectly in the conduct and affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises, thus affecting interstate commerce as set forth herein.

248.    Defendants participated in the Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including mail and wire fraud, as set forth herein.

249.    Plaintiffs' Assignors direct injuries were proximately caused by Defendants' overt predicate acts. Plaintiffs suffered direct financial injury as a result of Defendants illicit conduct which caused them to include Defendants' Subject Insulins on their drug formularies that they otherwise would not have included, but for Defendants' actions. The Subject Insulins' inclusion on the Assignors' formularies resulted in Assignors purchasing the Subject Insulins at illegally inflated prices set by the Manufacturer-PBM Insulin Pricing Enterprises. Attached as Exhibit A is a non-exhaustive list of claims showing specific incidences where Plaintiffs' Assignors purchased the Defendants' Subject Insulins.

250.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs' Assignors have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

251.    Plaintiffs' Assignors will continue to be injured in their business and property by paying more for the Subject Insulins due to the Insulin Pricing Scheme as long as the Manufacturer-PBM Insulin Pricing Enterprises are allowed to artificially inflate the price of insulin by concealing the net price and amount of kickbacks received by the PBM Co-conspirators.

## COUNT II
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962

252.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

253.    This count is against all Defendants.

254.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

255.    Defendants violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Manufacturer-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

256.    As set forth in detail above, Defendants engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants inflated the List Prices of the Subject Insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of their Subject Insulins; and made false or misleading statements or material omissions regarding the existence and amount of their Subject Insulins' List Price-to-net price spread. The truth about the net prices of the insulins as distinguished from the inflated List Prices is material.

257.    From the outset, Defendants knew, but did not disclose, that the List Prices they selected and published for the Subject Insulins did not reflect the net prices of those products. Defendants knew that their published List Prices were not reasonable approximations of the true market prices of their Subject Insulins. Yet they held out these List Prices as reasonable approximations of the true costs of the insulins and reasonable bases for consumer cost-sharing obligations with respect to these medicines. The Defendants substantially inflated the List Prices of their Subject Insulins to offer larger spreads to the PBM Co-conspirators in exchange for favorable formulary positions. Defendants knew, but did not disclose, that the List Price-to-net price spreads did not reduce the prices paid by TPPs, like Plaintiffs' Assignors, who included the

Subject Insulins in their formularies and purchased said insulins based on List Price. Defendants knowingly and deliberately misled consumers regarding the pricing of the Subject Insulins.

258.     The nature of the above-described Defendants' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

259.     Defendants engaged, and continue to engage, in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.     Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

b.     Multiple instances of wire fraud in violations of 18 U.S.C. § 1343;

c.     Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952;

d.     Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. Ann. § 2C:21-10(a).

260.     Defendants' violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. Plaintiffs' Assignors have been directly injured financially as a result of these violations. Plaintiffs' Assignors have paid millions of dollars in payments for the Subject Insulins that they would not have made but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

261.     Defendants' racketeering activity directly and proximately injured Plaintiffs' Assignors. Plaintiffs' Assignors included the Subject Insulins in their formularies and

substantially overpaid for Subject Insulins for their beneficiaries when they paid for these medicines at the point of sale, based on Defendants' inflated List Prices.

262.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiffs' Assignors for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT III**
**EQUITABLE RELIEF PURSUANT TO 18 U.S.C. § 1964(a)**

263.    Plaintiffs re-allege and incorporate herein by reference each of allegations contained in the preceding paragraphs as if fully set forth herein.

264.    Pursuant to the equitable relief provisions of RICO and applicable laws of the 50 states, Plaintiffs seek injunctive relief directing Defendants to publish accurate List Prices.

265.    Such information is necessary to enable TPPs to properly evaluate all material factors of the insulins, including cost, when determining whether a given insulin will be covered by their plans, and if so, to determine proper formulary placement.

266.    Without accurate information, TPPs risk irreparable harm in paying or reimbursing insulin prescriptions with inflated prices, or which may otherwise have been excluded from the TPPs formulary.

267.    The equitable relief sought pursuant to RICO and the applicable laws of the 50 states is within the jurisdiction of this Honorable Court. Under this count, Plaintiffs seek no monetary damages.

## COUNT IV
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

268.    Plaintiffs re-allege and incorporate herein by reference each of allegations contained in the preceding paragraphs as if fully set forth herein.

### Alaska Unfair Trade Practices and Consumer Protection Laws
### Alaska Stat. § 45.50.471 Through § 45.50.561

269.    Plaintiffs are "consumers" within the meaning of the Alaska Unfair Trade Practices and Consumer Protection Laws ("Alaska CPL").

270.    Defendants provided insulin products, described herein as "goods or services" in the State of Alaska, which includes goods or services, within the meaning of Alaska Stat. Ann. § 45.50.561(9).

271.    The Alaska CPL provides that "a person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful by AS 45.50.471 may bring a civil action to recover for each unlawful act or practice." Alaska Stat. Ann. § 45.50.531(a).

272.    As detailed above, in furtherance of the Insulin Pricing Scheme, Defendants employed unlawful practices, including deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in violation of the Alaska CPL.

273.    Plaintiffs' Assignors suffered, and continues to suffer, ascertainable losses as a result of Defendants' conduct.

274.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme described herein.

275.   Defendants knew or should have known that their conduct was in violation of the Alaska CPL.

276.   Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Alaska.

277.   Pursuant to the Alaska CPL, Plaintiffs seek treble damages or $500, whichever is greater, for each unlawful act or practice, injunctive relief, attorneys' fees and any other relief the court considers necessary and proper.

**Arizona Consumer Fraud Act**
**Ariz. Rev. Stat. § 44-1521, et seq.**

278.   Plaintiffs and Defendants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA").

279.   The insulin products described herein are "goods" within the meaning of Arizona CFA.

280.   Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5). Merchandise "means any objects, wares, goods, commodities, intangibles, real estate or services, including direct primary care provider plans as defined in § 20-123." Ariz. Rev. Stat. Ann. § 44-1521(5).

281.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise,

61

misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

282.    As detailed above, Defendants employed deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of the Arizona CFA by the participating in the Insulin Pricing Scheme.

283.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme described herein.

284.    Defendants knew or should have known that their conduct was in violation of the Arizona CFA.

285.    As alleged in this complaint, Defendants have employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment" with respect to their analog insulins.

286.    The Defendant Drug Manufacturers' conduct, as described in this complaint, also constitutes "unfair act[s]."

287.    Plaintiffs Assignors relied on the List Prices disseminated by the Manufacturer Defendants and the formulary placement determined by the PBM Defendants when they purchased insulin for their Enrollees directly from Defendants.

288.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Arizona.

Plaintiffs' Assignors' purchased insulin directly from the PBM Defendants' mail-order pharmacies.

289.     Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will, and/or acted with reckless indifference to the interests of others. *See Sellinger v. Freeway Mobile Home Sales, Inc*., 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.* 57 Ariz. 495, 115 P.2d 161 (1941).

290.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

### Arkansas Deceptive Trade Practices Act
### Ark. Code § 4-88-101, et seq.

291.     Plaintiffs and Defendants are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"). "Person" means an individual, organization, group, association, partnership, corporation, or any combination of them[.] Ark. Code Ann. § 4-88-102(5).

292.     The insulin products described herein at issue constitute "goods" within the meaning of Ark. Code § 4-88- 102(4).

293.     The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade. The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is

reasonably unable to protect his or her interest because of: (A) physical infirmity; (B) ignorance; . . . or (E) a similar factor." The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." Ark. Code. § 4-88-107(a); (a)(8), (a)(10); § 4-88-108.

294. As alleged in this complaint, Defendants' conduct with respect to the analog insulins constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

295. Plaintiffs Assignors relied on the List Prices disseminated by the Manufacturer Defendants and the formulary placement determined by the PBM Defendants when they purchased insulin for their Enrollees.

296. Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Arkansas.

297. Pursuant to the Arkansas DTPA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants have engaged in conduct that is wanton, reckless, or shows spite or ill-will, and/or acted with reckless indifference to the interests of others.

298. Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## Connecticut Unfair Trade Practices Act
## Conn. Gen. Stat. § 42-110a

299.    Plaintiffs and each Defendant are "persons" within the meaning of Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

300.    "Person" means a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, and any other legal entity[.] Conn. Gen. Stat. Ann. § 42-110a(3).

301.    Defendants provided insulin products in trade and commerce. Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

302.    As alleged in this complaint, Defendants' conduct with respect to the Insulin Pricing Scheme constitutes both "unfair" and "deceptive" acts in violation of the Connecticut UTPA in that Defendant's actions:

a.      offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;

b.      are immoral, unethical, oppressive, or unscrupulous; or

c.      cause substantial injury to consumers.

303.    Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut UTPA.

304.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Connecticut.

305.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

306.     Plaintiffs also seek an order enjoining each defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

## Delaware Consumer Fraud Act
## 6 Del. Code § 2513, et seq.

307.     Plaintiffs and Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

308.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

309.     As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Delaware CFA by perpetuating the fraudulent Insulin Pricing Scheme as described herein.

310.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme as described herein.

311.     Defendants knew or should have known that their conduct was in violation of the Delaware CFA.

312.     Despite knowing the true nature of their Insulin Pricing Scheme and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the characteristics of the Insulin Pricing Scheme described herein, with the intent to

mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive

practices in violation of the Delaware CFA.

313.    Defendants' unfair and deceptive acts or practices, omissions and

misrepresentations were material to Plaintiffs' Assignors and were likely to and did, in fact,

deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

314.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors

to pay inflated prices for the Subject Insulin products which they otherwise would not have paid.

Because Defendants did not reveal the true nature of the Insulin Pricing Scheme as described

herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants

under the Delaware CFA did not begin to accrue until the filing of this lawsuit. Defendants either

concealed or failed to reveal the facts until this filing.

315.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct

and proximate result of Defendants' unfair and deceptive practices and omissions and/or

misrepresentations, at a minimum, in the form of inflated prices of the Subject Insulin products

as described herein.

316.    Defendants' conduct alleged in this complaint occurred throughout the United

States, including in the State of Delaware.

317.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of the

Subject Insulins at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State

of Delaware.

318.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

general public. As such, Defendants' unlawful acts and practices complained of herein affect the

public interest.

319.     Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

320.     Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## Florida Deceptive and Unfair Trade Practices Act
## Fla. Stat. § 501.201, et seq.

321.     Defendants are engaged in "trade or commerce" as defined by the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") during all relevant periods by, at a minimum, advertising, offering for sale, and selling the Subject Insulin products described herein in Florida, to Plaintiffs, and throughout the United States.

322.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce ..." Fla. Stat. § 501.204(1).

323.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of FDUTPA by perpetuating the fraudulent Insulin Pricing Scheme as described herein.

324.     Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Florida.

325.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme described herein.

326.    Defendants knew or should have known that their conduct was in violation of FDUTPA.

327.    Despite knowing the true nature of their products and practices for years, Defendants intentionally and knowingly omitted and misrepresented material facts regarding the Insulin Pricing Scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of FDUTPA.

328.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

329.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the Subject Insulin products when they otherwise would not have paid inflated prices. Because Defendants did not reveal the true nature of the Insulin Pricing Scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the FDUTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

330.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of inflated prices of the Subject Insulins as described herein.

331.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

332.     Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Florida.

333.     Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

334.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### Hawaii Unfair or Deceptive Acts and Practices
### Hawaii. Rev. Stat. § 480-1 through § 480-24

335.     Plaintiffs and Defendants are "persons" within the meaning of Hawaii Unfair or Deceptive Acts and Practices ("Hawaii UDAP").

336.     Defendants were engaged in the "sale" or "selling of" insulin, which includes "contract to sell," "lease," "contract to lease," "license," and "contract to license." Haw. Rev. Stat. Ann. § 480-1.

337.     Defendants engaged in unfair methods of competition in the conduct of any trade or commerce which are unlawful, in violation of Haw. Rev. Stat. Ann. § 480-2(d).

338.     Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Hawaii.

339.     Pursuant to the Hawaii UDAP, Plaintiffs seek actual damages trebled, attorneys' fees and court costs, and any other just and proper relief available under the Hawaii UDAP.

## Idaho Consumer Protection Act
## Idaho Code § 48-601

340.    Plaintiffs and Defendants are "persons" as defined by Idaho Code Ann. § 48-602(1).

341.    In violation of the Idaho Consumer Protection Act, Defendants engaged in unfair or deceptive acts or practices, including, but not limited to: making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer, and engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

342.    Defendants' acts or practices in connection with the Insulin Pricing Scheme as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

343.    Defendants' conduct with respect to the Insulin Pricing Scheme constitutes both "unfair" and "deceptive" acts under the Idaho CPA.

344.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Idaho.

345.    Under Idaho Code § 48-608, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff.

346.    Plaintiffs also seek punitive damages because Defendants' conduct constitutes an extreme deviation from reasonable standards. Defendants flagrantly, maliciously, and fraudulently misrepresented actual insulin costs, and the existence, purpose, and amount of the rebates granted to the PBMs. Defendants concealed facts that only they knew. Defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

71

## Indiana Deceptive Consumer Sales Act
## Ind. Code § 24-5-0.5-2

347.   Plaintiffs and Defendants are "Persons" as defined by the Indiana Deceptive Consumer Sales Act ("Indiana DCSA").

348.   Defendants are also "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

349.   The Act defines person to include a corporation. Ind. Code Ann. § 24-5-0.5-2

350.   Plaintiffs' payments for the Subject Insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

351.   Defendants' conduct, as described in this complaint, constitutes "deceptive acts" as well as "unfair" acts in violation of the Indiana DCSA.

352.   Despite knowing the true nature of the Insulin Pricing Scheme for years, Defendants intentionally and knowingly omitted and misrepresented material facts regarding the Insulin Pricing Scheme with the intent to mislead and defraud regulators and Plaintiffs' Assignors and continued to engage in unfair and deceptive practices in violation of the Indiana DCSA.

353.   Plaintiffs' analysis of its Assignors' data identified one or more purchase of the Subject Insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Indiana.

354.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1000 for Defendants' willfully deceptive acts.

355.   Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under Indiana law.

**Massachusetts Regulation of Business Practice & Consumer Protection Act**
**Mass. Gen. Laws Ann. ch. 93A, § 1, et seq.**

356.    Plaintiffs and Defendants are "person[s]" under the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws Ann. ch. 93A, § 1(a).

357.    Defendants participation in the Insulin Pricing Scheme, as set forth herein, occurred in the conduct of trade or business as defined by the Massachusetts CPA.

358.    The Massachusetts CPA defined "trade" or "commerce" as "advertising, the offering of sale … the sale … or distribution of any services and any property, tangible or intangible, real, personal or mixed … and any other article, commodity, or thing of value whether situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." Mass. Gen. Laws Ann. ch. 93A, § 1(b).

359.    The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. ch. 93A, § 2(a).

360.    Defendants' participation in the Insulin Pricing Scheme involved unfair methods of competition and/or unfair or deceptive acts or practices in violation of the South Carolina UTPA by perpetuating the Insulin Pricing Scheme as described herein.

361.    Defendants owed and continued to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme.

362.    Defendants know, or should have known, that their conduct was in violation of the Massachusetts CPA.

363.     Defendants unfair methods of competition and/or unfair or deceptive acts or practices were material to Plaintiffs' Assignors, and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

364.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair methods of competition and/or unfair and deceptive practices, at a minimum, in the form of artificially inflated insulin prices as described herein.

365.     Despite knowing the true nature of their Insulin Pricing Scheme and practices for years, Defendants willfully and/or knowingly conducted omitted and/or misrepresented material facts regarding the characteristics of the Insulin Pricing Scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continue to engaged to engage in unfair methods of competition and/or unfair and deceptive acts or practices in violation of the Massachusetts CPA.

366.     The Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Delaware.

367.     Plaintiffs' analysis of its Assignor's data identified one or more purchases of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Massachusetts.

368.     Because Defendants' unfair methods of competition and/or unfair and deceptive practices caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary double or treble damages, reasonable attorney's fees and costs, and all other proper and just relief available under the Massachusetts CPA.

**Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.902, et seq.**

369.    Plaintiffs are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

370.    Each Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

371.    Defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

372.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Michigan.

373.    Plaintiffs seek: injunctive against Defendants to prevent continuing unfair and deceptive acts; monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Plaintiff, plus reasonable attorneys' fees and any other just and proper relief available under Mich. Comp. Laws § 445.911.

374.    Plaintiffs also seek punitive damages because each Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously inflated their benchmark prices and concealed the reasons for and amount of the rebates offered to PBMs, thus increasing profits at the expense of consumers, including Plaintiffs' Assignors. Through the Insulin Pricing Scheme, Defendants manipulated the price of their life-saving insulin without regard for the impact on consumers' ability to afford it. Defendants' conduct constitutes malice, oppression, and fraud, warranting punitive damages.

**Minnesota Private Attorney General Statute & Consumer Fraud Act**
**Minn. Stat. §§ 8.31, et seq. & § 325F.69**

375.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

376.    The insulin products described herein constitute "merchandise" within the meaning

of Minn. Stat. § 325F.68(2).

377.    As detailed herein, Defendants engaged in deceptive acts in violation of the

Minnesota CFA by perpetuating the Insulin Pricing Scheme as described herein.

378.    Defendants owed and continue to owe Plaintiffs' Assignors a duty to refrain from

the above-described unfair and deceptive practices and disclose the true nature of the Insulin

Pricing Scheme described herein.

379.    Defendants knew or should have known that their conduct was in violation of the

Minnesota CFA.

380.    Despite knowing the true nature of the Insulin Pricing Scheme for years,

Defendants intentionally and knowingly omitted and misrepresented material facts regarding the

Insulin Pricing Scheme with the intent to mislead regulators and Plaintiffs' Assignors and

continued to engage in unfair and deceptive practices in violation of the Minnesota CFA.

381.    Defendants' unfair and deceptive acts or practices, omissions and

misrepresentations were material to Plaintiffs' Assignors, and were likely to and did, in fact,

deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

382.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated prices for the insulin that they otherwise would not have paid. Because Defendants did not reveal the true nature of the Insulin Pricing Scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota CFA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

383.    Plaintiffs and the general public suffered, and continue to suffer, injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of inflated prices of the insulin described herein.

384.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

385.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Minnesota.

386.    Pursuant to Minn. Stat. § 8.31(3)(a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota Private Attorney General Statute.

387.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

<u>**Minnesota Uniform Deceptive Trade Practices Act**</u>
<u>**Minn. Stat. § 325d.43-48, et seq.**</u>

388.     The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, including the following enumerated actions, "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

389.     As detailed above, Defendants engaged in misleading, false and deceptive acts in violation of the above-noted provisions of the Minnesota DTPA by perpetuating the Insulin Pricing Scheme as described herein.

390.     Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme as described herein.

391.     Defendants knew or should have known that their conduct was in violation of the Minnesota DTPA.

392.     Despite knowing the true nature of the Insulin Pricing Scheme for years, Defendants intentionally and knowingly omitted and misrepresented material facts regarding the Insulin Pricing Scheme as described herein, with the intent to mislead regulators and Plaintiffs' Assignors, and continued to engage in unfair and deceptive practices in violation of the Minnesota DTPA.

393.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

394.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay inflated insulin prices that they otherwise would not have paid. Because Defendants did

not reveal the true nature of the Insulin Pricing Scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the Minnesota DTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

395.    Plaintiffs and the public suffered, and continue to suffer, injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased prices of the insulin products as described herein.

396.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

397.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Minnesota.

398.    Pursuant to Minnesota law, Plaintiffs seek attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota DTPA.

### Nebraska Consumer Protection Act
### Neb. Rev. Stat. § 59-1601, et seq.

399.    Plaintiffs and Defendants are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

400.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

401.    Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

402.    Defendants' conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Nebraska CPA.

403.    Defendants' conduct injured Plaintiffs' Assignors and the public at large as described herein.

404.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Nebraska.

405.    Because Defendants' conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining each Defendants' unfair or deceptive acts and practices, court costs, attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

### Nevada Deceptive Trade Practices Act
### Nev. Rev. Stat. § 598.0903, et seq.

406.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of, or amounts of price reductions." Nev. Rev. Stat. § 598.0915.

407.    Defendants conduct relating to the Insulin Pricing Scheme involved knowingly making false representations in transactions in violation of section 598.0915 of the Nevada DTPA.

408.    Defendants also failed to disclose material facts in connection with the sale or lease of goods or services in violation of section 598.0923 of the Nevada DTPA.

409.    Defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Nevada DTPA.

410.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Nevada.

411.     Plaintiffs seek actual damages, punitive damages, an order enjoining Defendants' further deceptive acts or practices, court costs, attorneys' fees, and all other appropriate and available remedies under Nevada law.

## New Hampshire Consumer Protection Act
## N.H. Rev. Stat. Ann. § 358-A:1 through § 358-A:13

412.     Plaintiffs and Defendants are "persons" within the definition of New Hampshire Consumer Protection Act ("NH CPA").

413.     Under the NH CPA, "trade" and "commerce" include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of New Hampshire.

414.     Defendants' Insulin Pricing Scheme involved knowingly engaging in unfair and deceptive acts and practices in the conduct of trade and commerce in New Hampshire. Defendants unfair or deceptive acts and practices include making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

415.     Defendants' conduct, as described in this complaint, constitutes "unfair methods" and "deceptive" acts or practices in violation of the NH CPA.

416.     Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper.

417.     Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of New Hampshire.

418.     Plaintiffs seek recovery in the amount of actual damages or $1,000, whichever is greater. If the court finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, Plaintiffs also seek an award as much as three times, but not less than two times, such amount.

419.     Plaintiffs also seek to be awarded the costs of this suit and reasonable attorneys' fees, as determined by the Court, as well as injunctive relief.

**New Mexico Unfair Trade Practices Act**
**N.M. Stat. Ann. §§ 57-12-1, et seq.**

420.     Plaintiffs and Defendants are "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"). N.M. Stat. Ann. § 57-12-2.

421.     Defendants actions as set forth herein occurred in the conduct of trade or commerce as defined under the New Mexico UTPA.

422.     The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to:  "making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction;" and "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive."

423.     In the course of their business, Defendants engaged in unfair and misleading acts in violation of the New Mexico UTPA by perpetuating the insulin pricing scheme as described herein.

424.    Defendants owed and continue to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the insulin pricing scheme as described herein.

425.    Defendants knew or should have known that their conduct was in violation of the New Mexico UTPA.

426.    Despite knowing the true nature of their Insulin Pricing Scheme for years, Defendants intentionally and knowingly omitted and misrepresented material facts regarding the pricing of the insulin products described herein, with the intent to mislead regulators and Plaintiffs' Assignors and continues to engage in unfair and deceptive practices in violation of the New Mexico UTPA.

427.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

428.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay artificially and fraudulently inflated insulin prices that they otherwise would not have paid. Because Defendants did not reveal the true nature of the Insulin Pricing Scheme as described herein until this lawsuit was filed, the statute of limitation for filing claims against Defendants under the New Mexico UTPA did not begin to accrue until the filing of this lawsuit. Defendants either concealed or failed to reveal the facts until this filing.

429.    Plaintiffs suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased insulin prices as described herein.

430.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of New Mexico.

431.    Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, they seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under the New Mexico UTPA.

## New York General Business Law
## N.Y. Gen. Bus. Law §§ 349-350

432.    Plaintiffs are "persons," and each defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349 ("New York GBL").

433.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce.

434.    Defendants' conduct in the Insulin Pricing Scheme, as described in this complaint, constitutes deceptive acts in violation of the New York GBL.

435.    Defendants' deceptive acts and practices, which were intended to mislead consumers who purchased insulin, constitutes conduct directed at consumers throughout the United States, including the State of New York.

436.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of New York.

437.    Because Defendants' willful and knowing conduct caused actual and measurable injury, Plaintiffs seek recovery of: actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order

enjoining defendants' unlawful conduct, and any other just and proper relief available under the New York GBL.

## North Dakota Consumer Fraud Act
## N.D. Cent. Code § 51-15-02

438.    Plaintiffs and Defendants are "persons" within the meaning of the North Dakota. Consumer Fraud Act ("North Dakota CFA").

439.    Defendants engaged in the "sale" of "merchandise" within the meaning of North Dakota CFA.

440.    The North Dakota CFA makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."

441.    Defendants' conduct, as described in this complaint, constitutes "deceptive acts" and "unconscionable conduct" in violation of the North Dakota CFA.

442.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of North Dakota.

443.    Defendants knowingly engaged in the Insulin Pricing Scheme. As a result, under the North Dakota CFA, Defendants are liable to Plaintiffs for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining each Defendants' unfair and deceptive acts or practices as well as other just and proper available relief under the North Dakota CFA.

## Ohio Deceptive Trade Practices Act
## Ohio Rev. Code Ann. §§4165.01 through 4165.04

444.    Plaintiffs and Defendants are "persons" within the meaning of Ohio Deceptive

Practices Act ("Ohio DPA"), which means an individual, corporation, government, governmental

subdivision or agency, business trust, estate, trust, partnership, unincorporated association,

limited liability company, two or more of any of the foregoing having a joint or common interest,

or any other legal or commercial entity.

445.    Defendants' conduct as it relates to the Insulin Pricing Scheme constitutes

"deceptive representations" and caused confusion or misunderstanding in violation of the Ohio

DPA.

446.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of

insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of

Ohio.

447.    As a result of Defendants' wrongful conduct, Plaintiffs have been damaged in an

amount to be proven at trial. Plaintiffs seek all just and proper remedies, including, but not

limited to injunctive relief, actual damages, court costs and attorney's fees.

## Pennsylvania Unfair Trade Practices and Consumer Protection Law
## 73 Pa. Cons. Stat. § 201-1, et seq.

448.    Plaintiffs' Assignors, which are TPPs, are "persons" as defined by the

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), that purchase

or lease goods "primarily for personal, family or household purposes."

449.    Plaintiffs and Defendants are "persons" as defined by the UTPCPL.

450.    The UTPCPL prohibits "unfair or deceptive acts or practices," including

"[m]aking false or misleading statements of fact concerning the reasons for, existence of, or

amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

451.    Section 201–9.2(a) of the UTPCPL permits a private action for the recovery of damages for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act . . ."

452.    Under Pennsylvania law, Plaintiffs' Assignors insulin purchases qualify as personal, family or household use, regardless of whether the Assignors themselves personally used the insulin or merely purchases it for their Enrollees. Pennsylvania courts have held that when TPPs, like Plaintiffs' Assignors, purchase medications on behalf of their members, and such medications were purchased for their members' personal, family and household use, the TPPs had standing to bring claims under the UTPCPL. *See In re Actiq Sales & Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 326–27 (E.D. Pa. 2011).

453.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of the UTPCPL.

454.    Defendants' conduct, as described in this complaint, constitutes "deceptive acts" and "unfair" acts in violation of the UTPCPL.

455.    TPPs, such as Plaintiffs' Assignors relied on Defendants' misrepresentations regarding the List Price of insulin published by the Defendant Manufacturers, and relied on the Defendant PBMs' decisions regarding formulary placement of said insulins, causing Plaintiffs' Assignors to finance the Insulin Pricing Scheme that lined all of Defendants' pockets at Plaintiffs' Assignors' expense.

456.     Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Pennsylvania.

457.     Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater, attorneys' fees, and court costs. Plaintiffs are entitled to an award of punitive damages because Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## South Carolina Unfair Trade Practices Act
## S.C. Code Ann. §§ 39-5-10, et seq.

458.     Plaintiffs and Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). S.C. Code Ann. § 39-5-140(a).

459.     Defendants participation in the Insulin Pricing Scheme, as set forth herein, occurred in the conduct of trade or commerce as defined by the South Carolina UTPA.

460.     The South Carolina UTPA defined "trade" and "commerce" as "advertising, offering for sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State." S.C. Code Ann. § 39-5-10(b).

461.     The South Carolina UTPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. § 39-5-20.

462.     Defendants' participation in the Insulin Pricing Scheme involved unfair methods of competition and/or unfair or deceptive acts or practices in violation of the South Carolina UTPA by perpetuating the Insulin Pricing Scheme as described herein.

463.     Defendants owed and continued to owe Plaintiffs a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Insulin Pricing Scheme.

464.     Defendants know, or should have known, that their conduct was in violation of the South Carolina UTPA.

465.     Defendants unfair methods of competition and/or unfair or deceptive acts or practices were material to Plaintiffs' Assignors, and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

466.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair methods of competition and/or unfair and deceptive practices, at a minimum, in the form of artificially inflated insulin prices as described herein.

467.     Because Defendants' unfair methods of competition and/or unfair and deceptive practices caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and just relief available under the South Carolina UTPA.

**South Dakota Deceptive Trade Practices and Consumer Protection Law**
**S.D. Codified Laws § 37-24-1 through § 37-24-35**

468.     Plaintiffs and Defendants are "persons" as defined by the South Dakota Trade Practices and Consumer Protection Law ("South Dakota DTPCPL").

469.     Under the South Dakota DTPCPL: "goods or services," are goods or services purchased, leased, or rented, "merchandise" includes any object, wares, goods, commodity, intangible, instruction, or service, and "trade" and "commerce" include the advertising, offering for sale, attempting to sell, selling, or distributing of any services, or any property, tangible or intangible, personal, or mixed, or of any other article, commodity, or thing of value wherever

situate, for cash, exchange of goods or services, or on credit, and include any trade or commerce directly or indirectly affecting the people of this state.

470.    Defendant is a "seller" as defined by the South Dakota DTPCPL.

471.    The South Dakota DTPCPL broadly prohibits, among other things, knowingly acting, using, or employing any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby.

472.    Defendants' conducted alleged in this complaint were conducted in the course of trade or commerce as defined by the South Dakota DTPCPL.

473.    Defendants' conduct alleged in this complaint constitutes "deceptive acts" in violation the South Dakota DTPCPL.

474.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of South Dakota.

475.    Plaintiffs' Assignors have been adversely affected by Defendants' violations of the South Dakota DTPCPL; accordingly, Plaintiffs have standing to bring a claim under the South Dakota DTPCPL.

## Tennessee Consumer Protection Act
## Tenn. Code Ann. § 47-18-101, et seq.

476.   Plaintiffs are "natural persons" and "consumers" and Defendants are "persons" as defined by the Tennessee Consumer Protection Act ("TCPA").

477.   The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."

478.   Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of the TCPA.

479.   Each Defendants' conduct, as described in this complaint, constitutes "deceptive acts" in violation of the TCPA.

480.   Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Tennessee.

481.   Pursuant to the TCPA, Plaintiffs seek monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of defendants' willful or knowing violations, and any other just and proper relief available under the TCPA.

## Virginia Consumer Protection Act of 1977
## Va. Code Ann. § 59.1-196, et seq.

482.   Plaintiffs and Defendants are "person[s]" under the Virginia Consumer Protection Act of 1977 ("Virginia CPA"). Va. Code Ann. § 59.1-198.

483.   Defendants are also "suppliers" within the meaning of Va. Code Ann. § 59.1-198.

484.     Under the Virginia CPA: "goods," means all real, personal or mixed property, tangible or intangible. Va. Code Ann. § 59.1-198.

485.     Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

486.     The Virginia CPA prohibits "fraudulent acts or practices by a supplier in connection with a consumer transaction." Fraudulent acts or practices include, among other things, using any form of deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

487.     Defendants' conduct, as described in this complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

488.     Defendants owed and continued to owe Plaintiffs a duty to refrain from the above-described fraudulent acts and disclose the true nature of the Insulin Pricing Scheme.

489.     Defendants know, or should have known, that their conduct was in violation of the Virginia UTPA.

490.     Despite knowing the true nature of their Insulin Pricing Scheme and practices for years, Defendants willfully and/or knowingly conducted omitted and/or misrepresented material facts regarding the characteristics of the Insulin Pricing Scheme described herein, with the intent to mislead regulators, and Plaintiffs' Assignors, and continue to engaged to engage in fraudulent acts or practices in violation of the Virginia CPA.

491.     Defendants fraudulent acts or practices were material to Plaintiffs' Assignors, and were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

492.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' fraudulent acts, at a minimum, in the form of artificially inflated insulin prices as described herein.

493.    Because Defendants' fraudulent acts caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $500, whichever is greater, discretionary treble damages or $1,000, whichever is greater, reasonable attorney's fees and costs, and all other proper and just relief available under the Virginia UTPA.

**West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46a-1-101, et seq.**

494.    Plaintiffs are "consumers" and Defendants are "persons" as defined by the West Virginia Consumer Credit and Protection Act ("West Virginia CPA").

495.    Defendants engaged in trade or commerce as defined by the West Virginia CPA.

496.    The West Virginia CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Unfair or deceptive acts or practices include, among other things, the act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby.

497.    Defendants' conduct, as described in this complaint, constitutes "deceptive acts" and "unfair acts" in violation of the West Virginia CPA.

498.    Pursuant to the West Virginia CPA, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial

93

and (b) statutory damages in the amount of $200 per violation of the West Virginia CPA for each

Plaintiff.

499.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of

insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of

West Virginia.

500.    Plaintiffs also seek punitive damages against Defendants because they carried out

despicable conduct with willful and conscious disregard of the rights of others, subjecting

Plaintiffs to cruel and unjust hardship as a result.

501.    Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or

practices, restitution, punitive damages, court costs, attorney's fees, and any other just and proper

relief available under the West Virginia CPA.

**Wisconsin Deceptive Trade Practices Act**
**Wis. Stat. § 100.18**

502.    Plaintiffs are members of "the public" within the meaning of the Wisconsin

Deceptive Trade Practices Act ("Wisconsin DTPA"). Plaintiffs purchased insulin Defendants.

503.    Each Defendant is a "person, firm, corporation or association" within the meaning

of the Wisconsin DTPA.

504.    The Wisconsin DTPA prohibits a "representation or statement of fact which is

untrue, deceptive or misleading."

505.    Defendants' conduct, as described in this complaint, constitutes "representation[s]

or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the

Wisconsin DTPA.

506.    Plaintiffs' analysis of its Assignors' data identified one or more purchase of insulin at fraudulently inflated prices as a result of the Insulin Pricing Scheme in the State of Wisconsin.

507.    Plaintiffs are entitled to damages, court costs, attorneys' fees and other relief provided for under Wisconsin DTPA. Because Defendants' conduct was committed knowingly and intentionally, Plaintiffs are entitled to treble damages.

**COUNT V**
**<u>New Jersey Common Law Fraud</u>**
**<u>(Against Defendants Sanofi and Novo Nordisk)</u>**

508.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

509.    As alleged extensively above, Defendants knowingly and affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (a) the true cost and/or price of the insulin products described herein; (b) the inflated and/or fraudulent nature of the List Price(s) set and/or charged by Defendants for the insulin products described herein; (c) the existence, amount, and/or purpose(s) of discounts and/or rebates (kickbacks) offered and/or negotiated by Defendants for those products; and (d) the role that Defendants' played in the price paid for the insulin products described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

510.    Defendants valued their profits over the trust, health, and safety of beneficiaries of Plaintiffs' Assignors who purchased insulin at the Wal-Mart in New Jersey and other locations throughout the United States.

511.    Necessarily, Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to consumers, including Plaintiffs' Assignors.

512.    Defendants' knowingly false representations and omissions were material to Plaintiffs' Assignors.

513.    Plaintiffs' Assignors reasonably relied on Defendants' deception, and Defendants intended that they would so rely.

514.    Plaintiffs' Assignors had no way of discerning that Defendants were, in fact, deceiving them because they possessed exclusive knowledge regarding the nature of insulin pricing, intentionally concealed the foregoing from Plaintiffs' Assignors and the public, and made incomplete or negligent representations about the pricing of the insulin products and Defendants' role in that pricing, while purposefully withholding material facts from Plaintiffs' Assignors that contradicted these representations.

515.    Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health.

516.    Indeed, as a direct result of Defendants' actions, access to live-saving insulin medication has been limited, denied, or forgone.

517.    Defendants owed Plaintiffs' Assignors a duty to disclose, truthfully, all the facts concerning the true cost of the insulin products described herein and the inflated and fraudulent nature of their pricing; the existence, amount, and purpose of rebated and discounts negotiated for those products; and the role that Defendants played in increasing the price of the insulin products described herein.

518.     Defendants hatched their deceptive schemes and knew that their customers, including Plaintiffs' Assignors, did not know about (and could not reasonably discover) the manner in which it sought to artificially inflate the price of the insulin medications.

519.     Defendants not only concealed all the facts concerning the true cost of the insulin products described herein but went further to make affirmative misrepresentations in marketing materials and other communications that Defendants worked to lower the ultimate cost of prescription medications.

520.     Defendants engaged in this fraudulent concealment at the expense of Plaintiffs' Assignors making such material misrepresentations to induce Plaintiffs' Assignors to rely on such, to their detriment.

521.     Plaintiffs' Assignors were not aware of the concealed and misrepresented material facts referenced above, and they reasonably relied on Defendants' representations.

522.     As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs' Assignors sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

523.     Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

524.     That serious harm would arise from Defendants' illegal conduct was inevitable.

525.     Defendants' knew, or should have known, that the serious harm at issue would arise from their illegal conduct.

526.     That Defendants engage in and conceal their illegal conduct demonstrates malicious intent, or at the very least, a reckless disregard for Plaintiffs' rights.

527.     To date, Defendants continue to engage in their illegal conduct, despite knowing that their conduct causes ongoing harm.

528.     Defendants knew, or should have known, that serious harm would result from their illicit conduct.

529.     Despite this knowledge, Defendant's illegal conduct is ongoing, and, upon information and belief, the Insulin Pricing Scheme has been operating for at least twenty years.

530.     Accordingly, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs' Assignors for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COUNT VI
## Indiana Common Law Fraud
## (Against Defendant Eli Lilly)

531.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

532.     Defendants knowingly and affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (a) the true cost and/or price of the insulin products described herein; (b) the inflated and/or fraudulent nature of the List Price(s) set and/or charged by Defendants for the insulin products described herein; (c) the existence, amount, and/or purpose(s) of discounts and/or rebates (kickbacks) offered and/or negotiated by Defendants for those products; and (d) the role that Defendants' played in the price paid for the insulin products described herein, including but not limited to marketing material averring that Defendants decrease the price of prescription drugs for consumers.

533.     Defendants' knowingly made these false statements with the knowledge of, or in reckless ignorance of, the falsity.

534.    Defendants intended to engage in this fraudulent conduct to induce Plaintiffs' Assignors to rely on such, to their detriment.

535.    Plaintiffs' Assignors were not aware of the concealed and misrepresented material facts referenced above, and they reasonably relied on Defendants' representations.

536.    As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs' Assignors sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

537.    Accordingly, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs' Assignors for the purpose of enriching themselves at Plaintiffs' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COUNT VII
## UNJUST ENRICHMENT

538.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

### Indiana Unjust Enrichment

539.    Plaintiffs' Assignors conferred a benefit on Defendants by directly purchasing the Subject Insulins from Defendants at artificially and illegally inflated prices as established by the Manufacturer-PBM Insulin Pricing Enterprises, and via the illegal and undisclosed rebate kickbacks to the PBM Defendants.

540.    Defendants have unfairly and unjustly profited from participation in, and failure to disclose, the Insulin Pricing Scheme to TPPs including Plaintiffs' Assignors; therefore, it is inequitable and unconscionable for Defendants to retain these benefits.

541.    The amount of Defendants' unjust enrichment should be disgorged and returned

to Plaintiffs, in an amount to be proven at trial.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs respectfully demands that this Court:

A.      Enter judgments against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

B.      Award preliminary and permanent injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, including, *inter alia*, an order prohibiting Defendants from engaging in the unlawful acts described above; an order requiring Defendants or their agents to disclose the existence and/or amount of any rebates, discounts, fees, or other payments received by the PBM Co-conspirators for including the prescription insulin medications described herein on any formulary, and an order requiring Defendants or their agents to disclose the true net price of the prescription insulin medication described herein collected by the Defendants;

C.      Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

D.      Award Plaintiffs damages (i.e. three times overcharges) in an amount to be determined at trial;

E.      Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO, the common fraud doctrine, and applicable state law;

F.      Find that Defendants are jointly and severally liable for all claims; and

G.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

**COHEN PLACITELLA AND ROTH PC**

/s/Christopher Placitella
Christopher M. Placitella (027781981)
Dennis M. Geier (035272006)
127 Maple Avenue
Red Bank, New Jersey 07701
Phone: 732-747-9003
Facsimile: 732-747-9004

*Attorneys for Plaintiff*

A1.      On 5/3/2016, Preferred Medical Plan, Inc. entered into an assignment with MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 8/8/2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc. Said assignment included the following language "[a]ssignor, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under New York law. Consideration was given between each party in executing these assignments.

A2.     On 5/12/2017, SummaCare, Inc. entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims'" The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Ohio law. On 6/12/2017, MSP Recovery, LLC entered into an assignment with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from SummaCare, Inc. Said assignment included the following language "Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and Delivers to Assignee and its successors and assigns, any and all of Assignors right, title ownership and interest in and to the 'Assigned Claims', 'Claims', ['][sic]Assigned Assets' and 'Assigned Documents' . . . whether based in contract, tort, statutory right, and any and all rights (including but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto." This second assignment contract was executed by individuals of

majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Delaware law. Consideration was given between each party in executing these assignments.

A3.    On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 2/20/2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC)." Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.